**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DOE I, *et al.*,

                              *Plaintiffs*,

                    v.                                    Civil Action No. 19-3737 (CJN)

APPLE INC., *et al.*,

                              *Defendants*.

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' JOINT MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 4

LEGAL STANDARD....................................................................................................... 7

ARGUMENT ................................................................................................................... 8

I.     Plaintiffs Lack Article III Standing................................................................................ 8

     A.     Plaintiffs' alleged injuries are not fairly traceable to Defendants.......................... 8

     B.     Plaintiffs separately lack standing to seek injunctive relief................................. 13

II.     The Complaint Fails To State A Claim For Relief Under The Plain Language Of The TVPRA ....................................................................................................................... 14

     A.     The complaint does not allege facts showing that Defendants participated in a venture within the meaning of the TVPRA ................................................ 16

          1.     An entire global supply chain is not a "venture" under the TVPRA ........ 16

          2.     Downstream purchases from a supply chain do not constitute "participation" in a venture under the TVPRA........................................ 19

          3.     Plaintiffs' other allegations do not constitute "participation" in a venture under the TVPRA ........................................................................ 22

     B.     The complaint does not allege an underlying violation of § 1589 or § 1590 ....... 24

     C.     The complaint fails to allege that Defendants had the requisite knowledge......... 26

     D.     The complaint fails to allege a "knowing[] benefit" from a violation of the TVPRA ............................................................................................................. 27

     E.     To the extent any of the TVPRA elements could reasonably be read to support liability, the rule of lenity precludes any such reading ............................ 28

III.     Plaintiffs' TVPRA Claims Are Impermissibly Extraterritorial ......................................... 29

     A.     The TVPRA contains no clear, affirmative indication of congressional intent to create extraterritorial civil liability ......................................................... 30

          1.     There is no private right of action for conduct abroad............................... 31

          2.     The predicate offenses on which Plaintiffs rely do not apply outside the United States........................................................................... 34

      B.     This case does not involve a domestic application of the TVPRA ....................... 36

IV.    The Complaint Fails To State A Claim For Relief Under Common Law ......................... 37

CONCLUSION ................................................................................................................................. 41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abafita v. Aldukhan*,
No. 116CV06072RMBSDA, 2019 WL 6735148 (S.D.N.Y. Apr. 4, 2019) ...........................32

*Acosta Orellana v. CropLife Int'l*,
711 F. Supp. 2d 81 (D.D.C. 2010) .........................................................................39

*Adhikari v. Daoud & Partners*,
697 F. Supp. 2d 674 (S.D. Tex. 2009) ...................................................................27

*Adhikari v. Daoud & Partners*,
994 F. Supp. 2d 831 (S.D. Tex. 2014) ...................................................................35

*Adhikari v. KBR Inc.*,
No. 4:16-CV-2478, 2017 WL 4237923 (S.D. Tex. Sept. 25, 2017)..................................31, 36

*Adhikari v. Kellogg Brown & Root, Inc.*,
845 F.3d 184 (5th Cir. 2017) .................................................................................32

*Alexander v. AmeriPro Funding, Inc.*,
848 F.3d 698 (5th Cir. 2017) .................................................................................21

*Angiulo v. Cnty. of Westchester*,
No. 11-CV-7823 (CS), 2012 WL 5278523 (S.D.N.Y. Oct. 25, 2012) ..................................18

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015).................................................................................11

*ASARCO Inc. v. Kadish*,
490 U.S. 605 (1989)..............................................................................................14

*\* Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................... *passim*

*Aston v. Johnson & Johnson*,
248 F. Supp. 3d 43, 56 (D.D.C. 2017).....................................................................38

*BedRoc Ltd., LLC v. United States*,
541 U.S. 176 (2004)..............................................................................................14

*\* Bistline v. Parker*,
918 F.3d 849 (10th Cir. 2019) ...........................................................................19, 25

*Brendsel v. Office of Fed. Hous. Enter. Oversight*,
  339 F. Supp. 2d 52 (D.D.C. 2004) ..................................................................................25, 32

*Bykov v. Rosen*,
  No. C15-0713-JCC, 2015 WL 13546420 (W.D. Wash. Oct. 20, 2015) ................................40

*Campidoglio LLC v. Wells Fargo & Co.*,
  No. C12-949 TSZ, 2012 WL 5844693 (W.D. Wash. Nov. 19, 2012) ...................................38

*Castillo v. Gared, Inc.*,
  1 S.W.3d 781 (Tex. App. 1999)..........................................................................................38

*Castro v. Serrata*,
  145 F. Supp. 2d 829 (S.D. Tex. 2000) ...........................................................................39, 40

*Chandler v. Wash. Toll Bridge Auth.*,
  17 Wash. 2d 591 (1943)......................................................................................................38

*Citizens for Responsibility & Ethics in Wash.*
  *v. U.S. Dep't of Hous. & Urban Dev.*, 415 F. Supp. 3d 215, 221 (D.D.C. 2019).....................7

*Clark v. Martinez*,
  543 U.S. 371 (2005)......................................................................................................14, 29

*Coal. for Mercury-Free Drugs v. Sebelius*,
  725 F. Supp. 2d 1 (D.D.C. 2010) .........................................................................................7

*Common Cause v. Dep't of Energy*,
  702 F.2d 245 (D.C. Cir. 1983)............................................................................................13

*Crandon v. United States*,
  494 U.S. 152 (1990)............................................................................................................29

*Davis v. OneWest Bank N.A.*,
  No. 02-14-00264-CV, 2015 WL 1623541 (Tex. App. Apr. 9, 2015)....................................38

*Doe I v. Wal-Mart Stores, Inc.*,
  572 F.3d 677 (9th Cir. 2009) .........................................................................................39, 40

*Doe I v. Wal-Mart Stores, Inc.*,
  No. CV 05-7307, 2007 WL 5975664 (C.D. Cal. Mar. 30, 2007) ...........................................40

*Doe S.W. v. Lorain-Elyria Motel, Inc.*,
  No. 2:19-CV-1194, 2020 WL 1244192 (S.D. Ohio Mar. 16, 2020)......................................21

*Doe v. Capital Cities*,
  58 Cal. Rptr. 2d 122 (App. 2d Dist. 1996)............................................................................39

iv

*Duncan v. Children's Nat'l Med. Ctr.*,
　702 A.2d 207 (D.C. 1997) .................................................................................41

*Exhaustless Inc. v. FAA*,
　931 F.3d 1209 (D.C. Cir. 2019) ........................................................................13

*Fei Guan v. Bing Ran*,
　No. 1:17CV332 (JCC), 2017 WL 2881363 (E.D. Va. July 6, 2017) ....................29

* *Fla. Audubon Soc'y v. Bentsen*,
　94 F.3d 658 (D.C. Cir. 1996) (en banc) ...................................................8, 10, 11

*Fulani v. Brady*,
　935 F.2d 1324 (D.C. Cir. 1991) .........................................................................13

*Geiss v. Weinstein Co. Holdings LLC*,
　383 F. Supp. 3d 156 (S.D.N.Y. 2019) ................................................................20

*Grimsby v. Samson*,
　530 P.2d 291 (Wash. 1975) (en banc) ................................................................41

*Guttenberg v. Emery*,
　26 F. Supp. 3d 88 (D.D.C. 2014) .......................................................................18

*H.H. v. G6 Hosp., LLC*,
　No. 2:19-CV-755, 2019 WL 6682152 (S.D. Ohio Dec. 6, 2019) ........................21

*Hedgeye Risk Mgmt., LLC v. Heldman*,
　271 F. Supp. 3d 181 (D.D.C. 2017) ...................................................................18

*Hester v. Friedkin Cos., Inc.*,
　132 S.W.3d 100 (Tex. App. 2004) ......................................................................38

*Hindi v. ExxonMobil Oil Corp.*,
　No. 07-CV-1664 WQH (LSP), 2008 WL 11337374 (S.D. Cal. Sept. 10, 2008) ....41

*Hoffmann-La Roche Inc. v. Zeltwanger*,
　144 S.W.3d 438 (Tex. 2004) .........................................................................38, 41

*Hopkins v. Anderson*,
　7 Wash. App. 762 (Ct. App. 1972) .....................................................................38

*Hull v. Eaton Corp.*,
　825 F.2d 448 (D.C. Cir. 1987) ...........................................................................40

*In re S. White Transp., Inc.*,
　725 F.3d 494 (5th Cir. 2013) .............................................................................19

*Int'l Longshoremen Ass'n, AFL-CIO v. NLRB,*
   56 F.3d 205 (D.C. Cir. 1995) ................................................................39

*Jama v. ICE,*
   543 U.S. 335 (2005) ...........................................................................25, 32

*Jane Doe 4 v. Red Roof Inns, Inc.,*
   No. 1:19-CV-03845-WMR, 2020 WL 1872336 (N.D. Ga. Apr. 13, 2020) ...........................26

* *John Roe I v. Bridgestone Corp.,*
   492 F. Supp. 2d 988 (S.D. Ind. 2007) ....................................................35

*Kalugin v. Lew,*
   No. 12-1792 (BAH), 2013 WL 12084544 (D.D.C. July 16, 2013) ........................12

*Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter,*
   575 U.S. 650 (2015) ...........................................................................31

*Kiobel v. Royal Dutch Petroleum Co.,*
   569 U.S. 108 (2013) ......................................................................33, 37

*Kiwanuka v. Bakilana,*
   844 F. Supp. 2d 107 (D.D.C. 2012) .......................................................37

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
   511 U.S. 375 (1994) ...........................................................................7

*Leocal v. Ashcroft,*
   543 U.S. 1 (2004) ..............................................................................28

* *Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ...................................................................2, 8, 9, 12

*M.A. v. Wyndham Hotels & Resorts, Inc.,*
   425 F. Supp. 3d 959 (S.D. Ohio 2019) ..................................................21

*Martinez-Rodriguez v. Giles,*
   391 F. Supp. 3d 985 (D. Idaho 2019) ...........................................24, 25, 35

*Menoken v. Miles,*
   270 F. Supp. 3d 200 (D.D.C. 2017) .......................................................11

*Morrison v. Nat'l Australia Bank Ltd.,*
   561 U.S. 247 (2010) .....................................................................3, 34, 37

*Muchira v. Al-Rawaf,*
   850 F.3d 605 (4th Cir. 2017) ...............................................................24

*Nattah v. Bush*,
    541 F. Supp. 2d 223 (D.D.C. 2008) ..................................................................35

*Niece v. Elmview Grp. Home*,
    904 P.2d 784 (Wash. Ct. App. 1995) ..............................................................39

*Ochoa v. Superior Court*,
    39 Cal. 3d 159 (Cal. 1985).............................................................................41

*Plaintiff A v. Schair*,
    No. 2:11-CV-00145-WCO, 2014 WL 12495639 (N.D. Ga. Sept. 9, 2014) ...........................32

*Prosser v. Fed. Agric. Mortg. Corp.*,
    593 F. Supp. 2d 150 (D.D.C. 2009) ...................................................................9

*Raflo v. United States*,
    157 F. Supp. 2d 1 (D.D.C. 2001) ....................................................................37

* *Ratha v. Phatthana Seafood Co., Ltd.*,
    No. CV 16-4271-JFW, 2017 WL 8293174 (C.D. Cal. Dec. 21, 2017) ....................20, 21, 27

*Ratha v. Phatthana Seafood Co., Ltd.*,
    No. CV 16-4271-JFW (ASX), 2016 WL 11020222 (C.D. Cal. Nov. 9, 2016) ....................32

*Reves v. Ernst & Young*,
    508 U.S. 170 (1993).......................................................................................19

*Ricchio v. McLean*,
    853 F.3d 553 (1st Cir. 2017)...........................................................................20

* *RJR Nabisco, Inc. v. European Cmty.*,
    136 S. Ct. 2090 (2016)..............................................................................*passim*

*Robbins v. U.S. Dep't of Housing & Urban Dev.*,
    72 F. Supp. 3d 1 (D.D.C. 2014) ........................................................................8

*Roe v. Howard*,
    917 F.3d 229 (4th Cir. 2019) ..............................................................33, 34, 35

*Roman v. Tyco Simplex Grinnell*,
    No. 8:16-cv-3449-T-33 (AEP), 2017 WL 2427251 (M.D. Fla. June 5, 2017) ....................25

*Siegel v. U.S. Dep't of Treasury*,
    304 F. Supp. 3d 45 (D.D.C. 2018) ...................................................................11

* *S.J. v. Choice Hotels Int'l*,
    — F. Supp. 3d —, 2020 WL 4059569 (E.D.N.Y. July 20, 2020) ...........................26

*Sebelius v. Cloer*,
   569 U.S. 369 (2013) ........................................................................................................17

*Simon v. E. Ky. Welfare Rights Org.*,
   426 U.S. 26 (1976) .......................................................................................................8, 9

*St. Louis v. Perlitz*,
   No. 3:13-CV-1132 (RNC), 2016 WL 1408076 (D. Conn. Apr. 8, 2016) .........................29, 32

*Sud v. Costco Wholesale Corp.*,
   229 F. Supp. 3d 1075 (N.D. Cal. 2017) ...........................................................................12

*TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*,
   808 F. Supp. 2d 60 (D.D.C. 2011) ...................................................................................38

*Tanedo v. E. Baton Rouge Parish School Bd.*,
   No. 10-CV-1172, 2012 WL 5378742 (C.D. Cal. Aug. 27, 2012) .........................................36

*United States v. Afyare*,
   632 F. App'x 272 (6th Cir. 2016) ...............................................................................19, 20

\* *United States ex rel. Hawkins v. ManTech Int'l Corp.*,
   No. 15-2105 (ABJ), 2020 WL 435490 (D.D.C. Jan. 28, 2020) ...........................................24

*United States v. Papagno*,
   639 F.3d 1093 (D.C. Cir. 2011) ..................................................................................19, 21

*United States v. Ron Pair Ent., Inc.*,
   489 U.S. 235 (1989) .......................................................................................................32

*United States v. Toviave*,
   761 F.3d 623 (6th Cir. 2014) ..........................................................................................24

*Voss v. Sutardja*,
   No. 14-CV-01581-LHK, 2015 WL 349444 (N.D. Cal. Jan. 26, 2015) .................................41

*Ward v. D.C. Dep't of Youth Rehab. Servs.*,
   768 F. Supp. 2d 117 (D.D.C. 2011) ...................................................................................7

*Warth v. Seldin*,
   422 U.S. 490 (1975) ....................................................................................................8, 10

*Zuniga v. Masse Contracting, Inc.*,
   290 F. Supp. 3d 581 (E.D. La. 2017) ...............................................................................25

**Statutes**

18 U.S.C. § 1581 ...............................................................................................................15

18 U.S.C. § 1584 ..................................................................................................15

18 U.S.C. § 1585 ..................................................................................................35

\* 18 U.S.C. § 1589 ......................................................................................... *passim*

\* 18 U.S.C. § 1590 ......................................................................................... *passim*

18 U.S.C. § 1591 ............................................................................................ *passim*

\* 18 U.S.C. § 1595 ......................................................................................... *passim*

18 U.S.C. § 1596 ............................................................................................ *passim*

18 U.S.C. § 1962 ..................................................................................................30

18 U.S.C. § 3271 ..................................................................................................34

22 U.S.C. § 7101 ..................................................................................................15

**Other Authorities**

Am. Heritage Dictionary of the English Lang. (4th ed. 2000) ....................................16

Black's Law Dictionary (7th ed. 1999)........................................................................17

H.R. Rep. No. 110–430 (2007) ...................................................................................32

Pub. L. No. 106–386, 114 Stat. 1464 (2000) .............................................................15

Restatement (Second) of Agency § 14 (1958).............................................................39

Restatement (Second) of Torts § 46 (Oct. 2019 update) .............................................40

Restatement (Third) of Restitution and Unjust Enrichment § 1 (Oct. 2019 update) ....................38

## INTRODUCTION

The circumstances of Plaintiffs' injuries, as alleged in the complaint, are serious, and Defendants strongly condemn the labor conditions that the complaint describes. But the facts alleged do not support a cause of action against Defendants. The limitless theory of liability Plaintiffs advance would allow any manufacturer, retailer, or even consumer of a product to be sued based on conduct by independent foreign actors anywhere in a global supply chain. Because there is no legal support for such a theory, the complaint should be dismissed.

Plaintiffs and their family members on whose behalf they sue (collectively, "Plaintiffs"), residents of the Democratic Republic of Congo ("DRC"), allege that various economic circumstances led them or their family members to seek work mining cobalt, and that they suffered severe injuries as a result. They seek to hold Apple Inc., Alphabet Inc., Dell Technologies Inc., Microsoft Corp., and Tesla Inc. (collectively, "Defendants") liable for those injuries under a U.S. statute enacted to address human trafficking—the Trafficking Victims Protection Reauthorization Act ("TVPRA")—and under state common law. The complaint does not allege that Defendants owned or operated the cobalt mining sites where Plaintiffs worked, or that Defendants had any direct contact with or control over the mines, the mine operators, or Plaintiffs. The only claimed factual connection between the mines and Defendants is that Defendants allegedly purchased cobalt or products containing cobalt from entities that were part of a global cobalt supply chain consisting of multiple tiers of owners and suppliers. The complaint alleges that the cobalt mined in the DRC is mixed with cobalt from various sources, allegedly making it impossible for a downstream purchaser to identify the specific mines from which the cobalt they purchased was sourced. First Amended Complaint ("FAC") ¶¶ 101, 103.

Plaintiffs nevertheless seek to hold Defendants liable for their injuries based on the contention that Defendants contributed to a "tech boom," which increased the demand for cobalt

mined from the DRC, which in turn increased the need for labor in the cobalt mines, thus creating the circumstances under which Plaintiffs began working and ultimately suffered injuries. *See* FAC ¶ 2. But contributing to a "tech boom" does not constitute human trafficking under the TVPRA or create legal liability under any other theory. Plaintiffs' complaint, if allowed to advance, would open the door to a wave of lawsuits against every company worldwide that uses lithium-ion batteries or any raw material sourced from a nation where poor economic conditions have been reported—indeed, the complaint promises to "add other[] [companies] using cobalt from the DRC" to this lawsuit. *See id.* ¶ 5 & n.2.

The expansive theories alleged in the complaint are not supported by law. The Court should dismiss the complaint for the following reasons:

*First*, Plaintiffs lack Article III standing because they have not alleged an injury that is "fairly traceable" to any alleged conduct by Defendants. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). At most, they allege an attenuated connection between Defendants' alleged purchase or use of cobalt and the mining sites at which Plaintiffs worked, with cobalt passing through a multi-tier supply chain composed of multiple independent recruiters and supervisors, mine operators and owners, and cobalt refiners and suppliers. The complaint does not allege that Defendants controlled—or even had any relationship with—the individuals or entities that allegedly injured Plaintiffs. To the contrary, the complaint states that cobalt from numerous mines is "inevitably mixed at various stages in the supply chain" such that "[a]ny claims made of a traceable cobalt supply chain" would be impossible. FAC ¶ 101. Because Plaintiffs cannot allege that they suffered injuries that are fairly traceable to each Defendant's direct purchase or use of cobalt, their claims cannot satisfy Article III. And the injunctive relief claims fail for the additional reason that Plaintiffs cannot establish that their injuries can be redressed by the relief sought.

*Second*, the complaint fails to state a claim under the TVPRA.  The Act, enacted as a criminal statute, was amended to create a civil cause of action for a victim "against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)."  18 U.S.C. § 1595(a).  The complaint tries to expand this provision—enacted to allow individuals to sue their traffickers and those who directly assist them—to impose liability on any entity and at any stage in a multi-tier supply chain.  But downstream purchases alone do not support liability under the TVPRA.

That conclusion is not changed by the allegation that, although Defendants have made efforts to improve labor conditions in the DRC by partnering with nongovernmental organizations, these efforts have not gone far enough.  Not only does such a theory have no basis in law, but it would discourage companies from collaborating with organizations to address complex societal and economic issues, including the use of child labor, in the DRC and elsewhere.  And in any event, ad hoc civil litigation in U.S. courts is not an effective vehicle for addressing the broad, systemic problems that Plaintiffs allege led to their injuries.  Instead, those issues are better addressed by policymakers in Congress and the Executive Branch in cooperation with civil society, industry groups, and foreign governments.

*Third*, Plaintiffs' TVPRA claims are impermissibly extraterritorial because they seek to impose civil liability on Defendants for injuries suffered overseas at the hands of foreign actors.  U.S. statutes are presumed not to apply to extraterritorial conduct, and nothing in the TVPRA defeats that presumption.  *See Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010).  Because Plaintiffs' claims arise from events overseas, they may not be pursued in a U.S. court.

*Finally*, Plaintiffs' common law causes of action also fail.  As with the TVPRA claims, the complaint fails to allege the requisite conduct to sustain a cause of action for unjust enrichment, negligent supervision, or intentional infliction of emotional distress.[1]

Defendants strongly condemn the use of forced, coerced, and child labor, and have enacted policies to promote responsible sourcing in the global supply chain, as the complaint acknowledges.  The presence of cobalt in Defendants' products does not create liability for injuries occurring far upstream and overseas at the hands of independent actors.  For all of these reasons, the complaint should be dismissed.

## BACKGROUND

Plaintiffs' complaint asserts claims on behalf of a putative class of former and current child laborers who allege that they were forced by poverty to pursue the only economic option in their region of the DRC—become "artisanal" cobalt miners.  FAC ¶ 6.  It alleges that Plaintiffs, while employed at cobalt mining sites, suffered injuries as a result of their working conditions.  The complaint seeks to hold Defendants liable for these injuries under the TVPRA and common law based on Defendants' sourcing of cobalt for use in their electronic devices.  Cobalt is a "key component of every rechargeable lithium-ion battery in all of the gadgets made by Defendants and all other tech and electric car companies in the world."  *Id.* ¶ 5; *see also id.* ¶ 7 (asserting that "[e]very smartphone, tablet, laptop, electric vehicle, or other device containing a lithium-ion rechargeable battery requires cobalt").  The complaint also alleges that programs designed or supported by Defendants "to ensure children are not working in their cobalt supply chains" do not

---

[1] The claims against Alphabet and Dell should be dismissed for the additional reasons described in their separate motions to dismiss.  *See* Alphabet Inc.'s Mot. to Dismiss (explaining Alphabet is not a proper defendant); Dell Tech. Inc.'s Mot. to Dismiss (explaining the Court lacks personal jurisdiction over Dell).

go far enough to protect against injuries caused by artisanal mining. *Id.* ¶ 112; *see also id.* ¶¶ 20, 115.

Although the complaint generally asserts that Defendants provided "substantial support to this 'artisanal' mining system in the DRC," FAC ¶ 7, it pleads no actual connection between Defendants and the mining sites where Plaintiffs allegedly worked. Instead, it acknowledges that Plaintiffs worked at local mines with up to six alleged levels of separation from Defendants. For example, the complaint alleges:

> 1. John Doe 9 worked at Tilwezembe mine, like six other Plaintiffs. FAC ¶ 49; *see also id.* ¶¶ 34, 39, 41, 44, 58, 61. While working in a pit at the mine, a wall collapsed, injuring his right leg. *Id.* ¶ 52.

> 2. John Doe 9's work was directed by his "'sponsor,' Ilunga, who had control over a specific pit at the mine." *Id.* ¶ 50.

> 3. At his sponsor's direction, John Doe 9 gave the cobalt he mined to a "man known as 'Ismail' in charge of buying the output of the artisanal miners at Tilwezembe." *Id.* ¶¶ 36, 50.

> 4. Ismail worked at the direction of a "sham cooperative, CMKK (Coopérative Minière Maadini kwa Kilimo)" and sold the cobalt to Glencore. *Id.* ¶¶ 35, 36, 50.

> 5. Glencore sold the cobalt to Umicore. *Id.* ¶ 49.

> 6. Umicore sold the cobalt to Apple, Alphabet, and Microsoft, or processed it for LG Chem, which supplied Dell and Tesla. *Id.*

The complaint likewise alleges that John Doe 7 worked under intermediaries in a multi-link chain leading to Umicore. It states that John Doe 7 was "recruited" by "Presidential Guards [who] had managed to gain control of access to the mine site" in Mashama East. FAC ¶ 46. John Doe 7 "essentially worked for the Presidential Guards," who would sell cobalt "to the buying houses located at the mining site" that eventually made its way to Glencore and Umicore—two companies that are not parties here. *Id.* ¶¶ 46, 101. The complaint asserts that John Doe 7 was injured by a member of the Presidential Guards after he tried to "cut[] [them] out … as

5

middlemen." *Id.* ¶ 46.  It does not allege that any of the Defendants had any interactions or connections of any kind with the Presidential Guards, John Doe 7, or anyone else connected with the mining site. *Id.*

The complaint also does not allege that Plaintiffs had an employment relationship with any of the Defendants, or that Defendants recruited or otherwise induced them to seek work at cobalt mining sites.  Nor does it allege that Defendants took any action that caused the economic pressures that Plaintiffs allege led them to seek mining work, much less that Defendants controlled or caused the unsafe working conditions that injured them.

What the complaint *does* allege is that Defendants have made efforts to promote responsible sourcing throughout the global electronics supply chain.  The complaint admits that each Defendant has established policies aimed at preventing forced labor in the international network of its suppliers.  FAC ¶¶ 20-21.  As the referenced policies confirm, each Defendant has established robust due diligence practices in accordance with guidance from the Organisation for Economic Co-operation and Development and requires its suppliers to comply with codes of conduct as a condition of doing business with the company.  Defendants' policies prohibit certain unlawful labor practices, including the use of child labor, at any tier of the supply chain and require regular supplier audits to evaluate compliance.[2]  The complaint also acknowledges that Defendants

---

[2] *See* Apple Inc., 2018 Statement on Efforts to Combat Human Trafficking and Slavery in Our Business and Supply Chains at 2-4 (2019), *available at* https://www.apple.com/supplier-responsibility/pdf/Apple-Combat-Human-Trafficking-and-Slavery-in-Supply-Chain-2018.pdf; *see also* Dell Technologies Inc., Dell Supplier Principles (2017), *available at* https://i.dell.com /sites/doccontent/corporate/corp-comm/en/Documents/dell-supplier-principles.pdf;  Tesla Inc., Tesla Supplier Code of Conduct, *available at* https://www.tesla.com/sites/default/files/about/legal /tesla-supplier-code-of-conduct.pdf; Microsoft Corp., Devices Sustainability at Microsoft at 43-44 (2019), *available at* https://query.prod.cms.rt.microsoft.com/cms/api/am/binary/RE4d74y; Google LLC, Google Responsible Supply Chain Report 2019 at 8, 16 (2019), *available at* https://services.google.com/fh/files/misc/google_2019-rsc-report.pdf; Apple, Inc., Apple Supplier

fund initiatives that empower local human rights defenders and whistleblowers in the DRC to identify and report misconduct.  *Id.* ¶¶ 20-21.

## LEGAL STANDARD

To survive a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of "establishing by a preponderance of the evidence that the Court has jurisdiction." *Coal. for Mercury-Free Drugs v. Sebelius*, 725 F. Supp. 2d 1, 7 (D.D.C. 2010), *aff'd*, 671 F.3d 1275 (D.C. Cir. 2012).  "Federal courts are courts of limited jurisdiction," and there is a presumption that "a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  A court accepts the plaintiff's factual allegations as true, but gives them "closer scrutiny in resolving a 12(b)(1) motion than in resolving a … motion for failure to state a claim." *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Hous. & Urban Dev.*, 415 F. Supp. 3d 215, 221 (D.D.C. 2019) (quotation marks omitted).

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

---

Responsibility 2020 Progress Report at 41-54, 88-89, 91-92 (2020), *available at* https://www.apple.com/supplier-responsibility/pdf/Apple_SR_2020_Progress_Report.pdf.

Plaintiffs quote at length from Apple's statement, allege that the remaining Defendants have "nearly identical" policies, and rely on the existence and content of those policies to support their claims.  FAC ¶¶ 20-21.  Accordingly, Plaintiffs have incorporated these documents by reference into the complaint, and they may be considered on a motion to dismiss.  *See Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119-20 & n.2 (D.D.C. 2011).

**ARGUMENT**

**I.     Plaintiffs Lack Article III Standing**

Article III standing "'is an essential and unchanging' predicate to any exercise" of a federal court's jurisdiction. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc) (quoting *Lujan*, 504 U.S. at 560). To meet the "irreducible constitutional minimum of standing," there must be "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly … trace[able] to the challenged action of the defendant, and not … th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976)). It must also be "likely," rather than "merely speculative," that a plaintiff's "injur[ies] will be redressed by a favorable decision." *Id.* at 561 (quotation marks omitted). These constitutional standing requirements fully apply in the class action context. *Simon*, 426 U.S. at 40 n.20.

Accordingly, Plaintiffs must allege that they suffered redressable injuries that are fairly traceable to each Defendant's conduct. Generalized allegations regarding conditions at artisanal mines, the market for cobalt, and injuries to unnamed individuals who are allegedly part of the putative class are insufficient. *See Warth v. Seldin*, 422 U.S. 490, 502 (1975). Because Plaintiffs cannot make this necessary showing, their claims should be dismissed.

**A.     Plaintiffs' alleged injuries are not fairly traceable to Defendants**

Article III demands "a 'fairly traceable' injury and not an attenuated connection." *Robbins v. U.S. Dep't of Housing & Urban Dev.*, 72 F. Supp. 3d 1, 7 (D.D.C. 2014) (quoting *Lujan*, 504 U.S. at 560-61), *aff'd sub nom. Robbins v. Castro*, 2015 WL 3372527 (D.C. Cir. May 6, 2015) (unpublished). The complaint cannot satisfy that standard. It does not allege that Defendants' employees forced Plaintiffs to work in the cobalt mines where they were injured or caused the economic pressures that Plaintiffs allege compelled them to seek work as cobalt miners. Nor does

it allege facts showing that Defendants owned or operated any of the mining sites where Plaintiffs worked, or that any mining accident or injury can be fairly traced to conduct by Defendants.  The theory the complaint alleges is that Defendants "led" the "tech boom" and "participat[ed] in, support[ed], and provid[ed] the essential market for cobalt that has caused the explosion of production by young children."  FAC ¶¶ 2, 19.  These allegations cannot establish Article III standing, as "[t]here is no allegation that the defendants control or controlled [alleged wrongdoers], and no claim or allegation that the defendants actually caused [Plaintiffs'] direct injury at all."  *Prosser v. Fed. Agric. Mortg. Corp.*, 593 F. Supp. 2d 150, 155 (D.D.C. 2009).

Not only does the complaint not trace Plaintiffs' injuries to any Defendant, it makes clear that those injuries were "the result of the independent action[s] of [third parties] not before the court."  *Lujan*, 504 U.S. at 560 (quoting *Simon*, 426 U.S. at 41-42) (alterations omitted).  For example, the complaint describes at least ***four*** independent actors standing between the injuries alleged by John Doe 10 and Defendants' alleged conduct:

1. **John Doe 10** worked at **Kamilombe No. 1 mine**.  He was injured when a tunnel collapsed.

2. **Kamilombe No. 1 mine** is operated by **Taruga Minerals**, an Australian mining company.

3. **Taruga Minerals** is owned by **Kamoto Copper Company.**

4. **Kamoto Copper Company** is owned by **Glencore**, a mining company.

5. **Glencore** sells cobalt to **Umicore, NV**, a Belgian company.[3]

6. **Umicore** processes cobalt received from **Glencore**.

7. **Umicore** sells refined cobalt to Defendants **Apple**, **Alphabet**, and **Microsoft**, as well as non-defendants **Samsung SDI** and **LG Chem**.

---

[3] Plaintiffs also allege that Tesla, on or about June 16, 2020, "finalized an agreement with Glencore to obtain ownership of or exclusive rights to a major portion of its cobalt production in the DRC." *See, e.g.*, FAC ¶ 49.

8. **LG Chem** sells cobalt to Defendants **Dell** and **Tesla**.

FAC ¶¶ 53-54.

Elsewhere, the complaint alleges the involvement of a diverse group of parties and entities, including (i) a Glencore-arranged "sham cooperative … with Congolese nationals as leaders," FAC ¶ 35, (ii) "a Lebanese man known as 'Ismail' in charge of buying the output of the artisanal miners … to sell to Glencore," *id.* ¶ 36, (iii) "a labor broker, Mr. X who arranged for mine work, *id.* ¶ 37, (iv) the unknown driver of "a large cobalt transport truck" driving on a main road, *id.*, (v) "three Chinese men who coordinated the work of the boys at the mine site," *id.* ¶ 39, (vi) "a 'Sponsor,' Chief Wali" to whom cobalt had to be sold, *id.* ¶ 42, (vii) "a 'Sponsor' Guylain, who gathered children at Kayebela and organized them to work at the mine," *id.* ¶ 44; (viii) "five Presidential Guards," one of whom allegedly shot a Plaintiff after a disagreement, *id.* ¶ 46, (ix) "three other Lebanese brokers who worked with Ismail," *id.* ¶ 51; and (x) a man known only as "John" who "was related to the Glencore mining site in some way," though Plaintiffs concede that they "do not yet have the details," *id.* ¶ 56.  Plaintiffs make no attempt to explain how the conduct of these various individuals—several of whom are unnamed—can be traced to, let alone was caused by, Defendants.  The "protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged act[] to the asserted particularized injury."  *Fla. Audubon Soc'y*, 94 F.3d at 670.

In a case where, as here, the alleged basis for Article III standing turns on the actions of third parties, it is "substantially more difficult to meet the minimum requirement of Article III." *Warth*, 422 U.S. at 505; *see also Fla. Audubon Soc'y*, 94 F.3d at 670 ("The greater number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true.").  In such

a case, a plaintiff must present "substantial evidence of a causal relationship between [Defendants' conduct] and the third-party conduct, leaving *little doubt as to causation*." *Arpaio v. Obama*, 797 F.3d 11, 20 (D.C. Cir. 2015) (citation omitted) (emphasis added); *see also Fla. Audubon Soc'y*, 94 F.3d at 663 ("Causation, or 'traceability,' examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff." (citations omitted)).

For example, in *Siegel v. U.S. Department of Treasury*, the court concluded that plaintiffs lacked Article III standing where their injuries "flow[ed] from the responses of third parties to [d]efendants' actions." 304 F. Supp. 3d 45, 54 (D.D.C. 2018). The plaintiffs alleged that their properties were unlawfully seized by the Israeli military, and that the Treasury Department caused those injuries by funding the Israeli initiative under which those properties were seized. *Id.* at 48-49. But Judge Moss found Article III traceability lacking because plaintiffs' causation theory would impermissibly require "the Court [to] speculate about the actual path of the funds, the various intermediate steps, the ultimate recipients, and their relationship to the control of [p]laintiffs' property." *Id.* at 53. Likewise here, Plaintiffs' allegations would require the Court to speculate that their injuries were caused by the use of cobalt in Defendants' products, rather than by one of the many intermediate parties in the multi-tier cobalt supply chain or another company that purchased or used cobalt. *See Menoken v. Miles*, 270 F. Supp. 3d 200, 213 (D.D.C. 2017) (no standing where plaintiff "expressly attribute[d] her alleged injuries to actions by … third-parties not now before the Court"), *aff'd sub. nom Menoken v. Kerner*, 741 F. App'x 817 (D.C. Cir. 2018) (unpublished).

Plaintiffs cannot overcome this fundamental defect by asserting that "Defendants and other members of the venture now control at least 80-85 percent of the DRC cobalt supply chain." FAC

11

¶ 110. Even if this type of supply chain "control" theory could establish traceability—which it cannot because allegations linking Defendants' *actions* to Plaintiffs' injuries still would be lacking—the complaint does not even state how much of the alleged share Defendants control, as opposed to the unnamed "other members of the venture," or what "control" even means in this context. Nor does it suggest that the cobalt mined by Plaintiffs can be traced to any particular Defendant. To the contrary, it alleges that "cobalt from numerous … sources is inevitably mixed at various stages in the supply chain, including transport by truck from mining sites and buying houses to refiners in the DRC, or within refiners in the DRC prior to export for additional processing by companies like Umicore and Huayou Cobalt." *Id.* ¶ 101. It asserts that this mixing of cobalt "impair[s the] traceability of DRC cobalt," such that "[a]ny claims made of a traceable cobalt supply chain from the DRC … are preposterous." *Id.* ¶¶ 101, 103. These allegations are fatal to Plaintiffs' attempt to establish Article III standing: If Plaintiffs are correct that the cobalt ultimately purchased by Defendants cannot be traced to any particular mine in the DRC, Plaintiffs cannot even begin to show that their injuries are "fairly traceable" to Defendants' conduct. *Lujan*, 504 U.S. at 561; *see also Kalugin v. Lew*, No. 12-1792 (BAH), 2013 WL 12084544, at *5 (D.D.C. July 16, 2013) (dismissing for lack of standing where plaintiffs allege that defendants are mortgagees, but "do not state any facts to suggest that any of the defendants," rather than a different mortgagee "actually originated any of the[] mortgages" that caused plaintiffs' injuries); *Sud v. Costco Wholesale Corp.*, 229 F. Supp. 3d 1075, 1081 (N.D. Cal. 2017) (dismissing for lack of standing where plaintiffs alleged "Costco [sold] prawns sourced by the … [d]efendants," but did

"not allege that the prawns they purchased" came from defendants), *aff'd*, 731 F. App'x 719 (9th Cir. 2018).[4]

The theory of causation alleged in the complaint is so expansive that it could extend to any manufacturer or retailer, and even to *consumers* who buy electronic products with lithium-ion batteries because they, too, "participat[e] in, support[], and provid[e] the essential market for cobalt." FAC ¶ 19. But Article III bars such sweeping theories, which would overwhelm the federal courts with cases lacking any concrete connection between a plaintiff's injury and a defendant's alleged actions. On this ground alone, the complaint should be dismissed.

**B.** **Plaintiffs separately lack standing to seek injunctive relief**

Because Plaintiffs' alleged injuries cannot plausibly be traced to Defendants' purported conduct, their claims should be dismissed. Their claims for injunctive relief, FAC ¶ 139, fail for the additional reason that Plaintiffs cannot satisfy Article III's redressability requirement.

"[T]raceability and redressability overlap as two sides of a causation coin." *Exhaustless Inc. v. FAA*, 931 F.3d 1209, 1212 (D.C. Cir. 2019) (quotation marks omitted). "[T]his Court has denied standing where 'the plaintiff seeks to change the defendant's behavior *only as a means* to alter the conduct of a third party, not before the court, who is the direct source of the plaintiff's injury.'" *Fulani v. Brady*, 935 F.2d 1324, 1330 (D.C. Cir. 1991) (quoting *Common Cause v. Dep't of Energy*, 702 F.2d 245, 251 (D.C. Cir. 1983)). Here, although the complaint does not specify what "injunctive relief" it seeks, FAC ¶ 139(h), even ordering Defendants to stop purchasing cobalt from the DRC or batteries containing DRC cobalt would not redress adverse conditions or

---

[4] These allegations also directly contradict Plaintiffs' assertion that Defendants have the "ability to make any necessary changes in the operation of cobalt mining in the DRC." FAC ¶ 110; *see, e.g.*, *Fulani v. Brady*, 935 F.2d 1324, 1330 (D.C. Cir. 1991) (Article III standing absent where claims sought to change defendant's behavior only as a means of altering conduct of absent third parties who caused plaintiff's injury).

injuries caused by mine operators.  As the complaint alleges, "all other tech and electric car companies in the world" would continue to purchase and use DRC cobalt.  *Id.* ¶ 6.  According to the complaint, "approximately two-thirds of the global supply of cobalt" is mined in the DRC, and "[c]obalt is a key component of every rechargeable lithium-ion battery in all of the gadgets made by Defendants and all other tech and electric car companies in the world."  *Id.* ¶ 5.  Any injunctive relief would therefore merely shift the purchase of DRC cobalt from Defendants to other companies, an outcome that would not directly address the labor practices about which Plaintiffs complain.  Accordingly, although Defendants fully support the goal of combatting forced labor, the injunctive relief Plaintiffs seek would not redress their injuries for Article III standing purposes.  *See ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (no standing where redressability "depends on the unfettered choices made by independent actors not before the courts").[5]

## II.  The Complaint Fails To State A Claim For Relief Under The Plain Language Of The TVPRA

Because Plaintiffs' claims are unambiguously foreclosed by the statutory text, this Court's inquiry can "begin[] … and end[] there."  *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004).  And even if the text could be read more than one way, the rule of lenity would require the Court to resolve any such ambiguity against liability.  *Clark v. Martinez*, 543 U.S. 371, 380 (2005).  Here, the complaint contends that the entire cobalt supply chain is a forced labor "venture" under

---

[5] The complaint also seeks an order compelling Defendants to "create a fund" for various purposes, including, for example, to "clean up the environmental impacts caused by Defendants' use of suppliers for cobalt."  FAC ¶ 139.  The complaint does not try to link the alleged labor violations and mining injuries to any purported environmental impact.  This disconnect underscores the lack of connection between any conduct by Defendants and the injuries for which Plaintiffs seek redress.  Article III simply does not allow Plaintiffs to hold Defendants liable for any and all purported ills associated with the mining industry in the DRC.

the TVPRA, and that Defendants "participate" in that venture by purchasing or using DRC-mined cobalt.  FAC ¶¶ 99-100, 110.  That expansive theory finds no support in the text of the TVPRA.

Congress enacted the TVPRA "to combat trafficking in persons," which it found was being "increasingly perpetrated by organized, sophisticated criminal enterprises."  22 U.S.C. § 7101(a), (b)(8).  To this end, Congress imposed enhanced criminal penalties for certain offenses related to peonage, slavery, involuntary servitude, sex trafficking, and forced labor.  *See* Pub. L. No. 106–386, § 112(a)-(b), 114 Stat. 1464, 1486, 1490 (2000) (amending 18 U.S.C. §§ 1581, 1583, and 1584, and codifying §§ 1589-94).  Section 1595, the civil remedies provision, provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595(a).

As the text indicates, a civil claim under § 1595 must rest on a predicate violation of one of the provisions of Chapter 77 of Title 18.  *See* 18 U.S.C. § 1595(a).  Here, the complaint alleges violations of two predicates: § 1589 (the forced labor provision) and § 1590 (the trafficking provision).[6]  A § 1595 claim based on these predicate violations requires that the defendant: (1) "knowingly benefit[ted]" (2) from "participation in a venture" (3) that violated § 1589(a) and/or § 1590(a), and (4) knew or should have known that the "venture" committed such a

---

[6] Plaintiffs mention two other predicate offenses, stating that "[t]his case is brought under the TVPRA, 18 U.S.C. § 1596, for violations of 18 U.S.C. §§ 1581, 1584, 1589, and 1590."  FAC ¶ 23.  Apart from these stray references, the complaint contains no reference to § 1581 (peonage) or § 1584 (sale of persons into involuntary servitude), nor does it offer factual allegations to support violations of those sections.  These "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to "state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678 (citations omitted).

violation.  *Id.* §§ 1589, 1590, 1595(a).[7]  Because the complaint does not allege facts that would establish these elements, it fails to state a claim for relief under the TVPRA.

### A. The complaint does not allege facts showing that Defendants participated in a venture within the meaning of the TVPRA

The TVPRA claim fails at the outset because the complaint does not allege that any Defendant unlawfully "participated" in a "venture" within any reasonable meaning of those terms.

Here, the complaint alleges that "[t]he cobalt supply chain … is a 'venture'" engaged in TVPRA violations, and that Defendants participated in that "venture" by purchasing cobalt or components containing cobalt downstream.  FAC ¶¶ 99-100.  That argument fails for two reasons.  First, a global supply chain is not a TVPRA "venture" within the Act's terms.  Second, even if a global supply chain could be considered a "venture," the act of buying goods several tiers downstream does not constitute active "participation" in the venture's TVPRA violations, nor do the handful of other allegations the complaint makes about Defendants' activities.

#### 1. An entire global supply chain is not a "venture" under the TVPRA

The complaint first asserts that the entire "cobalt supply chain … is a 'venture' that exists for the purpose of maintaining a steady supply of cheap cobalt that is mined by children and poverty-stricken adults."  FAC ¶ 99.  Based on the common meaning of these terms as of the time Congress enacted these provisions of the TVPRA, "venture" means "[a] business enterprise involving some risk in expectation of gain."  Am. Heritage Dictionary of the English Lang. (4th

---

[7] Although the complaint alleges an independent cause of action for violations of § 1590, that section prohibits "knowingly recruit[ing], harbor[ing], transport[ing], provid[ing], or obtain[ing] by any means, any person for labor or services in violation of this chapter."  18 U.S.C. § 1590(a).  Here, the complaint asserts an underlying violation of § 1589.  FAC ¶¶ 121-22.  Thus, to prevail on either TVPRA claim, Plaintiffs must establish a violation of § 1589.

ed. 2000) ("Am. Heritage"); *accord* Black's Law Dictionary (7th ed. 1999) ("Black's") ("[a]n undertaking that involves risk; esp., a speculative commercial enterprise").[8]

But the facts as alleged make clear that the cobalt supply chain, rather than being a single business enterprise, involves multiple independent entities, many of which are either in competition or have no interaction with one another. The complaint provides no factual basis to infer that entities such as Glencore and Huayou Cobalt are *engaged together* in a single business enterprise or undertaking, much less that both are also engaged together with each Defendant, each mine that employs each Plaintiff, and each intermediary.

Seeming to recognize these problems, the complaint proposes two alternative "venture" theories. It asserts that Umicore and Glencore formed a "venture" in which Glencore mined cobalt in locations that use child labor and Umicore processed the cobalt before selling it to others. FAC ¶ 103. It then claims, without support, that Apple, Alphabet, Microsoft, and LG Chem (which allegedly supplies batteries containing refined cobalt to Dell and Tesla) were "formally locked in" to this venture with Umicore and Glencore. *Id.* The complaint also alleges that Huayou Cobalt and its mining arms are part of their own distinct venture, which allegedly exists "to ensure that no matter what the actual facts are about the ongoing use of children performing hazardous work to harvest DRC cobalt for Huayou Cobalt, Apple, Dell, and Microsoft will have a steady supply of cobalt from Huayou Cobalt." *Id.* ¶¶ 104, 107.

Neither of these two alternative "ventures" supports a plausible TVPRA claim against Defendants. Even under these narrower theories, the complaint does not allege facts that would

---

[8] Sections 1589, 1590, and 1595 do not define the terms "participation" or "venture," so the terms should be given their ordinary meanings in the context of the surrounding text. *See Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). Although § 1591 defines "venture" and "participation in a venture," by their own terms, these definitions do not govern § 1589. 18 U.S.C. § 1591(e)(1) (defining terms "[i]n this section").

establish that Defendants engaged in a business enterprise with the entities that employed Plaintiffs—that is, the mines from which Glencore, Umicore, or Huayou Cobalt acquire cobalt, often indirectly. The complaint focuses on Defendants' possible engagement with Glencore, Umicore, and Huayou Cobalt, but it offers only one clear allegation that a Defendant even had a contract with one of those entities. *See* FAC ¶ 30 (Tesla "finalized an agreement with Glencore to obtain ownership of or exclusive rights to a major portion of its cobalt production in the DRC"). And even that allegation provides almost no details of that alleged contract and does not allege that it is for anything other than the purchase of cobalt. The complaint also alleges that the contract was entered into very recently, far past the point when many Plaintiffs stopped working as cobalt miners.

Plaintiffs appear to acknowledge this problem when they suggest they "will seek discovery of this arrangement to determine the details and how this likely [a]ffects Tesla's direct liability for Glencore's past and future liability for injuries to certain Plaintiffs." *See, e.g.*, FAC ¶¶ 18, 30. But that puts the cart before the horse: "a plausible claim must come *before* discovery, not the other way around." *Angiulo v. Cnty. of Westchester*, No. 11-CV-7823 (CS), 2012 WL 5278523, at *3 n.4 (S.D.N.Y. Oct. 25, 2012); *see also Guttenberg v. Emery*, 26 F. Supp. 3d 88, 97 (D.D.C. 2014) (discovery before resolving motions to dismiss "is not the norm").

The plain meaning of the word "venture" under the TVPRA, particularly when read together with the other language of § 1595, requires more than simply being a part of a global supply chain. Indeed, if the law were otherwise, any manufacturer or consumer of products that contain cobalt supplied by Glencore, Umicore, or Huayou Cobalt would be part of an unlawful "venture" and subject to potential enforcement, including potential criminal enforcement. *See, e.g.*, *Hedgeye Risk Mgmt., LLC v. Heldman*, 271 F. Supp. 3d 181, 195 (D.D.C. 2017) (if Congress

had "intended to impose criminal penalties on such a broad swath of conduct … it would have done so with far greater clarity").

### 2. Downstream purchases from a supply chain do not constitute "participation" in a venture under the TVPRA

Even if one of the alleged DRC cobalt supply chains described in the complaint could be a "venture," the complaint fails to establish that Defendants "participated" in either of those so-called ventures or in any illegal activities allegedly conducted by any such venture. Plaintiffs' main theory of "participation" is that Defendants allegedly purchased cobalt or products containing cobalt from the DRC, and sold those devices to consumers. FAC ¶ 2. This is insufficient.

The common meaning of the term "participate" from the time of the TVPRA's passage is "[t]he act of taking part in something, such as a partnership." Black's; *see also* Am. Heritage ("[t]o take part in" or "share in something"). To "participate" thus refers to *active* engagement. *See Reves v. Ernst & Young*, 508 U.S. 170, 178-89 (1993) (rejecting argument that "aid" equals "participation"); *United States v. Papagno*, 639 F.3d 1093, 1098 (D.C. Cir. 2011) (assistance and participation "are not equivalent"); *In re S. White Transp., Inc.*, 725 F.3d 494, 497 (5th Cir. 2013) ("[T]he word 'participation' connotes activity, and not mere nonfeasance.").

Several courts have held that unlawful "participation" in a TVPRA venture requires that the defendant have actively taken part in some aspect of the underlying violation. In *Afyare*, the Sixth Circuit found it insufficient that the defendant was merely associated with a person who engaged in a TVPRA violation; rather, the defendant must have "engaged in some aspect of the [TVPRA violation]" itself. *United States v. Afyare*, 632 F. App'x 272, 286 (6th Cir. 2016) (plaintiff must prove that defendants "engage[d] in sex trafficking together" or "associated for the purpose of furthering the sex trafficking"). The same rule has been applied in civil cases under § 1595. For example, in *Bistline v. Parker*, the Tenth Circuit held that lawyers who intentionally

crafted and enforced legal documents with the objective of enabling leaders of the Fundamentalist LDS church to engage in child sex abuse and slavery and of concealing those activities "participated" in a venture by "creating the intricate scheme that both enabled forced labor and allowed the threats which enforced that labor to be effective." 918 F.3d 849, 874 (10th Cir. 2019); *see also, e.g.*, *Ratha v. Phatthana Seafood Co., Ltd.*, No. CV 16-4271-JFW, 2017 WL 8293174, at *4 (C.D. Cal. Dec. 21, 2017) (no participation absent allegations of "directing or participating in [primary violator's] labor recruitment, [its] employment practices, or the working conditions"); *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019) (requisite "participation" must be "participation *in a sex-trafficking venture*, not participation in other activities engaged in by the sex trafficker that do not further the sex-trafficking aspect of their venture") (citing *Afyare*, 632 F. App'x at 286).[9]  Applying these principles, Plaintiffs' TVPRA claims fail because they do not and cannot allege that by purchasing components containing cobalt far downstream in the supply chain, Defendants themselves "engaged in some aspect of the [TVPRA violation]." *Afyare*, 632 F. App'x at 286.[10]

Indeed, even those courts that have found participation under the TVPRA without active participation in the underlying violation have required, at a minimum, actions indicating tacit agreement to the unlawful aspects of the venture. *See Ricchio v. McLean*, 853 F.3d 553, 554-55 (1st Cir. 2017) (citing allegations that defendants knew about trafficking and "wished to reinstate"

---

[9] *Afyare,* too, refers to the need for a "sex-trafficking venture" in a case brought based on § 1591. 632 F. App'x at 287.  Accordingly, the same approach can also be considered as part of the "venture" requirement—that Plaintiffs must be able to identify a venture, or an aspect of a venture, that has the unlawful conduct as its purpose, and then show that Defendants participated in *that*. The result is the same.

[10] Plaintiffs' allegation that Tesla entered an "agreement with Glencore to obtain ownership of or exclusive rights to a major portion of its cobalt production in the DRC," *see, e.g.*, FAC ¶ 30, does not allege that Tesla is anything more than a downstream purchaser.

their business of renting the trafficker rooms, as evidenced by "high fives" with the traffickers and discussion of "getting this thing going again"); *Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 2:19-CV-1194, 2020 WL 1244192, at *6 (S.D. Ohio Mar. 16, 2020) ("participation" in sex trafficking venture requires that "the trafficker and the hotels have established a pattern of conduct or could be said to have a tacit agreement" regarding the illicit activities). Here, the complaint does not allege that Defendants engaged in any such tacit agreement for the operation of a forced labor or trafficking venture.[11]

Under any standard, the downstream purchase of a product does not constitute "participation" in a business venture that produces and distributes that product. *See Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 710 (5th Cir. 2017) (bank's secondary market purchase of mortgages does not constitute "'participation' whatsoever in [a co-defendant's] decision to extend credit to any of its applicants"). As the D.C. Circuit explained in rejecting a similar theory in *Papagno*, "[a] health insurance company may pay for a patient's operation, but the insurer does not participate in the operation at the hospital." 639 F.3d at 1098.

---

[11] Many of these cases involve § 1591, which covers the TVPRA's sex trafficking offense. Unlike § 1589, § 1591 contains explicit definitions of "venture" and "participation in a venture." Although these definitions do not apply to § 1589, *see* 18 U.S.C. § 1591(e)(1) (defining terms "[i]n this section"); *Ratha*, 2017 WL 8293174, at *4, they are consistent with the above cases in that they require a close connection between the association and the end goal of violating the TVPRA, *see* 18 U.S.C. § 1591(e)(4) ("'participation in a venture' means knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)"); *id.* § 1591(e)(6) ("'venture' means any group of two or more individuals associated in fact, whether or not a legal entity"). And several courts have required evidence of a "tacit agreement" in applying § 1595, even with respect to a predicate violation of § 1591. *See, e.g.*, *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 969-70 (S.D. Ohio 2019); *H.H. v. G6 Hosp., LLC*, No. 2:19-CV-755, 2019 WL 6682152, at *4 (S.D. Ohio Dec. 6, 2019). Because the ordinary definitions of "participation" and "venture" under § 1589 are consistent with those in § 1591, the cases interpreting § 1591 narrowly are instructive: If there is no liability under § 1591, there certainly would be none under § 1589.

No court has held that the purchase of an item that might have been handled by persons engaged in TVPRA violations somewhere upstream in the supply chain constitutes "participation" in an unlawful venture under the TVPRA.  For good reason:  Expanding "participation" to include mere downstream purchases, as the complaint would do, would mean that countless entities worldwide could be sued for similar TVPRA violations based on the benefit they allegedly receive from purchasing DRC cobalt or products that contain DRC cobalt—including manufacturers, retailers, and even consumers.  Indeed, the complaint notes that Defendants are only the "first group of companies" to be sued and that Plaintiffs "expect to add others using cobalt from the DRC."  FAC ¶ 5 & n.2.  Such a limitless reach finds no support in the plain meaning of the statutory text.  Simply put, purchasing goods in a supply chain does not constitute unlawful "participation" in a venture.

### 3. Plaintiffs' other allegations do not constitute "participation" in a venture under the TVPRA

The complaint also offers a handful of other alleged actions by Defendants, none of which constitutes unlawful "participation" in venture under the TVPRA.

The complaint first alleges that, "[k]nowing that the tech boom was going to cause a major surge in demand for cobalt, [Defendants and other companies] stepped in to dominate the market and develop reliable sources for cobalt."  FAC ¶ 100; *see also id.* ¶ 110 ("The cobalt supply chain venture was developed by the participating companies, including Defendants….").  The complaint makes no connection between this alleged "stepping in" and any of the wrongdoing alleged to have injured Plaintiffs.  The complaint also contains no facts to support these vague and conclusory allegations.  *Iqbal*, 556 U.S. at 680-81 (rejecting unsupported allegations that one defendant "was the principal architect of [an] invidious policy" and another "was instrumental in adopting and executing it" (quotation marks omitted)).  And in fact, the allegations are inconsistent with

Plaintiffs' more specific assertion that these ventures were created by agreements between only DRC companies.  *See supra* pp. 17-18 (discussing FAC ¶¶ 103-04).

The complaint next asserts that some or all Defendants have developed programs or adopted policies to help ensure that their supply chains are *free from* troubling labor practices, but that these policies and programs fall short in various ways.  FAC ¶ 112.  It also criticizes Defendants for allegedly not providing Amnesty International and other non-profit organizations with enough detail to allow assessment of the success of the companies' policies and programs.  *Id.* ¶¶ 108, 109.  These arguments do not establish participation in any alleged venture.  If anything, the cited policies and programs negate the suggestion that Defendants knowingly participated in an unlawful venture, as they demonstrate that Defendants have affirmatively undertaken actions aimed at addressing human rights issues in their global supply chains.  Plaintiffs' suggestions that these efforts do not go far enough, or are inadequately enforced or disclosed, do not mean that Defendants participated in an unlawful venture with the alleged wrongdoers.  *See generally Iqbal*, 556 U.S. at 681.

Finally, the vague allegation that Defendants are working to "deceive" the public about the existence of child labor in DRC cobalt supply chains by "manipulat[ing] the various middlemen of their supply chain" fails.  FAC ¶ 107.  The complaint admits that Defendants have established *public programs* aimed at addressing labor conditions in their supply chains and publicly report about their engagements in such efforts, which negates any suggestion that Defendants are working to obscure their existence.  And the complaint does not even explain who these middlemen are, how they were allegedly "manipulate[d]," their connection to Defendants, or how any of that constitutes Defendants' participation in the unlawful venture itself.  These types of conclusory assertions have no weight at the pleadings stage.  *Iqbal*, 556 U.S. at 681.

**B.      The complaint does not allege an underlying violation of § 1589 or § 1590**

Defendants abhor child labor, take steps to prohibit its use, and have made significant efforts to combat it.  But the statutory language of the TVPRA does not cover the circumstances Plaintiffs describe.

Section 1589 of the TVPRA prohibits "knowingly … obtain[ing]" labor or services "by means of" (i) "force, threats of force, physical restraint, or threats of physical restraint," (ii) "serious harm or threats of serious harm," (iii) "the abuse or threatened abuse of law or legal process," or (iv) "any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint."  18 U.S.C. § 1589(a).  Section 1590 extends liability to any person who "knowingly recruits, harbors, transports, provides, or obtains by any means" any person in violation of § 1589.  *Id.* § 1590(a).

The statutory definition in § 1589 encompasses only labor that is compelled "by means of" an employer's threats of force or harm; it does not encompass labor that is compelled by circumstances such as economic pressures.  *Martinez-Rodriguez v. Giles*, 391 F. Supp. 3d 985, 998 (D. Idaho 2019), *appeal docketed* No. 19-35526 (9th Cir. June 24, 2019); *see also United States v. Toviave*, 761 F.3d 623, 625 (6th Cir. 2014).  "[T]he critical inquiry for the purposes of the [TVPRA] is whether a person provides those services free from a *defendant's* physical or psychological coercion that as a practical matter eliminates the ability to exercise free will or choice."  *United States ex rel. Hawkins v. ManTech Int'l Corp.*, No. 15-2105 (ABJ), 2020 WL 435490, at *18 (D.D.C. Jan. 28, 2020) (citation omitted) (emphasis added).  The "*employer's conduct* [must be] sufficiently serious to coerce the victim to provide labor or services against her will."  *Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017) (emphasis added).

The circumstances alleged here do not meet the express legal standard set forth in the statute. The central theory of the complaint is that economic conditions in the DRC drove Plaintiffs to seek work mining cobalt in order to support their families, obtain necessities, and earn money to pay school fees. *See, e.g.*, FAC ¶¶ 6, 29, 30. But the complaint does not allege that the purported venture compelled Plaintiffs to work in the ways specified in the statute. *See Martinez-Rodriguez*, 391 F. Supp. 3d at 997 (no § 1589 claim where plaintiffs alleged they "had to remain employed against their will until they could save enough money to … leave [the defendant's] employ").

Finally, the TVPRA does not create automatic liability under § 1589 or § 1590 based on a victim's age. *See Bistline*, 918 F.3d at 873. On the contrary, the fact that Congress created automatic liability based on the victim's age in another section of the statute, § 1591, but chose not to do so in § 1589 or § 1590, demonstrates that the TVPRA does not create strict liability for all violations of § 1589 or § 1590 involving minors. *See Jama v. ICE*, 543 U.S. 335, 341 (2005); *Brendsel v. Office of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 65 (D.D.C. 2004); *see also* 18 U.S.C. § 1591 (specifying crimes and punishments specific to the victim's age).

Because Plaintiffs do not allege that their employers—much less Defendants—obtained their labor "by means of" actual conduct prohibited by the TVPRA, their claims should be dismissed. *See, e.g.*, *Roman v. Tyco Simplex Grinnell*, No. 8:16-cv-3449-T-33 (AEP), 2017 WL 2427251, at *5 (M.D. Fla. June 5, 2017) (dismissing § 1589 claim where plaintiff failed to allege "who threatened him, how he was threatened, and for what purpose"); *Martinez-Rodriguez*, 391 F. Supp. 3d at 993 (similar); *Zuniga v. Masse Contracting, Inc.*, 290 F. Supp. 3d 581, 588 (E.D. La. 2017) (dismissing § 1595 claim where plaintiffs did not allege facts sufficient to establish predicate violation of § 1589 or § 1590).

**C.      The complaint fails to allege that Defendants had the requisite knowledge**

Even if Plaintiffs could overcome the above defects, their TVPRA claims still would fail because the complaint fails to establish that each Defendant possessed the requisite scienter.

Section 1595 requires that the defendant "knew or should have known" about the specific underlying violation in which the "venture" allegedly engaged.  Courts read this provision to require knowledge of the violation or series of violations that injured the plaintiff—knowledge of a general problem in an industry, for example, is insufficient.  *See, e.g.*, *S.J. v. Choice Hotels Int'l*, — F. Supp. 3d —, 2020 WL 4059569, at *5 (E.D.N.Y. July 20, 2020); *Jane Doe 4 v. Red Roof Inns, Inc.*, No. 1:19-CV-03845-WMR, 2020 WL 1872336, at *3 (N.D. Ga. Apr. 13, 2020).  Here, at a minimum, that means that to satisfy the knowledge requirement of § 1595(a), Plaintiffs must allege facts sufficient to suggest that Defendants were aware of TVPRA violations at the mining sites where Plaintiffs worked.

Plaintiffs' allegations are insufficient under this standard because they constitute, at most, general assertions that Defendants should have known of labor issues in the DRC or in the cobalt mining industry generally.  Plaintiffs allege that Defendants have "risk assessment departments or use outside firms that have advised them of the conditions facing child cobalt miners in the companies' direct supply chain," FAC ¶ 18; that an Apple employee was terminated for reporting on poor conditions related to cobalt mining in the DRC, *id.* ¶ 17; and that some of the Defendants interacted with PACT, a non-profit organization that focuses on child labor in the cobalt mining sector, *id.* ¶ 115 (alleging that Apple, Alphabet, Dell, and Microsoft worked with PACT).  As an initial matter, these allegations are entirely conclusory and are entitled to no weight.  *See Iqbal*, 556 U.S. at 681.  But in any event, none of these activities or connections is alleged to have provided Defendants with knowledge of TVPRA violations at the mining sites where Plaintiffs worked.  *See Choice Hotels*, 2020 WL 4059569, at *5; *Red Roof Inns*, 2020 WL 1872336, at *3.

Finally, the complaint cites news articles and public reports that purportedly describe labor conditions at cobalt mines in the DRC. *See* FAC ¶¶ 10-13, 104-05, 116. But the cited articles do not discuss the conditions at the mining sites where Plaintiffs worked. If such general articles were enough to establish knowledge for TVPRA purposes, virtually any manufacturer or retailer that sells a device or component that contains cobalt or any consumer that purchases such a device could be exposed to liability under the TVPRA based on general media coverage of labor conditions in the DRC. The TVPRA requires more. *See Ratha*, 2017 WL 8293174, at *5 ("[Defendants'] knowledge of forced labor—at a factory that they did not own, operate, or have any control over—cannot be based solely on conflicting and sometime unsubstantiated general reports."); *cf. Adhikari v. Daoud & Partners*, 697 F. Supp. 2d 674, 684 (S.D. Tex. 2009) (alleging that the defendant knew forced labor and trafficking was occurring "through statements and complaints made by laborers" directly to the defendant).

**D.    The complaint fails to allege a "knowing[] benefit" from a violation of the TVPRA**

The complaint also fails to allege facts supporting any viable "benefit" theory under the TVPRA. Section 1595 allows civil claims only against a party who "knowingly benefits, financially or by receiving anything of value from participation" in an unlawful TVPRA venture. 18 U.S.C. § 1595(a). No such facts are alleged here.

The only "benefit" theory articulated in the complaint is that Defendants are allegedly "knowingly benefiting from the cheap labor of child cobalt miners" like "Plaintiffs and others similarly situated." FAC ¶ 112. That does not constitute a "benefit" under the plain meaning of that term. A benefit is an "advantage" or "profit." Am. Heritage ("an advantage"); Black's ("[a]dvantage … [p]rofit or gain"). The complaint alleges no such advantage or profit. As noted, it asserts that "[c]obalt from numerous both industrial and artisanal sources is inevitably mixed at

27

various stages in the supply chain," FAC ¶ 101, and that "cobalt mined by child labor is regularly mixed into" the supply from other entities, *id.* ¶ 115.  It does not allege that Defendants chose to purchase products containing lower-cost cobalt mined in violation of the TVPRA instead of products containing more expensive cobalt mined in compliance with that statute—indeed, it does not allege that any such alternative source of cobalt exists in the DRC or elsewhere.  Absent allegations that Defendants paid a reduced price as compared to an alternative source that charged more, Plaintiffs' economic benefit theory is not plausible.

The complaint also does not contend that Defendants gained any advantage in the marketplace by virtue of their participation in any alleged TVPRA violation.  *See Geiss*, 383 F. Supp. 3d at 169 (the plaintiff must show that the defendant received the benefit "*because of* [the defendant's] facilitation of the [TVPRA violation]").  But the complaint acknowledges that Defendants are in exactly the same position as every other technology company that purchases cobalt or lithium-ion batteries that contain cobalt through the standard supply chain.  *See* FAC ¶ 5 & n.2.  Because the TVPRA was never intended to sweep so broadly and indiscriminately, the Court should reject the conclusory allegations of a "benefit" where no supporting facts have been adequately alleged.

### E.  To the extent any of the TVPRA elements could reasonably be read to support liability, the rule of lenity precludes any such reading

The TVPRA claims fail on their face in light of the statutory language discussed above.  But even if the text and structure of § 1589, § 1590, and § 1595 did not squarely foreclose Plaintiffs' claims for relief, "any ambiguity in the statute" must be construed in favor of Defendants.  *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004).  Although this case arises in a civil context, the TVPRA "is a criminal statute, and it has both criminal and noncriminal applications."  *Id.*  In such cases, "the rule of lenity applies" to ensure that the statute is interpreted "consistently" in both contexts.  *Id.*;

*accord Crandon v. United States*, 494 U.S. 152, 158 (1990) ("[B]ecause the governing standard is set forth in a criminal statute, it is appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's coverage."); *St. Louis v. Perlitz*, No. 3:13-CV-1132 (RNC), 2016 WL 1408076, at *3 n.3 (D. Conn. Apr. 8, 2016) (applying rule of lenity to § 1591); *accord Fei Guan v. Bing Ran*, No. 1:17CV332 (JCC), 2017 WL 2881363, at *4 (E.D. Va. July 6, 2017) (under rule of lenity, § 1591 "must be strictly construed").

Even if the terms of the TVPRA could reasonably be read multiple ways, including in the countertextual and overbroad fashion contemplated by the complaint, those terms would have to be construed consistently with the Supreme Court's mandate that laws supporting criminal and civil liability must be given the narrower of two reasonable interpretations in order to ensure that the defendant is on notice of potential liability. *See, e.g.*, *Perlitz*, 2016 WL 1408076, at *3 n.3 (citing *Clark*, 543 U.S. at 380). Any reading of the TVPRA that would hold Defendants liable for downstream purchases from a multi-layer supply chain cannot meet that standard.

## III.     Plaintiffs' TVPRA Claims Are Impermissibly Extraterritorial

The complaint fails to state a TVPRA claim for a second, independent reason: the presumption against extraterritoriality. "Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2100 (2016). Courts use a two-step framework to determine whether Congress clearly expressed such intent when faced with a purportedly extraterritorial statutory claim. First, the court must decide whether "the statute gives a clear, affirmative indication that it applies extraterritorially." *Id.* at 2101. Second, if it does not, the court must "determine whether the case involves a domestic application of the statute." *Id.*

Neither step is met here. As to the first, neither § 1595 (the private right of action provision) nor § 1589 or § 1590 (the predicate offenses at issue here) contain the requisite clear, affirmative

indication of extraterritorial application, as required by *RJR Nabisco*. By contrast, § 1596 expressly addresses and authorizes extraterritorial jurisdiction for *criminal* violations of § 1589 and § 1590. *See* 18 U.S.C. § 1596(a). Nor does this case satisfy the second step of *RJR Nabisco*, because it does not involve a domestic application of the TVPRA: Plaintiffs' allegations involve conduct that occurred entirely in the DRC. Because Plaintiffs' TVPRA claims are impermissibly extraterritorial, they should be dismissed.

### A.       The TVPRA contains no clear, affirmative indication of congressional intent to create extraterritorial civil liability

*RJR Nabisco* provides the governing framework for the first step of the extraterritoriality analysis in the context of a private right of action such as is allowed by § 1595. There, the Supreme Court considered the presumption against extraterritoriality in the context of RICO's underlying substantive prohibitions, which criminalize conduct related to racketeering activity, *see* 18 U.S.C. § 1962, as well as its civil remedies provision, which authorizes persons "injured … by reason of a violation of section 1962" to recover damages, *see id.* § 1964(c). The Court held that the presumption was rebutted as to the underlying criminal provisions, because "RICO defines racketeering activity to include a number of predicates that plainly apply to at least some foreign conduct." *RJR Nabisco*, 136 S. Ct. at 2101. By contrast, the Court held that the presumption was *not* rebutted as to the private right of action, which requires a predicate violation of § 1962: "[T]he presumption against extraterritoriality must be applied separately to both RICO's substantive prohibitions and its private right of action." *Id.* at 2108. It was "not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign

countries." *Id.*  Because nothing in the text indicated that RICO's private right of action provision applied extraterritorially, it did not.  *See id.* at 2108-11.

Applying *RJR Nabisco*, this suit is barred unless § 1595 (the private right of action) *and* either § 1589 or § 1590 (the predicate offenses) apply extraterritorially.  *See id.* at 2099-2100. Because they do not, Plaintiffs' civil claims arising from foreign conduct are barred.

### 1.    There is no private right of action for conduct abroad

Section 1595 contains no express authorization for a private right of action based on conduct abroad.  Like RICO's civil remedies provision, it authorizes a plaintiff who is injured by a violation of a substantive criminal provision to sue and recover damages and reasonable fees. *See* 18 U.S.C. §§ 1595(a), 1964(c).  And, like RICO's civil remedies provision, "[n]othing in" § 1595 "provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States."  *RJR Nabisco*, 136 S. Ct. at 2108.  Section 1595 neither expressly refers to extraterritorial application, nor contains any terms that indicate Congress's intent to provide a cause of action for foreign injuries or conduct.   Under a straightforward application of *RJR Nabisco*, § 1595 "lacks those clear indications" that can overcome the presumption against extraterritoriality.  *Adhikari v. KBR Inc.*, No. 4:16-CV-2478, 2017 WL 4237923, at *5 (S.D. Tex. Sept. 25, 2017).

The TVPRA does contain a provision—§ 1596—that authorizes extraterritorial actions, but it applies only to criminal prosecutions, not civil actions.  In § 1596, Congress granted U.S. courts "extra-territorial jurisdiction over any *offense* (or any *attempt* or *conspiracy* to commit an *offense*) under section 1581, 1583, 1584, 1589, 1590, or 1591," when the alleged offender has a sufficient connection to the United States.  18 U.S.C. § 1596(a) (emphases added).  The term offense "is most commonly used to refer to crimes."  *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 135 S. Ct. 1970, 1976 (2015) (noting that the term "appears hundreds of times

in Title 18" but "the Solicitor General" was unable "to find a single provision" using it "to denote

a civil violation").  And that is how § 1596 uses the term.  *See, e.g.*, 18 U.S.C. § 1596(b)

("Prosecutions of Offenses").  The legislative history confirms this reading of the plain text.  *See*

H.R. Rep. No. 110–430, pt. 1, at 51, 55 (2007) (Section 1596 "provides jurisdiction … for

prosecution of certain slavery and trafficking offenses committed abroad").[12]

Congress's express authorization in § 1596 for the federal government to prosecute

extraterritorial crimes sharply contrasts with the absence of any such authorization in § 1595.

"Where Congress knows how to [displace a presumption] but chooses not to, its silence is

controlling."  *Brendsel*, 339 F. Supp. 2d at 65 (quotation marks omitted); *see Jama*, 543 U.S. at

341.  And, as with the RICO statute at issue in *RJR Nabisco*, the distinction between criminal

prosecutions and civil actions makes sense.  Congress's decision to authorize the federal

government to prosecute extraterritorial offenses involves an entirely different set of policy

choices than whether civil plaintiffs may use the U.S. courts to pursue civil claims arising from

---

[12] A few district courts have found that § 1596 applies to *civil* suits and that plaintiffs accordingly may sue for extraterritorial TVPRA violations under § 1595.  Most of these courts did not analyze the statutory text.  *See Perlitz*, 2016 WL 1408076, at *2 n.1; *Plaintiff A v. Schair*, No. 2:11-CV-00145-WCO, 2014 WL 12495639, at *6 (N.D. Ga. Sept. 9, 2014); *Abafita v. Aldukhan*, No. 116CV06072RMBSDA, 2019 WL 6735148, at *5 (S.D.N.Y. Apr. 4, 2019), *report and recommendation adopted*, 2019 WL 4409472 (S.D.N.Y. Sept. 16, 2019) (citing *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 200 (5th Cir. 2017)).  One court reasoned that because § 1596 was enacted after two district courts declined to apply § 1595 extraterritorially, Congress must have meant for *§ 1596* to displace the presumption *as to § 1595*.  *See Ratha v. Phatthana Seafood Co., Ltd.*, No. CV 16-4271-JFW (ASX), 2016 WL 1020222, at *5 (C.D. Cal. Nov. 9, 2016).  But there is no such indication in the legislative history.  *See United States v. Ron Pair Ent., Inc.*, 489 U.S. 235, 246 (1989) (noting that a holding "recognized by only a few courts and often dependent on particular circumstances" is not the kind of "'rule' that we assume Congress was aware of").  And even if § 1596's grant of extraterritorial jurisdiction applied to civil claims, Plaintiffs' claims still would fail because the predicate offenses on which Plaintiffs rely— violations of § 1589 and § 1590—do not apply extraterritorially.  *See infra* pp. 34-35; *see also RJR Nabisco*, 136 S. Ct. at 2108 (presumption against extraterritoriality "must be applied separately" to the substantive prohibition and the right of action).

overseas activities.  "'Each of the decisions' involved in defining a cause of action based on 'conduct within the territory of another sovereign carries with it significant foreign policy implications.'"  *RJR Nabisco*, 136 S. Ct. at 2106 (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 117 (2013) (quotation marks and brackets omitted)).  If § 1596 or § 1595 authorized private suits by foreign actors for foreign injuries, plaintiffs could dictate when U.S. courts must sit in judgment of how foreign governments or other foreign actors addressed (or did not) alleged wrongdoing.  This case proves the point:  Plaintiffs allege that "corrupt government officials" have "fail[ed] to regulate health and safety in the mining sector" and "financially benefit in [the] DRC from forced child labor mining cobalt."  FAC ¶¶ 21, 28; *see RJR Nabisco*, 136 S. Ct. at 2106.  In this setting, "the need to enforce the presumption is at its apex."  *RJR Nabisco*, 136 S. Ct. at 2107.

Although a Fourth Circuit panel held that § 1595 can reach certain extraterritorial actions, it relied on reasoning that the Supreme Court rejected in *RJR Nabisco*.  The panel stated that, "even absent an express statement of extraterritoriality, a statute may apply to foreign conduct insofar as it clearly and directly incorporates a predicate statutory provision that applies extraterritorially." *Roe v. Howard*, 917 F.3d 229, 242 (4th Cir. 2019).  Section 1595, according to the panel, "directly incorporates predicate offenses that govern foreign conduct," which the panel said "provid[ed] strong textual evidence of its extraterritorial effect when applied to those predicates."  *Id.* at 241. It is impossible to square this approach with *RJR Nabisco*.  136 S. Ct. at 2108.  As the Supreme Court explained in that case, even though the RICO civil remedies provision requires a predicate violation of a criminal provision covering foreign conduct, the civil remedies provision must be analyzed separately and, so analyzed, does *not* apply extraterritorially.  *See id.* (rejecting the view that the "extraterritorial effect [of RICO's private right of action] flows directly from" the

extraterritorial effect of RICO's substantive prohibition).[13]  This Court should follow *RJR Nabisco* and reach the same holding with respect to § 1595.

### 2.    *The predicate offenses on which Plaintiffs rely do not apply outside the United States*

Although both the private right of action and the predicate offenses must apply extraterritorially to overcome the presumption, neither of the predicate offenses on which Plaintiffs primarily rely—§ 1589 and § 1590—has extraterritorial application.  "On its face," each "contains nothing to suggest it applies abroad."  *Morrison*, 561 U.S. at 262; *see RJR Nabisco*, 136 S. Ct. at 2101 (requiring "a clear, affirmative indication that [the statute] applies extraterritorially").  Section 1589 extends to any person who "knowingly provides or obtains the labor or services of a person by any one of, or by any combination of," various coercive means, and also defines a secondary offense, by setting out requirements for benefitting from, knowing about, and participating in that primary offense.  18 U.S.C. § 1589.  It also provides several applicable definitions, but nowhere in any of these provisions or definitions does it even mention extraterritorial activities, much less provide for extraterritorial jurisdiction.  *Id.*  For its part, § 1590 simply extends liability to anyone who "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services" in violation of § 1589.  18 U.S.C. § 1590; *see also Martinez-Rodriguez*, 391 F. Supp. 3d at 998-99.  It also prohibits efforts to obstruct enforcement of that provision. 18 U.S.C. § 1590(b).  That is all.  *See Roe*, 917 F.3d at 244

---

[13] *Roe* can also be distinguished.  The alleged conduct in that case occurred *before* Congress enacted § 1596 and thus clarified the domestic scope of § 1595.  *See Roe*, 917 F.3d at 237.  And the panel in *Roe* relied on a different provision, not relevant here, that applies to U.S. government employees who violate the TVPRA while abroad.  *See id.* at 244 (applying 18 U.S.C. § 3271).  Thus, its holding was "limited in scope."  *See id.* (explaining that, "[b]y the [TVPRA]'s own terms, this extraterritorial application" of § 1589 and § 1590 "applies only to persons employed abroad by the federal government").

("Sections 1589 and 1590 … do not directly refer to foreign conduct.").  Because neither provision contains an express authorization of extraterritorial application, that is the end of the analysis.

When it comes to this area of criminal law, "Congress knows how to legislate with extraterritorial effect" and "has done so expressly when it has intended to do so."  *John Roe I v. Bridgestone Corp.*, 492 F. Supp. 2d 988, 1002 (S.D. Ind. 2007).  And this conclusion is confirmed by the fact that other related criminal offenses *do* contain textual indications that Congress intended for them to have extraterritorial application.  As noted above, § 1596 expressly authorizes extraterritorial *criminal* prosecutions of § 1589 and § 1590, but not related civil claims.  And § 1585, another predicate TVPRA offense, addresses overseas activity relating to the capture of persons for slavery, applying to persons who "on any foreign shore seize[] any person with intent to make that person a slave."  18 U.S.C. § 1585; *see Bridgestone*, 492 F. Supp. 2d at 1002  n.7 (collecting additional examples).  That Congress chose to use "explicit extraterritorial language" in these statutes but not in § 1589 or § 1590 "weighs against giving extraterritorial effect to" either § 1589 or § 1590.  *Bridgestone*, 492 F. Supp. 2d at 999 ("[S]ection 1595 does not provide a remedy for alleged violations of section 1589's standards that occur outside the United States."); *Nattah v. Bush*, 541 F. Supp. 2d 223, 234 & n.11 (D.D.C. 2008) (agreeing with *Bridgestone* and holding that § 1595 likewise does not provide a cause of action for extraterritorial violations of § 1590), *aff'd in part, rev'd in part on other grounds and remanded* 605 F.3d 1052 (D.C. Cir. 2010); *see Adhikari v. Daoud & Partners*, 994 F. Supp. 2d 831, 836-37 (S.D. Tex. 2014) ("Congress intended Sections 1589 and 1590 to be purely national solutions."); *see also RJR Nabisco*, 136 S. Ct. at 2102 ("The inclusion of some extraterritorial predicates does not mean that *all* RICO predicates extend to foreign conduct.").

35

### B.     This case does not involve a domestic application of the TVPRA

Because § 1595 does not contain a "clear, affirmative indication" that Congress displaced the presumption against extraterritoriality, this suit cannot be maintained unless this case involves a *domestic* application of § 1595.  *RJR Nabisco*, 136 S. Ct. at 2101.  It does not.

To determine "whether the case involves a domestic application of the statute," courts "look[ ] to the statute's 'focus.'"  *RJR Nabisco*, 136 S. Ct. at 2101.  "[I]f the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory."  *Id.*  As multiple courts have recognized, the "focus" of the TVPRA is where the TVPRA violation occurred.  *Adhikari*, 2017 WL 4237923, at *3; *Tanedo v. E. Baton Rouge Parish School Bd.*, No. 10-CV-1172, 2012 WL 5378742, at *6 (C.D. Cal. Aug. 27, 2012).  The complaint does not allege that Plaintiffs were trafficked to the United States, or that any violations of § 1589 occurred in this country.  Nor does it allege injuries in the United States.  The claims here involve alleged conduct in the DRC, where Plaintiffs were allegedly compelled by economic pressures to work in artisanal mines, and where mine owners or operators allegedly created the harsh and inhumane working conditions that caused their injuries.  FAC ¶¶ 30-64.  That is also where most of the entities that allegedly mined, purchased, and smelted the cobalt were located.  *See id.*; *see also id.* ¶¶ 37, 40 (intermediaries located in China).  "Because 'all the relevant conduct'" here "'took place outside the United States,'" that ends the inquiry.  *RJR Nabisco*, 136 S. Ct. at 2101 (quoting *Kiobel*, 569 U.S. at 124).

The allegation in the complaint that the "policymaking that facilitated the harms Plaintiffs suffered was the product of decisions made in the United States by Defendants," FAC ¶ 22, does not make this case a domestic application of § 1595.  Even if true, the allegation would show nothing more than that a U.S. defendant, due to its location in the United States, must have made a decision here.  That theory fails under clear Supreme Court precedent.  As the Court noted in

*Kiobel*, "it would reach too far to say that mere corporate presence [in the United States] suffices" to demonstrate that the claims in question "displace the presumption against extraterritorial application." 569 U.S. at 124-125; *accord Morrison*, 561 U.S. at 266.

## IV. The Complaint Fails To State A Claim For Relief Under Common Law

As a last resort, the complaint asserts common law claims for unjust enrichment, negligent supervision, and intentional infliction of emotional distress. FAC ¶¶ 8, 124-37. But the same flaws in Plaintiffs' statutory claims also undermine their common law claims: The harms they allege from cobalt mining in the DRC are based on complex systems with multiple actors and layers of separation from Defendants. *See id.* ¶¶ 22; *see also id.* ¶¶ 30-58, 61-64.

District of Columbia choice of law rules determine which jurisdiction's law applies to these claims. *Raflo v. United States*, 157 F. Supp. 2d 1, 4 (D.D.C. 2001). Those rules require that the Court "1) identify[] the governmental policies underlying the applicable laws; and 2) determin[e] which state's policy would be most advanced by having its law applied to the facts of this case." *Id.* at 5 (tort claims); *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 119 (D.D.C. 2012) (unjust enrichment). The complaint appears to allege that D.C. law applies, *see* FAC ¶ 68, but it also alleges that Defendants' principal places of business are in Texas, California, and Washington, so the laws of those states may instead apply, *see id.* ¶¶ 72, 76, 79, 82, 85. That said, and although the common law is not the same in each of these states, the claims alleged in the complaint fail under any of these states' laws.[14]   Accordingly, although Defendants reserve the right to brief

---

[14] *Compare Davis v. OneWest Bank N.A.*, No. 02-14-00264-CV, 2015 WL 1623541, at *1 (Tex. App. Apr. 9, 2015) (rejecting unjust enrichment as an independent cause of action), *and Castillo v. Gared, Inc.*, 1 S.W.3d 781, 785 (Tex. App. 1999) (Texas does not recognize a separate cause of action for negligent supervision independent of a claim for negligent hiring), *and Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004) (Texas does not allow a claim for intentional infliction of emotional distress where the "gravamen of plaintiff's complaint is really

choice of law at a later stage, the Court need not decide that issue here, because the claims fail under any potentially applicable law. *See, e.g.*, *TAC-Critical Sys., Inc. v. Integrated Facility Sys., Inc.*, 808 F. Supp. 2d 60, 65 (D.D.C. 2011).

To state a claim for unjust enrichment, a complaint generally must allege that (1) the plaintiff "conferred a benefit on the defendant"; (2) the defendant retained the benefit; and (3) allowing the defendant to retain the benefit would be unjust. *Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 56 (D.D.C. 2017); *see also, e.g.*, Restatement (Third) of Restitution and Unjust Enrichment § 1 (Oct. 2019 update).

The unjust enrichment claim fails because the complaint does not allege that the Defendants had any relationship with Plaintiffs, as opposed to some connection to the intermediaries from which Defendants allegedly purchased cobalt or products containing cobalt. An unjust enrichment claim cannot be asserted against a third party based on its alleged receipt of benefits from a relationship between the plaintiff and a different entity. *See Aston*, 248 F. Supp. 3d at 56; *Campidoglio LLC v. Wells Fargo & Co.*, No. C12-949 TSZ, 2012 WL 5844693, at *4 (W.D. Wash. Nov. 19, 2012) (citing *Chandler v. Wash. Toll Bridge Auth.*, 17 Wash. 2d 591, 605 (1943) and *Hopkins v. Anderson*, 7 Wash. App. 762, 765 (Ct. App. 1972)); *Hester v. Friedkin Cos., Inc.*, 132 S.W.3d 100, 106-07 (Tex. App. 2004); *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 685 (9th Cir. 2009) (applying California law) ("[A] party generally may not seek to disgorge another's profits unless 'a prior relationship between the parties subject to and benefitting from disgorgement originally resulted in unjust enrichment.'"). Defendants did not employ any of Plaintiffs, and the alleged relationship between Plaintiffs and Defendants "is simply too attenuated to support an

---

another tort," "even if emotional distress results" (citation omitted)), *with infra* pp. 37-41 (stating tests for each claim).

unjust enrichment claim." *Doe I*, 572 F.3d at 685 (explaining that there is no "plausible basis upon which the employee of a manufacturer, without more, may obtain restitution from one who purchases goods from that manufacturer").

The negligent supervision claim fails because the alleged relationship between any act by Defendants and Plaintiffs' injuries is likewise too attenuated as a matter of law.  *See Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 100 (D.D.C. 2010); *Doe v. Capital Cities*, 58 Cal. Rptr. 2d 122, 132 (App. 2d Dist. 1996); *Niece v. Elmview Grp. Home*, 904 P.2d 784, 788 (Wash. Ct. App. 1995); *Castro v. Serrata*, 145 F. Supp. 2d 829, 831 (S.D. Tex. 2000).  The unsupported assertion that "Glencore/Umicore and Huayou Cobalt … acted as Defendants' agents," FAC ¶ 128, ignores the "fundamental principle of hornbook agency law that an agency relationship arises only where the principal 'has the right to control the conduct of the agent with respect to matters entrusted to him,'" *Int'l Longshoremen Ass'n, AFL-CIO v. NLRB*, 56 F.3d 205, 213 (D.C. Cir. 1995) (quoting Restatement (Second) of Agency § 14 (1958)).  Even if these entities were Defendants' agents, they were not Plaintiffs' employers.  The complaint makes no contention that Defendants own or operate the employing mines, or even Glencore, Umicore, or Huayou Cobalt.  And even if Defendants could have indirectly influenced their operations merely by purchasing components containing cobalt far downstream in the supply chain, liability for negligent supervision requires "more than a general right to order the work to start or stop, to inspect progress, or receive reports."  *Castro*, 145 F. Supp. 2d. at 831.

The absence of any alleged day-to-day control requires dismissal of a negligent supervision claim.  *See Doe I*, 572 F.3d at 684 (affirming dismissal of plaintiffs' claim under California law because Wal-Mart was not plaintiffs' employer, as it "exercised minimal or no control over the day-to-day work of Plaintiffs in the suppliers' foreign factories"); *Castro*, 145 F. Supp. 2d at 831-

833 (dismissing claim under Texas law where there was no evidence of "some clear actual exercise of control" of employee's work or any "evidence that [defendant] had the contractual right to control" employee's work); *Bykov v. Rosen*, No. C15-0713-JCC, 2015 WL 13546420, at *2 (W.D. Wash. Oct. 20, 2015) (dismissing claim under Washington law where plaintiff failed to show that a supervisor controlled how an employee's work was performed), *rev'd in part on other grounds*, 703 F. App'x 484 (9th Cir. 2017); *Hull v. Eaton Corp.*, 825 F.2d 448, 458 (D.C. Cir. 1987) (affirming dismissal of claim because "[t]he lack of day-to-day control … precludes a finding of agency"). Otherwise, under the logic of the complaint, all businesses would have supervisory liability for the employment conditions and employees of *any other* business in a supply chain from which a company purchases goods. *See Doe I v. Wal-Mart Stores Inc.*, No. CV 05-7307, 2007 WL 5975664, at *5 (C.D. Cal. Mar. 30, 2007). That logic goes "well beyond the recognized limits of liability and cannot be accepted." *Id.*

Finally, the complaint fails to state a claim for intentional infliction of emotional distress. Although the complaint alleges that Plaintiffs suffered severe injuries that undoubtedly caused them pain and suffering, it does not plausibly allege that *Defendants* engaged in "extreme and outrageous conduct" that "intentionally or recklessly" caused Plaintiffs to suffer "severe emotional distress." *E.g.*, Restatement (Second) of Torts § 46 (Oct. 2019 update). This very demanding standard requires a showing that the defendant's "conduct exceed[ed] all bounds usually tolerated by decent society, of a nature which is *especially calculated to cause*, and does cause, mental distress of a very serious kind." *Ochoa v. Superior Court*, 39 Cal. 3d 159, 165 n.5 (Cal. 1985) (citation omitted); *see also Hoffmann-La Roche*, 144 S.W.3d at 447; *Duncan v. Children's Nat'l Med. Ctr.*, 702 A.2d 207, 211 (D.C. 1997); *Grimsby v. Samson*, 530 P.2d 291, 295 (Wash. 1975) (en banc). A commercial transaction, such as purchasing goods or raw materials from a

40

downstream supplier, does not meet that exacting standard.  *See Hindi v. ExxonMobil Oil Corp.*, No. 07-CV-1664 WQH (LSP), 2008 WL 11337374, at *5 (S.D. Cal. Sept. 10, 2008).  And the complaint acknowledges that Defendants have taken affirmative steps to prevent the use of forced labor in their supply chains.  FAC ¶¶ 20-21, 112.

If the law of the DRC instead applies to these common law claims, they still should be dismissed.  Plaintiffs themselves concede that they lack a remedy under DRC law.  *See* FAC ¶ 22 ("there is currently no law in the DRC whereby Plaintiffs could seek civil damages for their injuries against the major end users of cobalt operating outside of the country"); *Voss v. Sutardja*, No. 14-CV-01581-LHK, 2015 WL 349444, at *10 (N.D. Cal. Jan. 26, 2015) ("At the motion to dismiss stage, Plaintiffs' concessions [that they lack a remedy under applicable law] are sufficient.").

Under any applicable law, Plaintiffs' common law claims should be dismissed.

## CONCLUSION

For these reasons, this Court should dismiss Plaintiffs' complaint under Rule 12(b)(1) and Rule 12(b)(6), with prejudice.

August 25, 2020

Craig A. Hoover (D.C. Bar No. 386918)
Neal Kumar Katyal (D.C. Bar. No. 462071)
David M. Foster (D.C. Bar No. 497981)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5694
Facsimile: (202) 637-5910
craig.hoover@hoganlovells.com

*Counsel for Alphabet Inc.*

James L. Stengel (admitted *pro hac vice*)
Darren Pouliot (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP

Respectfully submitted,

*/s/ Emily Johnson Henn*
Emily Johnson Henn (D.C. Bar No. 471077)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
Telephone: (650) 632-4700
ehenn@cov.com

John E. Hall (D.C. Bar No. 415364)
Henry Liu (D.C. Bar No. 986296)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, N.W.
Washington, DC 20001
Telephone: (202) 662-6000

51 West 52nd Street
New York, New York 10019
Telephone: (212) 506-5000
jstengel@orrick.com

Mark Parris (admitted *pro hac vice*)
Carolyn Frantz (admitted *pro hac vice*)
ORRICK, HERRINGTON & SUTCLIFFE LLP
701 Fifth Avenue, Suite 5600
Seattle, Washington 98104
Telephone: (206) 839-4800
cfrantz@orrick.com

Upnit K. Bhatti (D.C. Bar No. 1600480)
ORRICK, HERRINGTON & SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, DC 20005
Telephone: (202) 339-8400
ubhatti@orrick.com

*Counsel for Microsoft Corp.*

Sean Gates (D.D.C. No. CA00051)
CHARIS LEX P.C.
301 N. Lake Avenue, Suite 1100
Pasadena, CA 91101
Telephone: (626) 508-1715
sgates@charislex.com

*Counsel for Tesla, Inc.*

jhall@cov.com
hliu@cov.com

*Counsel for Apple Inc.*

Theodore J. Boutrous Jr. (D.C. Bar No. 420440)
Perlette Michèle Jura (pro hac vice pending)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7000
tboutrous@gibsondunn.com
pjura@gibsondunn.com

Kristin A. Linsley (*pro hac vice* pending)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA  94105
(415) 393-8200
klinsley@gibsondunn.com

Josh Krevitt (*pro hac vice* pending)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166
(212) 351-4000
jkrevitt@gibsondunn.com

*Counsel for Dell Technologies Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that, on August 25, 2020, I electronically filed the foregoing with the United States District Court for the District of Columbia by using the Court's CM/ECF system, which will send a notice of filing to all registered users, including counsel for all parties.


August 25, 2020                                    Respectfully submitted,

                                                   */s/ Emily Johnson Henn*
                                                   Emily Johnson Henn (D.C. Bar No. 471077)