## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DOE I, *et al.*,

                                        *Plaintiffs*,

                    v.                                          Civil Action No. 19-3737 (CJN)

APPLE INC., *et al.*

                                        *Defendants.*

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT
## MOTION TO DISMISS

## **TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT…………………...…………1

II.     STATEMENT OF FACTS……………….....…………………………………...…..3

III.    STANDARD OF REVIEW…………....…………………………..……………………4

IV.     ARGUMENT……………………………………………………………...…..……4

    A.  Plaintiffs State a Claim for Forced Labor
        Under the TVPRA…..…………………………………………………….....…4

        1.  Plaintiffs Properly Allege that Defendants Knew or Should
            Have Known that Forced Child Labor Was Used in DRC
            Cobalt Mining…………………………………………...……..……..……...…4

        2.  Defendants Participated in a Cobalt Supply Chain Venture….…….……………...9

            a.   Defendants' Cobalt Supply Chain in DRC is a "Venture."……………....…9

            b.   Defendants "Participated in" a Cobalt Supply Chain "Venture."…………14

        3.  Defendants Are Financially Benefitting From the Cobalt
            Supply Chain Venture……………………………………………………...18

        4.  All of the 16 Plaintiffs or their Decedents Were Subjected
            to Forced Labor………………………………………………………….....20

    B.  Plaintiffs or their Decedents Were Trafficked………...……..………….……..……..32

    C.  Section 1596(a) Extends the TVPRA to Plaintiff's
        Claims Even if They Are Considered Extraterritorial…………………….……………33

    D.  The Doctrine of Lenity Does Not Apply to the TVPRA,
        a Remedial Statute Meant to Be Construed Broadly…………………………….…..35

    E.  Plaintiffs Have Properly Alleged Their Common Law Claims…………………....…37

        1.  Plaintiffs have stated a claim for unjust enrichment……………..…..……………37

        2.  Plaintiffs have stated a claim for negligent supervision…………………………..39

i

3.    Plaintiffs have stated a claim for intentional
        infliction of emotional distress…………………………………..………………41

F.    Plaintiffs Have Article III Standing to Seek Redress
       for their Injuries Caused by Defendants……………...………………………………42

G.   Plaintiffs Seek Leave to Amend if There Are Any Issues
       the Court Identifies As Requiring More Specificity…………...………………………44

V.    CONCLUSION……………………………………………...…………………..…………45

## TABLE OF AUTHORITIES

### CASES

*Abafita v. Aldukhan*, No. 16-CV-06072 (RMB) (SDA),
   2019 U.S. Dist. LEXIS 59316 (S.D.N.Y. Apr. 4, 2019) ………………………………. 33-34

*Abbott Laboratories v. Portland Retail Druggists Ass'n, Inc.*,
   425 U.S. 1 (1976)……………………………………………..…...…………………….37

*A.B. v. Marriott Int'l, Inc.*,
   No. 19-cv-5770, 2020 U.S. Dist. LEXIS 70644 (E.D. Pa. April 20, 2020)……………...16, 18

*A.B. v. Hilton Worldwide Holdings, Inc.*,
   No. 19-cv-01992, 2020 WL 5371459, 2020 U.S. Dist. LEXIS 163412
   (D. Or. Sept. 8, 2020) …………..……………………………………………5, 11, 19, 43

*A.C. v. Red Roof Inns, Inc.*,
   No. 19-cv-4965, 2020 U.S. Dist. LEXIS 106012, (S.D. Ohio June 16, 2020)…...….1, 5, 15, 19

*Adhikari v. Kellogg Brown & Root, Inc.*,
   845 F.3d 184 (5th Cir. 2017)…………………...………………………………………34

*Aguilera v. Aegis Commc'ns Grp., LLC*,
   72 F. Supp. 3d 975 (W.D. Mo. 2014)…………………...………………………………34

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)………………………………………….……………………...…4

*Baloco ex rel. Tapia v. Drummond* Co.,
   640 F.3d 1338 (11th Cir. 2011)…………………….……………...………….43

*Barrientos v. CoreCivic, Inc.*,
   951 F.3d 1269 (11th Cir. 2020)………………………....………………………30

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)……………………………….…………………….…..4, 36

*Bellotti v. Baird*,
   443 U.S. 622 (1979) ……………………………………....……………………28

*Bistline v. Parker*,
   918 F.3d 849 (10th Cir. 2019)……………………….……………………..10, 16, 25

*B.M. v. Wyndham Hotels & Resorts, Inc.*,  No. 20-cv-00656, 2020 WL 4368214,
2020 U.S. Dist. LEXIS 135494 (N.D. Cal. July 30, 2020) …………………………5,11,16,43

*Braxton-Secret v. A.H. Robins Co.*,
  769 F.2d 528 (9th Cir. 1985) ……………………………………………………………….9

*Bregman v. Perles*,
  747 F.3d 873 (D.C. Cir. 2014)………………………………………………...…………..38-39

*Cahlin v. General Motors Acceptance Corp.*,
  936 F.2d 1151 (11th Cir. 1991)…………………………………………………………23

*Cannon v. Wells Fargo Bank, N.A.*,
  926 F. Supp. 2d 152 (D.D.C. 2013)…………………………...…………..…………………40

*Cousin v. Trans Union Corp.*,
  246 F.3d 359 (5th Cir. 2001) …………………………………………………………..…23

*Crandon v. United States*,
  494 U.S. 152 (1990)…………………………………………………………………………36

*Ditullio v. Boehm*,
  662 F.3d 1091 (9th Cir. 2011)……………………………………………...…………………..2

*Doe I v. Exxon Mobil Corp.*,
  573 F. Supp. 2d 16 (D.D.C. 2008)…..…………....…………..…………………………..41

*Doe S.W. v. Lorain-Elyria Motel, Inc.*,
  No. 19-CV-1194, 2020 WL 1244192, 2020 U.S. Dist. LEXIS 44961
  (S.D. Ohio Mar. 16, 2020) ……………………………………………………5, 8, 11, 43

*Doe v. Nestle, S.A.*, 929 F.3d 623 (9th Cir. 2019), *cert. granted*, 2020 WL 3578678
  (U.S. July 2, 2020) (Nos. 19-416 and 19-453)…………………………………………43-44

*Fed. Deposit Ins. Corp. v. Bank of Am., N.A.*,
  308 F. Supp. 3d 197 (D.D.C. 2018)………………………..………………………………38-39

*Fei Guan v. Bing Ran*,
  No. 17-CV-332 (JCC), 2017 WL 2881363 (E.D. Va. July 6, 2017)…………………………....37

*Firestone v. Firestone*,
  76 F.3d 1205 (D.C. Cir. 1996)………………………………………………………..45

*Foman v. Davis*,
  371 U.S. 178 (1962)…………………………………..………………..……………………..45

*Gilbert v. United States Olympic Comm.*,
  No. 18-cv-00981, 2019 U.S. Dist. LEXIS 166957 (D. Colo. Sept. 27, 2019)........10, 16, 18, 19

*Geiss v. Weinstein Co. Holdings LLC,*
    383 F. Supp. 3d 156 (S.D.N.Y. 2109)… ……………………….…………………….........19

*Godfrey v. Iverson,*
    559 F.3d 569 (D.C. Cir. 2009) ……………………………………….…….................23

*H.H. v. G6 Hosp., LLC,*
    No. 19-CV-755, 2019 WL 6682152, 2019 U.S. Dist. LEXIS 211090
    (S.D. Ohio Dec. 6, 2019) …………………………………………………………...5, 17, 19

*Howard University v. Best,*
    484 A.2d 958 (D.C. 1984)…………..……….……….……….……….……….…………41

*In re Lorazepam & Clorazepate Antitrust Litig.,*
    295 F. Supp. 2d 30, 50-51 (D.D.C. 2003)…………………………………………………39

*Jane Doe 4 v. Red Roof Inns, Inc.,*
    No. 1:19-CV-03845-WMR, 2020 WL 1872336 (N.D. Ga. Apr. 13, 2020)…………………6

*J.C. v. Choice Hotels Int'l, Inc.,*
    No. 20-CV-00155-WHO, 2020 WL 3035794 (N.D. Cal. June 5, 2020)…...………..……11

*Jean-Charles v. Perlitz,*
    937 F. Supp. 2d 276 (D. Conn. 2013)…………...……………………………… 5, 10, 15

*Kiwanuka v. Bakilana,*
    844 F. Supp. 2d 107 (D.D.C. 2012)………………………...……………....…24, 38, 42

*Kramer Assocs., Inc. v. Ikam, Ltd.,*
    888 A.2d 247 (D.C. 2005)…………….…………….......……...……………………..38-39

*Lagayan v. Odeh,*
    199 F. Supp. 3d 21 (D.D.C. 2016)……………………………....………………….24-25

*Lesnik v. Se,*
    374 F. Supp. 3d 923 (N.D. Cal. 2019)………………………..………………...…..…..5

*Leocal v. Ashcroft,*
    543 U.S. 1 (2004)…………………………………………………………...……..35

*Levitt v. Merck & Company, Inc.,*
    914 F.3d 1169 (8th Cir. 2019)……………………………………………………..23

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)..………………………………………………………………42

*M.A. v. Wyndham Hotels & Resorts, Inc.,*
        425 F. Supp. 3d 959 (S.D. Ohio 2019)…………………..……..5, 7, 10-11, 15-16, 19, 43

*Mazor v. Farrell,*
        186 A.3d 829 (D.C. 2018)…………………………………………………………37

*Meyers v. Lamer,*
        743 F.3d 908 (4th Cir. 2014) ……………………………………………..……………23

*Mitchell v. Riegel Textile, Inc.,*
        259 F.2d 954 (D.C. Cir. 1958)……………………………………...…………....39

*M.L. v. Craigslist Inc.,*
        No. C19-6153, 2020 U.S. Dist. LEXIS 166334 (W.D. Wash. Sept. 11, 2020)………...6, 11-12

*Morrison v. Nat'l Australia Bank,*
        561 U.S. 247 (2010)…………………………...…………………..……………………35

*Muchira v. Al-Rawaf,*
        850 F.3d 605 (4th Cir. 2017)………………………………………………………24

*News World Commc'ns, Inc. v. Thompsen,*
        878 A.2d 1218 (D.C. 2005)……………………………….........……………………37

*Noble v. Weinstein,*
        335 F. Supp. 3d 504 (S.D.N.Y 2018)…………………………….…..…....36

*Nunag-Tanedo v. East Baton Rouge Parish School Bd,*
        790 F. Supp. 2d 1134 (C.D. Ca. 2011)……………………………...………30

*O'Connor v. Boeing N. Am.,*
        311 F.3d 1139 (9th Cir. 2002)…………………………………..8-9

*Oveissi v. Islamic Republic of Iran,*
        573 F.3d 835 (D.C. Cir. 2009)……………………………………………37

*Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund,*
        575 U.S. 175 (2015)…………………………………………..……...7

*Peyton v. Rowe,*
        391 U.S. 54 (1968)………………………………….…………..36

*Phelan v. City of Mount Rainier,*
        805 A.2d 930 (D.C. 2002)……………………..……………40

*Plaintiff A v. Schair,*
        No. 2:11-CV-00145-WCO, 2014 WL 12495639 (N.D. Ga. Sept. 9, 2014)……..…...35

*Purcell v. Thomas*,
  928 A.2d 699 (D.C. 2007)……………….…………………..……………………………41

*Ratha v. Phatthana Seafood Co., Ltd.*,
  No. CV 16-4271-JFW, 2017 WL 8293174 (C.D. Cal. Dec. 21, 2017), *appeal pending*,
  *Ratha v. Phatthana Seafood Co., Ltd.*, No. 18-55041 (9ᵗʰ Cir., filed January 10, 2018). . . . . . . .15

*Ricchio v. McLean*,
  853 F.3d 553 (1st Cir. 2017)……………………………………….…….……..5, 10-11, 15

*Robinson v. Washington Metropolitan Area Transit Authority*,
  774 F.3d 33 (D.C. Cir. 2014)……………………………………………..…………………..23

*Roe v. Bridgestone*,
  492 F. Supp. 2d 988 (S.D. Ind. 2007)……………….…..…..……………………………27

*Schneckloth v. Bustamonte*,
  412 U.S. 218 (1973)……………………………………..…………….……………..23

*S.J. v. Choice Hotels Int'l*,
  No. 19-cv-6071, 2020 WL 4059569 (E.D.N.Y. July 20, 2020)………………..……......6, 11

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998)……………………………………..…..……………..……………………42

*St. Louis v. Perlitz*,
  No. 3:13-CV-1132 (RNC), 2016 WL 1408076 (D. Conn. Apr. 8, 2016)……...……………37

*S.Y. v. Naples Hotel Co.*,
  2020 U.S. Dist. LEXIS 139013 (M.D. Fla. August 5, 2020)………………………………..19

*United Klans of Am. v. McGovern*,
  621 F.2d 152 (5th Cir. 1980)……………………..…………………………………………8

*United States ex rel. Elgasim Mohamed Fadlalla v. Dyncorp Int'l LLC*,
  402 F. Supp. 3d 162 (D. Md 2019)………………………………………..………………10

*United States ex rel. Hawkins v. Mantech Int'l Corp.*,
  No. 15-cv-2105, 2020 U.S. Dist. LEXIS 13733 (D.D.C. Jan. 28, 2020)……………..…..21, 29

*United States v. Calimlim*,
  538 F.3d 706 (7th Cir. 2008). ………..…….…………….……………..………...24-25, 30-31

*United States v. Callahan*,
  801 F.3d 606 (6th Cir. 2015)………..…….…………….…..…….…....…….……………25

*United States v. Cash,*
    733 F.3d 1264 (10th Cir. 2013) …………………………………………...………………….23

*United States v. Dann,*
    652 F.3d 1160 (9ᵗʰ Cir. 2011) …………..………………………...………………..………24, 29

*United States v. Djoumessi,*
    538 F.3d 547 (6th Cir. 2008) …………..…………………..…...………………....25, 29-30

*United States v. Farrell,*
    563 F.3d 364 (8ᵗʰ Cir. 2009) …………..…………………………...………………29

*United States v. Hart,*
    226 F.3d 602 (7th Cir. 2000). ………………………………………...…………....………24

*United States v. Hodge,*
    19 F.3d 51 (D.C. Cir. 1994) ……………………………………………………………….23

*United States v. Key,*
    889 F.3d 910 (7th Cir. 2018)…………………………………………………………….28

*United States v. Kozminski,*
    487 U.S. 931 (1988)……………………………………………………………………….25

*United States v. Rivera,*
    799 F.3d 180 (2d. Cir. 2015)……………………………………………………………....22

*United States v. Rouse,*
    936 F.3d 849 (8th Cir. 2019)……………………………………………………………….28

*Wilson v. Good Humor Corp.,*
    757 F.2d 1293 (D.C. Cir. 1985)……………………………………..…………………...41

## STATUTES

18 U.S.C. § 1589…………………..……………....…………...2, 4, 11, 17, 19, 21, 22, 24-26, 31, 33-35

18 U.S.C. § 1590……………………………………………………………….2, 25, 33-35

18. U.S.C. § 1595……………………………………………...……....1, 4-6, 9, 10, 14-19, 36

29 U.S.C. § 212……………………………………………………………...…………...28

# OTHER AUTHORITIES

10A C. Wright, A. Miller & M. Kane, <u>Federal Practice and Procedure</u> § 2729 (4th ed. 1998)..............9

29 C.F.R. § 570.53……………………………………………………….……………....…28

106th Cong. 80 (2000)…………………………………………………………………………12

H.R. Rep. No. 106-939 (2000)…………………………………………..…………………..10, 25

H.R. Rep. No. 110-430 (2007)…………………………………………………………………35

Brief of Members of Congress Senator Blumenthal, Representative Smith *et al.*, as *Amicus Curiae* in Support of Respondents, *Doe I v. Nestle U.S.A.* (Nos.19-416, 91-453)(October 21, 2020) . 1, 2, 10, 34

H. Sanderson, *Glencore Backs Cobalt Mining Pact in DR Congo,*
        FINANCIAL TIMES, Aug. 24, 2020...……………………………………...………3, 13, 26, 44

Laura Ezell, *Human Trafficking in Multinational Supply Chains: A Corporate Director's Fiduciary Duty to*
        *Monitor and Eliminate Human Trafficking Violations*, 69 Vand. L. Rev. 499 (2016)……………12

Pub. L. No. 110-457, 122 Stat. 5044 (2008)……………………………..…………………10

Article 10 of Ministerial Order No. 12 (60) (Dem. Rep. Congo)… ..……………  . .……………27

Convention Concerning the Prohibition and Immediate Action for the Elimination of the Worst Forms of Child Labour (No. 182), June 17, 1999, 2133 U.N.T.S. 161 . . . . . . . . . . . . . . . . . . . . . . 27, 28

## I.      INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs are eleven children who were severely injured in tunnel collapses while they were performing extremely dangerous cobalt mining work and legal representatives for five children who were buried alive and died while mining cobalt. In their joint Motion to Dismiss ("MTD"), ECF No. 33-1, Defendants Apple Inc., Alphabet Inc., Microsoft, Inc., Dell Technologies Inc., and Tesla, Inc. (collectively "Defendants") do not dispute Plaintiffs' factual allegations describing horrific conditions they endured as child cobalt miners in the Democratic Republic of Congo ("DRC"). Defendants also do not dispute that they obtain the cobalt necessary for their lithium-ion batteries from the DRC cobalt mines where Plaintiffs were killed or maimed. Defendants purport to "strongly condemn the labor conditions the complaint describes." MTD at 1.

Defendants argue generally that they are not legally liable for the harm Plaintiffs suffered because Defendants claim to be mere purchasers of DRC cobalt and, as such, have no responsibility for the conditions in the cobalt mines from which they source. In doing so, Defendants disregard the fact that Plaintiffs' allegations, taken as true, establish that Defendants are participants in a cobalt supply chain venture rather than mere remote purchasers of cobalt. In addition, Defendants repeatedly invoke a baseless and legally irrelevant specter of the "floodgates" of supply chain cases that will be coming if Plaintiffs prevail here. MTD at 2. Discussing the scope of liability under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595 *et. seq.*, one court noted that "speculative concerns about opening the floodgates for other kinds of corporate liability…[are] untethered to the statutory language itself." *A.C. v. Red Roof Inns, Inc.*, No. 19-cv-4965, 2020 U.S. Dist. LEXIS 106012, at *11-13 (S.D. Ohio June 16, 2020). As a group of Members of Congress recently emphasized in filing an amicus brief in the Supreme Court concerning the intended scope of the TVPRA, "***it is not enough to target the traffickers themselves. Effective antitrafficking policy requires disincentives directed toward those who would benefit from***

*trafficking—including corporate actors who knowingly profit from trafficking in their*

*supply chains*."[1] Defendants, five tech giants that dominate the DRC supply chain for cobalt, ignore the text and Congressional intent of the TVPRA, as well as the great weight of authority interpreting the TVPRA in arguing for a narrow and restrictive construction of the statute.

Defendants may not agree with the intentionally broad scope of the TVPRA, but that dispute must be taken up with Congress. Numerous recent cases, not cited by Defendants, establish that Plaintiffs' claims are squarely within the scope of the statute. As amended, the TVPRA authorizes civil suits against any person who "knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in [forced labor]." 18 U.S.C. § 1589 (b).[2] The amended TVPRA provides for liability based on what the defendant "should have known," so beneficiaries cannot escape the remedial reach of the statute by ignoring red flags or turning a blind eye. The "benefit" prong imposes liability beyond the direct perpetrator. *Ditullio v.Boehm*, 662 F.3d 1091, 1100 (9th Cir. 2011). This is the issue Defendants repeatedly ignore in arguing that they cannot be liable for the actions of the mining companies they contract with to supply them cobalt. The TVPRA imposes liability to all members of the cobalt venture, including the Defendants herein, because they know the DRC cobalt mines they contract to source from use forced child labor to mine cobalt for them.

Plaintiffs also establish that their TVPRA claims are not impermissibly extraterritorial. Further, Plaintiffs have properly alleged their common law claims for unjust enrichment, negligent

---

[1] Brief of Members of Congress Senator Blumenthal, Representative Smith *et al.*, as *Amicus Curiae* in Support of Respondents, *Doe I v. Nestle U.S.A.* (Nos.19-416, 91-453)(October 21, 2020)(hereinafter "Congressional TVPRA Amicus Brief") at 19-20 (emphasis added), attached hereto as Exhibit A.

[2] 18 U.S.C. § 1590 has similar elements that apply to human trafficking. *See* section IV.B, *infra*.

2

supervision, and intentional infliction of emotional distress. Finally, Plaintiffs establish that they have

legal standing to bring their claims. Defendants' MTD should be dismissed in its entirety.[3]

## II.    STATEMENT OF FACTS

Plaintiffs include a detailed discussion of the facts within their legal responses to

Defendants' arguments. The key facts are not in dispute. The sixteen Plaintiffs are eleven former

child cobalt miners who were severely injured and maimed in cobalt mines and five legal

representatives of five former child miners who were killed in tunnel collapses while mining cobalt.

Plaintiffs and their decedents were forced to work for either Glencore or Huayou, the two major

mining companies with which Defendants have agreements to ensure a steady supply of cheap

cobalt for the lithium-ion batteries that their products all require. FAC ¶¶ 5, 7, 30-64. The DRC has,

by far, the largest deposits of cobalt in the world, with approximately two thirds of the world's

supply. *Id.* ¶ 5. In order to lock in a steady source of essential cobalt from the DRC, Defendants

established a venture with Glencore and Huayou, along with the refiners and distributers that

worked as partners with these companies. *Id.* ¶¶ 6, 7, 99-110. In doing this, each Defendant had

knowledge of the horrible conditions in the cobalt mines and they were aware that child miners

worked in these mines and were regularly killed or maimed in mining accidents. *Id.* ¶¶ 6-11, 16, 113-

19. Defendants did not act to change the practices in the mines or take any concrete steps to stop

Glencore or Huayou from using child miners and allowing them to get killed or maimed until this

case was first filed in December 2019. *See id.* ¶¶ 16-21,88, 106, 110. Recently, Defendants used the

control and influence they always had and required Glencore and Huayou to join a newly formed

industry initiative, the Fair Cobalt Alliance. *See* H. Sanderson, *Glencore Backs Cobalt Mining Pact in DR*

---

[3] Plaintiffs separately respond to Dell's MTD based on lack of personal jurisdiction, ECF No. 32, and Alphabet's MTD based on naming the proper corporate Defendant, ECF No. 34.

*Congo*, F<span>INANCIAL</span> T<span>IMES</span>, Aug. 24, 2020 (hereafter "Cobalt Mining Pact"). [4] Whether this is a

legitimate program or a corporate public relations diversion remains to be seen.

### III.    STANDARD OF REVIEW

The well-established pleading rules require that Plaintiffs' allegations must be taken as true

and all reasonable inferences must be drawn in their favor to determine whether they state a

plausible claim. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 570 (2007); *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). In assessing this standard, *all* of the allegations must be taken as true.

*Twombly*, 550 U.S. at 555. Violating these fundamental rules, Defendants repeatedly ignore Plaintiffs'

allegations, mischaracterize the nature of Plaintiffs' claims, and argue against the reasonable

inferences Plaintiffs draw from the facts.

### IV.    ARGUMENT

#### A. Plaintiffs State a Claim for Forced Labor Under the TVPRA.

Plaintiffs demonstrate that the four elements of a TVPRA forced labor claim have been

satisfied: (1) Defendants knew or should have known that forced child labor was used in DRC

cobalt mining; (2) with this knowledge Defendants nonetheless joined and/or continued to

participate in a supply chain venture that utilized forced child labor; (3) Defendants knowingly

benefited from their participating in the venture; and (4) Plaintiffs, all children, were subjected to

forced labor. 18 U.S.C. § 1589.

##### 1. Plaintiffs Properly Allege that Defendants Knew or Should Have Known that Forced Child Labor Was Used in DRC Cobalt Mining.

Defendants concede, as they must, that the relevant *mens rea* requirement for TVPRA civil

liability stated in section 1595(a) is "knew or should have known." MTD at 26. However, without

---

[4] Available at https://www.ft.com/content/9194c7ee-9726-4462-ae04-e7c72c0818d4

4

mentioning the numerous cases that constitute the great weight of authority on the issue, Defendants overstate the two cases they do cite and incorrectly argue that the standard requires that Plaintiffs allege Defendants "knew or should have known" of the specific harms Plaintiffs suffered. MTD at 26-27. Defendants' position has been soundly rejected. Defendants' effort to interpose a specific knowledge requirement into the TVPRA's "knew or should have known" standard would effectively remove the "should have known" language from the statute. "Defendants need not have actual knowledge of the sex trafficking in order to have participated in the sex trafficking venture for civil liability under the TVPRA, otherwise the 'should have known' language in § 1595(a) would be meaningless." *A.C. v. Red Roof Inns, Inc.*, 2020 U.S. Dist. LEXIS 106012, at *19. "[T]he plain text of § 1595(a) makes clear that the standard under this section is a negligence standard of constructive knowledge, not actual knowledge" *Id.* at *12-13; *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 971 (S.D. Ohio 2019) (section 1595(a) imposes is a should have known negligence standard).

The following cases, constituting the great weight of authority, agree that the "should have known" standard under the TVPRA can be met by showing Defendants were aware of general allegations of the category of violation Plaintiffs suffered and, as a result, were put on notice of the violations at issue. *See, e.g.*, *Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d at 968; *H.H. v. G6 Hosp., LLC*, No. 2:19-CV-755, 2019 WL 6682152, at *3 (S.D. Ohio Dec. 6, 2019); *Doe S.W. v. Lorain-Elyria Motel, Inc.*, No. 2:19-CV-1194, 2020 WL 1244192, at *5 (S.D. Ohio Mar. 16, 2020).

Applying the constructive knowledge standard, courts have uniformly held that liability under section 1595(a) can be imputed based on knowledge or acts of others in the venture with Defendants. *See, e.g.*, *Ricchio v. McLean*, 853 F.3d 553, 556 (1st Cir. 2017); *A.B. v. Hilton Worldwide Holdings, Inc.*, No. 19-cv-01992, 2020 WL 5371459, at *6 (D. Or. Sept. 8, 2020); *B.M. v. Wyndham Hotels & Resorts, Inc.*, No. 20-cv-00656, 2020 WL 4368214, at *4 (N.D. Cal. July 30, 2020); *Jean-Charles v. Perlitz*, 937 F. Supp. 2d 276, 288 (D. Conn. 2013); *see also*, *Lesnik v. Se*, 374 F. Supp. 3d 923,

952-953 (N.D. Cal. 2019) (finding that Defendant Tesla had the required knowledge of forced labor conditions at a subcontractor based on constructive knowledge from its direct contractor of worker conditions, access to entry and exit records at the plant, and access to worker hazard records).

Summing up the state of the law after reviewing most of the cases cited above, the Court in *M.L. v. Craigslist Inc.* noted that "Craigslist argues that to state a claim under § 1595, Plaintiff must allege that Craigslist possessed knowledge or constructive knowledge about Plaintiff's *specific* trafficking, rather than general, abstract knowledge of potential trafficking. . . . These cases make clear that this Court should apply a negligence, constructive knowledge standard." No. C19-6153, 2020 U.S. Dist. LEXIS 166334, at *17-18 (W.D. Wash. Sept. 11, 2020).

Instead of discussing the many cases rejecting their argument that specific knowledge is required under section 1595(a), Defendants cite only two cases they claim support their position, *Jane Doe 4 v. Red Roof Inns, Inc.*, No. 1:19-CV-03845-WMR, 2020 WL 1872336, at *3 (N.D. Ga. Apr. 13, 2020) and *S.J. v. Choice Hotels Int'l*, No. 19-cv-60712020 WL 4059569, at *5 (E.D.N.Y. July 20, 2020). MTD at 26. Defendants overstate the ruling in *Choice Hotels*. The Court there did not require defendants to have specific knowledge of plaintiff being trafficked; rather, the court required knowledge of the sex trafficking venture that injured plaintiff. *See id.* at *12-13. Defendants herein clearly have knowledge of the cobalt supply chain venture discussed in the next section. *Jane Doe 4* does suggest specific knowledge is required, making it an outlier that should not be followed. Indeed, while Defendants failed to disclose it, that court recognized it was in conflict with other courts and  certified the case for immediate appeal under 28 U.S.C. 1292(b). *Jane Doe 4*, 2020 U.S. Dist. LEXIS 159897, at *5-7.

Plaintiffs' allegations here easily satisfy any reasonable construction of the "should have known" standard in section 1595(a). Defendants' contrary argument is based solely on their application of the improper legal standard they advance that Plaintiffs' allegations must show Defendants had knowledge specific to the Plaintiffs. *See* MTD at 26-27. Plaintiffs allege that all of the Defendants

had specific knowledge of horrific conditions facing child miners in DRC cobalt mines from a number of sources. For example, they all had internal or external risk assessment reports and corporate social responsibility offices. FAC ¶¶ 17-18. Apple even fired an employee who implored the company to do more to stop the use of child labor. *Id.* ¶ 17. Four of the companies–Apple, Dell, Microsoft, and Alphabet–collaborated with PACT, a non-profit organization to fund a "model" mine that is child labor free. *Id.* ¶ 115. As the FAC states, "[t]hese companies cannot be paying to try to stop a system of forced child labor that they do not have specific knowledge of." *Id.*[5]

In addition, all Defendants have specific policies that, on paper, prohibit child labor in their supply chains, indicating their knowledge that child labor could exist. FAC ¶¶ 20-21. In a strange response to this allegation, Defendants strongly reinforce it: "***Defendants' policies prohibit*** certain unlawful labor practices, including the use of ***child labor***, ***at any tier of the supply chain*** and ***require regular supplier audits to evaluate compliance.***" MTD at 6 (emphasis added). Taking as true Plaintiffs' allegations that forced child labor is endemic in DRC cobalt mining, *see, e.g.*, FAC ¶¶ 2, 7, 10-16, either Defendants have knowledge of "many" specific reports confirming forced child labor in the cobalt supply chains or their audits of the policies against child labor are grossly ineffective in ending forced child labor. If the latter, "[s]everal courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence." *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d at 968; *see*

---

[5] Defendants label these allegations as fatally "conclusory." MTD at 26. A conclusory allegation on knowledge would be "defendants had knowledge of . . ." A proper allegation under the *Iqbal/Twombly* standard provides, as Plaintiffs do here, details of **how** the Defendants acquired their knowledge. *See, e.g., Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 195-96 (2015) (rejecting as conclusory the allegation that defendant lacked "reasonable grounds for the belief" made without supporting facts).

*also Does S.W. v. Lorain-Elyria Motel, Inc.*, 2020 U.S. Dist. LEXIS 44961, at *16-18 (stating Defendants "failed to take adequate steps to train staff in order to prevent" sex trafficking at their hotels).

Defendants also had constructive knowledge of pervasive forced child labor in DRC cobalt mining as a result of widespread public reports from highly credible sources. Among many, Plaintiffs note that "cobalt mined in the DRC is listed on the U.S. Department of Labor's International Labor Affairs Bureau's List of Goods Produced with Child Labor." FAC ¶ 9. Numerous stories with detailed findings and photos appeared in major media reports, including the <u>Washington Post</u>, <u>The Guardian</u>, and the <u>Mail on Sunday</u>, all before Plaintiffs were killed or injured. *See, e.g.,* FAC ¶¶ 10-13.

In 2016, Amnesty International published a major report on the horrific conditions experienced by child laborers mining cobalt in the DRC, titled *This Is What We Die For – Human Rights Abuses in the Democratic Republic of Congo Power the Global Trade in Cobalt* (hereinafter the "Amnesty Report"). FAC ¶ 12. The report states,

> **It is no secret that children mine cobalt in the DRC**. The US Department of Labor has listed it as a good produced by child labour since at least 2009. Several non-governmental organizations (NGOs) have also published studies on child labour in Katangan mines. UNICEF estimated in 2014 that approximately 40,000 boys and girls work in all the mines across the whole of the former province, many of them involved in cobalt mining. In 2013, World Vision published a detailed study of children working in the artisanal mines of Kambove. *Id.* ¶ 12 (emphasis added).

Defendants again, relying on the incorrect legal standard, dismiss these allegations because the reports are not specific to the Plaintiffs, MTD at 27. There is no question that these prominent public reports gave Defendants notice and constructive knowledge of forced child labor in their cobalt supply chain venture. *See, e.g.*, *O'Connor v. Boeing N. Am.,* 311 F.3d 1139, 1152 (9th Cir. 2002); *United Klans of Am. v. McGovern*, 621 F.2d 152, 154 (5th Cir. 1980).

In fact, Amnesty discussed directly with Apple and Microsoft their failed efforts to eliminate child labor from their cobalt supply chains, and Dell failed to respond to Amnesty's inquiries about

child labor in its cobalt supply chain. Amnesty Report at 8-9, 59-60, 64-65, 82. Questioned by the Washington Post about child labor in its cobalt supply chain, Tesla's spokesperson said "we need to take [child labor] even more seriously. So, we are going to send one of our guys there." FAC ¶ 116. Rather than sending someone to DRC to address the known forced child labor issues, after this case was first filed and provided additional notice, Tesla purchased an interest in Glencore, a company repeatedly identified as using children to mine cobalt. FAC ¶ 32. If any of the Defendants can really claim they did not have at least constructive knowledge of the appalling mining conditions and use of child labor in the DRC from these and other sources, simply googling "child labor in cobalt mines" turns up the entire history of the abuses of children forced to mine cobalt in DRC. The fact is Defendants turned a blind eye to the widely known use of forced child labor in cobalt mining, including by their contracted suppliers, Glencore and Huayou. FAC ¶¶ 110, 112, 115, 117-19.

While Plaintiffs' allegations on the intent issue are more than sufficient to withstand a motion to dismiss, even if the issue is close, questions involving a person's state of mind, *e.g.*, whether a party knew or should have known, are generally inappropriate for summary judgment, let alone resolution on a motion to dismiss. *See O'Connor*, 311 F.3d at 1152; *Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985); 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2729 (4th ed. 1998).

## 2. Defendants Participated in a Cobalt Supply Chain Venture.

### a. Defendants' Cobalt Supply Chain in DRC is a "Venture."

Citing only a dictionary and not a single case applying the TVPRA or its legislative history, Defendants advocate for a restrictive reading of the TVPRA and proclaim their cobalt supply chain cannot be a "venture" under section 1595(a) of the TVPRA. MTD at 16-19. Based on the TVPRA's legislative history and cases actually defining "venture" in the TVPRA, Plaintiffs' allegations taken with all reasonable inferences properly allege that Defendants are in a "venture."

Defendants complain about the breadth of the TVPRA's reach, but this reach was intended by Congress. *See* Congressional TVPRA Amicus Brief, *supra* note 1, at 19-20. Indeed, the "benefit from participation in a venture" language was originally enacted only in the criminal provision of section 1591 of the TVPRA. Congress omitted it from the other TVPRA sections out of concern that the provision was too broad; the conferees "agreed not to extend it to persons who benefit financially or otherwise from trafficking out of a concern that such a provision might include within its scope persons, such as stockholders in large companies who have an attenuated financial interest in a legitimate business where a few employees might act in violation of the new statute." H.R. Rep. No. 106-939, at 101-02 (2000) (Conf. Rep.).

Notwithstanding those initial concerns about the breadth of liability, Congress added the language to the other TVPRA sections in 2008, including the provision at issue here, section 1595(a) Pub. L. No. 110-457, 122 Stat. 5044 (2008). Section 1595(a) does not define "venture" with respect to civil liability, but the identical statutory language in the parallel criminal provision of 1595(b) defines "venture" as "any group of two or more individuals associated in fact, whether or not a legal entity." 18 U.S.C. § 1591(e)(5). Recognizing that within the TVPRA this definition does not apply directly to the civil liability section 1595(a), courts have considered the definition a useful indication of the scope of "venture" within the civil context. *See, e.g.*, *Bistline v. Parker*, 918 F.3d 849, 873 (10th Cir. 2019); *Ricchio v. McLean*, 853 F.3d at 556; *United States ex rel. Elgasim Mohamed Fadlalla v. Dyncorp Int'l LLC*, 402 F. Supp. 3d 162, 196 (D. Md 2019); *Gilbert v. United States Olympic Comm.*, No. 18-cv-00981, 2019 U.S. Dist. LEXIS 166957, at *47-51, (D. Colo. Sept 27, 2019); *Jean-Charles,* 937 F. Supp. 2d at 288 n. 11 (D. Conn. 2013). Other courts rejected this approach, finding the criminal provision **narrower** than the provision establishing civil liability. *See, e.g.*, *Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d at 968; *J.C. v. Choice Hotels Int'l, Inc.*, No. 20-CV-00155-WHO, 2020 WL 3035794, at *1 n. 1 (N.D. Cal. June 5, 2020).

10

In pushing their dictionary definition of "venture," Defendants express alarm that Plaintiffs' position on the scope of "venture" would have sweeping consequences and could subject venture participants to criminal liability as well. MTD at 18-19. While Defendants fail to mention the TVPRA's definition of "venture" applicable to criminal cases, even if the narrower definition of "venture" from the criminal statute is applied, Plaintiffs' allegations easily establish Defendants were "associated in fact" in a cobalt supply chain "venture." *See* FAC ¶¶ 99-110.

All of the cases that have assessed the scope of "venture" using the "associated in fact" language of section 1591(e)(5) have found a "venture" existed based solely on an informal, tacit understanding. The hotel/sex trafficking cases in particular do not require any formal agreement or creation of a business relationship. Instead, a tacit understanding that the hotels would rent rooms to a sex trafficker and turn a blind eye to the unlawful conduct was sufficient. In none of these cases was there any explicit agreement forming the venture, which was found to exist based on a mutually beneficial relationship. *See, e.g., A.B. v. Hilton Worldwide Holdings, Inc.,* 2020 WL 5371459, at *6; *B.M. v. Wyndham Hotels & Resorts, Inc.,* 2020 WL 4368214, at *4; *M.A. v. Wyndham Hotels & Resorts, Inc.,* 425 F. Supp. 3d at 968; *see also Does S.W. v. Lorain-Elyria Motel, Inc.,* 2020 U.S. Dist. LEXIS 44961, at *16-18.

In one case, the First Circuit held that allegations that motel owner defendants rented out a room were sufficient to constitute "participation in a venture" under both § 1591 and § 1589(b), because it could be inferred that "the Patels understood that in receiving money as rent for the quarters where McLean was mistreating Ricchio, they were associating with him." *Ricchio,* 853 F.3d at 555 (Souter, J. by designation). In *Craigslist Inc.,* 2020 U.S. Dist. LEXIS 166334, at *19-20, a venture was found based only on the fact that Craigslist allowed ads that it should have known were placed by sex traffickers to run on its list service in exchange for payment. There was apparently no agreement at all, and the association was based on a mutually beneficial relationship. *See id.*

11

Defendants' overall strategy of raising alarm over the potential scope of Plaintiffs' complaint ignores, as these cases demonstrate, that the TVPRA *is* broad in scope and was intended to establish a strong tool to fight forced and trafficked labor in the global economy. "[I]t is necessary to punish those who knowingly benefit or profit from slavery or use contractors, intermediaries, and others to do their bidding." 106th Cong. 80 (2000) (statement of William Yeomans, Chief of Staff, Civil Rights Div., U.S. Dep't. of Justice); *see also* Laura Ezell, *Human Trafficking in Multinational Supply Chains: A Corporate Director's Fiduciary Duty to Monitor and Eliminate Human Trafficking Violations*, 69 Vand. L. Rev. 499, 501 (2016) (stating that the TVPRA was intended to reach global supply chain violations). As such, "[t]he language of the 2008 TVPRA eclipses the need for complicated legal theories of vicarious liability or joint employment to hold corporations accountable for actions of their suppliers[.]" *Id.* at 528. A firm could be held liable for financial benefit accrued from business relationships, including those abroad, where the corporation knew or should have known that the other party employed trafficked labor. *Id.*

Here, Plaintiffs allege much more than Defendants' mere tacit agreement with the cobalt suppliers; there was a formal agreement between each of the five Defendants that one or both of the main purveyors of cobalt mined with child labor, Glencore and Huayou, would provide them with a steady supply of cobalt at a price that reflected the cheap forced labor of child miners. *See* FAC ¶¶ 72-86, 88-89, 99, 100, 107, 110-13. The additional tacit term is, as established in the preceding section, that Defendants had specific or constructive knowledge of forced child laborers mining their cobalt but turned a blind eye to ensure their supply of cheap DRC cobalt. *See supra*, section IV.A, and FAC ¶¶ 110, 112, 115, 117-19. The tacit agreement was modified as a result of this lawsuit. Once Defendants could no longer merely turn a blind eye following increased public scrutiny, they, as major customers with actual clout and control over their cobalt supply chains, FAC ¶ 88, 106, 110, required Glencore and Huayou to join the Fair Cobalt Alliance. *See* Cobalt Mining

12

Pact;[6] *see also* FAC ¶ 106 (After this case was filed, Huayou specifically said its customers now required it to stop using child labor). Defendants' improper factual argument that there are no facts suggesting that these competing companies actually cooperated within the venture is severely undermined by the explicit participation of the companies in the Fair Cobalt Alliance to create the joint impression that they are taking action within their cobalt venture to combat forced child labor.

Defendants attempt to muddy the waters of their cobalt supply chain and invent a nonexistent complexity. However, Plaintiffs' allegations establish that, regardless of the steps between mining and processing the cobalt, Defendants all had direct purchasing relationships with Glencore and/or Huayou, which both used forced child labor in producing cobalt and all of the Plaintiffs were injured or killed at mines owned or operated by these mining companies. The cobalt supply chain relationships are not diffuse or unknown as in other situations, such as purchasing oil on the spot market or soybeans from a broker. Plaintiffs allege that Defendants are among the handful of large tech companies buying cobalt and that each company had a direct relationship with its major cobalt suppliers, Glencore and/or Huayou. *See* FAC ¶¶ 72-86, 88-89, 99, 100, 107, 110-13. Indeed, Defendants conclusively confirm the existence of this relationship in their Motion, stating, "***Defendants' policies prohibit*** certain unlawful labor practices, including the use of ***child labor, at any tier of the supply chain and require regular supplier audits to evaluate compliance****."* MTD at 6 (emphasis added). Defendants are dealing directly with and have made explicit and tacit agreements with their major cobalt suppliers, Glencore and/or Huayou.

---

[6] Available at https://www.ft.com/content/9194c7ee-9726-4462-ae04-e7c72c0818d4

Plaintiffs' allegations establish that the five Defendants were in a "venture" with their cobalt suppliers that was first based on a formal supplier agreement and then an additional tacit understanding that Defendants would turn a blind eye to the child miners providing cheap cobalt for the companies. This venture is much better-defined than in virtually any of the cases discussed herein that found a "venture" established merely by a tacit understanding.

      b.   Defendants "Participated in" a Cobalt Supply Chain "Venture."

Defendants' entire argument that they did not "participate in" a venture to satisfy TVPRA's section 1595(a) is based on a false premise that Plaintiffs seek to impose liability merely because Defendants made "downstream purchases" of cobalt. *See* MTD at 19-22.  As the preceding section makes clear, Defendants are ***not*** mere purchasers of cobalt but are participants in a cobalt supply chain venture in which they have explicit supplier agreements, *see* FAC ¶¶ 72-86, 88-89, 99, 100, 107, 110-13, and an implicit understanding that Defendants were getting cheap cobalt mined by children and they would turn a blind eye to continue with and protect the venture. *Id.* ¶¶ 110, 112, 115, 117-19. Indeed, Tesla has doubled down on its participation in the venture by purchasing a direct stake in Glencore. *Id.* ¶ 23.

Defendants turn again to a dictionary and cite non-TVPRA cases to define "participate," *see* MTD 19, but Defendants' position that Plaintiffs must allege Defendants ***actively*** participated in the forced labor violation of the TVPRA is ***not*** the law. *See* MTD at 19-20.  As was previously established in discussing the intent requirement, *see* section IV.A, *supra*, Defendants need not have actual knowledge of the forced labor or trafficking "in order to have participated in a forced labor or trafficking venture for civil liability under the TVPRA, otherwise the 'should have known' language in § 1595(a) would be meaningless." *Red Roof Inns, Inc.*, 2020 U.S. Dist. LEXIS 106012, at *1; *see also*, *Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d at 971.

14

Courts have consistently held that participation in a venture does not require actual participation in the wrongful act. For example, in *Jean-Charles* plaintiffs alleged that the venture was Project Pierre Toussaint, a school for poor Haitian children run by the Haiti Fund in conjunction with Fairfield University and Father Paul E. Carrier. 937 F. Supp. 2d at 279-80. There was no allegation that the school was organized for the purpose of sex trafficking. But because Perlitz, a venture participant, engaged in sex trafficking, Carrier and Fairfield University were liable for benefitting from their participation in the school, even if the common purpose was education and not sex trafficking. *Id.*

Citing *Jean-Charles* with approval, the *Red Roof Inns* Court found that a hotel participated in a venture with a sex trafficker by renting rooms and selling amenities to the trafficker. This was an established business relationship founded on a tacit agreement to allow the trafficking that provided a financial benefit to the hotel. *Red Roof Inns, Inc.,* 2020 U.S. Dist. LEXIS 106012, at *19; *see also Ricchio,* 853 F.3d at 556 (holding the allegation that motel owners rented a room to a sex trafficker and benefitted financially was sufficient to establish participation in a venture).  Every court but one[7] interpreting the "participation in a venture" language for civil liability under section 1595(a) of the TVPRA[8] agrees that a defendant need not actively participate in the underlying forced labor or trafficking as long as they knew or should have known they are supporting a venture that is

---

[7] The single outlier decision that incorrectly required direct participation in the forced labor or trafficking activity, *Ratha v. Phatthana Seafood Co., Ltd.*, No. CV 16-4271-JFW, 2017 WL 8293174, at *4 (C.D. Cal. Dec. 21, 2017), is currently pending on appeal. *Ratha v. Phatthana Seafood Co., Ltd.*, No. 18-55041 (9th Cir., filed January 10, 2018).

[8] The other case Defendants rely heavily upon, *United States v. Afyare*, 632 F. App'x 272 (6th Cir. 2016), *see* MTD at 19-20, was interpreting a separate criminal provision of the TVPRA, section 1591(a)(2). Courts have rejected applying *Afyare* to the distinct language of the civil provision at issue here, section 1595 (a).  *See, e.g.,*  *Red Roof Inns, Inc.*, 2020 U.S. Dist. LEXIS 106012, *16-19, 2020 WL 3256261*; *Gilbert v. United States Olympic Comm.*, 2019 U.S. Dist. LEXIS 166957, *47-51.

.

responsible for the unlawful activity. *See, e.g.*, *Bistline*, 918 F.3d at 876 ("In this case, plaintiffs allege facts supporting their claims that defendants were well aware of the crimes being committed against plaintiffs, did nothing to expose these atrocities, tacitly approved of the conduct by constructing a scheme for the purpose of enabling it, and benefited for years from [it]"); *Wyndham Hotels & Resorts, Inc.*, 2020 U.S. Dist. LEXIS 135494, at *14, 20 ("'participation in venture under section 1595 of the TVPRA does not require an 'overt act' of participation in the sex trafficking itself . . . . [T]he Court finds that Plaintiff has alleged sufficient facts to support a plausible claim that Wyndham and Choice received financial benefits from a venture they vicariously participate in (through their franchisees) that the franchisees should have known was engaged in sex trafficking"); *A.B. v. Marriott Int'l, Inc.*, No. 19-cv-5770, 2020 U.S. Dist. LEXIS 70644, at *2 (E.D. Pa. April 20, 2020)("A.B. sufficiently pleads specific facts from which we can reasonably infer Marriott . . . knowingly benefitted from participating in a venture which it should have known engaged in her trafficking. This is all Congress requires a victim to plead"); *Gilbert v. United States Olympic Comm.*, 2019 U.S. Dist. LEXIS 166957, at *47-51 ("Although Section 1589(b) certainly requires the defendant to participate in a venture with another member who violated Section 1589(a), nothing in it requires that the defendant's participation be an overt act in furtherance of the other member's TVPA violation."). As the Court in *G6 Hosp., LLC*, 2019 U.S. Dist. LEXIS 211090,  stated clearly:

> ***Defendants need not have actual knowledge of the sex trafficking in order to have participated in the sex trafficking venture for civil liability under the TVPRA, otherwise the "should have known" language in § 1595(a) would be meaningless.*** This Court finds Plaintiff has alleged sufficient facts to show Defendants "participated in a venture" under § 1595 by alleging that Defendants rented rooms to people it knew or should have known were engaged in sex trafficking. These acts and omissions by Defendants, H.H. alleges, facilitated the sex trafficking venture. *Id.* at *11-13 (emphasis added).

Defendants dismiss this line of cases, arguing that "[h]ere the complaint does not allege that Defendants engaged in any such tacit agreement for the operation of a forced labor or trafficking venture." MTD at 21. This argument stands in direct conflict with Plaintiffs' allegations and the

reasonable inferences required to be drawn from them. As the preceding section demonstrating that Defendants were in a cobalt supply chain "venture" established, Defendants made a formal agreement to have Glencore and/or Huayou supply them with cobalt. FAC ¶¶ 72-86, 88-89, 99, 100, 107, 110-13. In addition, Defendants had a tacit agreement that the cobalt supply chain would include cheap cobalt mined by forced child labor. Defendants then protected this tacit agreement by covering it up, enacting sham programs to mislead the public, and failing to implement known policies that would protect against abusing children. FAC ¶¶ 110, 112, 115, 117-19.

Defendants have always had the necessary control to require Glencore and Huayou to stop using child labor, FAC 88, 106, 110, but confirming they did have this control, Defendants waited until after this lawsuit was filed, and subsequently caused increased public scrutiny of their venture, to at least begin working to create the impression they were trying to stop the venture from using forced child labor. *See supra* note 6 and FAC ¶ 106. That they could do this certainly demonstrates they were, at a minimum, participating in a mutually beneficial business relationship within a venture that was using forced and trafficked child labor. This is not a case that pushes the outer limits of the scope of the TVPRA. Defendants are knowingly participating in a cobalt supply chain venture that benefits them financially, and they could, if they chose to put the lives of child miners above their profits, stop the abuse of children forced to work in DRC cobalt mines.[9]

---

[9] Defendants have a separate miscellaneous section arguing against the facts alleged and the reasonable inferences to be drawn. *See* MTD at 22-23. Plaintiffs have addressed in this section the specifics of those arguments. Defendants' domination of the cobalt market shows that the supply chain of cobalt is finite and specific to a few large tech companies. The fact that Defendants have bogus or ineffectual child labor programs and are attempting to deceive the public shows both that Defendants know they have child labor in their cobalt supply chain and want to keep their participation in the unlawful venture from the public. On their own motion to dismiss, Defendants are not permitted to dispute facts alleged and reasonable inferences to be drawn from them.

3.   **Defendants Are Financially Benefitting From the Cobalt Supply Chain Venture.**

In addressing the requirement of section 1595(a) that a plaintiff must allege the defendant "knowingly benefits financially or by receiving anything of value from participation in a venture," Defendants here once again cite only to a dictionary and entirely ignore the applicable case law defining this provision of the TVPRA. MTD at 27-28. There is a growing body of law, particularly in the hotel/sex trafficking cases, uniformly holding that a "benefit" or "anything of value" can be from whatever Defendants gain from participating in the venture. In the numerous hotel cases around the country, none of which are cited by Defendants on this issue, the courts uniformly reject the argument Defendants here are making that the benefit must derive directly from the TVPRA violation. *Id.* at 28. For example, in *Red Roof Inns, Inc.*, 2020 U.S. Dist. LEXIS 106012, at *11-12, after first rejecting the very "floodgates" argument Defendants here are making as "untethered to the statutory language itself," the Court held that the benefit standard "merely requires that Defendant knowingly receive a financial benefit, not that the perpetrator have actual knowledge of the sex trafficking venture. As this Court found in *M.A.* and *H.H.*, 'the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard.' *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959 [at 971] . . . ; *H.H.* [v. *G6 Hosp., LLC*], 2019 WL 6682152 at *2." 2020 U.S. Dist. LEXIS 106012, at *11-12. Numerous other cases are in accord. *See, e.g.*, *Marriott Int'l, Inc.*, 2020 U.S. Dist. LEXIS 70644, at *21-22, *37-38 (concluding, after surveying the case law, that "the rental of a room constitutes a financial benefit from a relationship with the trafficker sufficient to meet this element of the § 1595(a) standard" (citation omitted)); *S.Y. v. Naples Hotel Co.*, No. 20-cv-118-FtM-29MRM, 2020 U.S. Dist. LEXIS 139013, at *12 (M.D. Fla. August 5, 2020) (court found required benefit to hotel from payments for rooms paid by the sex traffickers and sales of food and beverages); *A.B. v. Hilton Worldwide Holdings Inc.*, 2020 U.S. Dist. LEXIS 163412, at *20-21 (finding that hotel benefitted from room rentals and

18

other charge to rooms in which the Plaintiff was trafficked); *see also Gilbert v. United States Olympic Comm.*, 2019 U.S. Dist. LEXIS 166957, at \*45-51 (forced labor provision of §1589(b) does not "require[] the party to benefit from the [forced] labor or services for liability to attach").

Defendants ignore this directly-applicable authority and they grossly misstate the sole case they do cite for their position, *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y 2109). *See* MTD at 28. The language Defendants cite for *Geiss* is incomplete. The Court was actually addressing the "participate in a venture" prong of the standard, not the benefit prong, and stated "the participation giving rise to the benefit must be participation in a sex-trafficking venture." *Geiss*, 383 F. Supp. 3d at 169. After finding that Defendants "undoubtedly benefited from H. Weinstein's continued employment" the court found the defendant company had not participated in a sex trafficking venture. *Id.* at 170.

Using the correct test based on the uniform agreement of the courts addressing the "benefit" or "anything of value" standard, Plaintiffs' allegations establish Defendants benefitted from the cheap and steady supply of cobalt in the venture provided to them. FAC ¶¶ 7, 88, 89, 99, 100-12. These allegations establish that Defendants benefitted from participation in the venture by obtaining cobalt at a cheaper price because it was mined by children,[10] that they are willing to turn a blind eye to the forced child labor the venture depends upon to get a steady supply of the essential cobalt, and that they participate in covering up the child labor with their suppliers to avoid a financial penalty from consumers. These factually specific allegations are more than sufficient to meet the benefit

---

[10] Defendants' assert that the lower price of cobalt due to forced child labor is not a "benefit" to them because other tech companies who are not defendants in this case might also be getting the cheap cobalt. MTD at 28. Defendants cite no authority for this frivolous argument and there is nothing in the statutory language or any case interpreting the benefit requirement saying the benefit must be unique to the Defendants. Plaintiffs' assertion that Defendants are buying cobalt at a cheaper price due to child labor cannot be disputed on a motion to dismiss.

requirement. Further, as is specifically alleged, they could solve the child labor issue in cobalt mining, but it would cost them money—the money they are saving by participating in the venture dependent upon child labor—and that is a price they are unwilling to pay. *See* FAC ¶¶ 110, 112.

### 4. All 16 Plaintiffs or their Decedents Were Subjected to Forced Labor.

Plaintiffs or their decedents were children when they started working in the cobalt mines and when they were killed or maimed in mining accidents. *See* FAC ¶¶ 30-64. When they were killed or maimed, Plaintiffs or their decedents were performing mining work that was extremely hazardous. As Plaintiffs allege in detail, they were forced to work in cobalt mines containing extremely fragile tunnels without any safety equipment or structural reinforcements in the tunnels. They worked in constant fear because they knew that tunnel collapses were common in the cobalt mines and child miners were routinely killed or maimed. In addition, they worked long hours in filthy conditions and they were food insecure, often hungry and malnourished. Plaintiffs were exposed to dangerous chemicals from working in the midst of cobalt dust without any protective masks and with poor ventilation. They all were virtually illiterate because they were forced to drop out of school when they could not pay their school fees. Plaintiffs lived in extreme poverty at the time they started working in the cobalt mines for the venture. FAC ¶¶ 6, 8, 9, 11, 12, 30-64.

Defendants' position is brutally clear: they purport to "abhor" child labor, but coldly assert "the statutory language of the TVPRA does not cover the circumstances Plaintiffs describe" because, they argue, Plaintiffs were not "compelled" to work within the meaning of the statute. MTD at 24-25. The TVPRA most certainly does prohibit Defendants, operating within the cobalt venture, from knowingly benefiting from Plaintiffs' labor as described in the Complaint.

Section 1589 of the TVPRA defines "forced labor" as:

  **(a)** Whoever knowingly provides or obtains the labor or services of a person by

any one of, or by any combination of, the following means–[11]

> **(2)** by means of ***serious harm or threats of serious harm*** to that person or another person; [or]
> **(4)** by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person ***would suffer serious harm or physical restraint***. 18 U.S.C. § 1589(a) (emphasis added).

Subsection (c)(2) defines "serious harm:"

> The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, ***under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm***. *Id.* (emphasis added).

As an initial matter, there can be no debate in assessing the "serious harm"[12] issue that the statute specifically states as per the emphasized portion of section 1589(c)(2) above that all of the victim's surrounding circumstances must be considered to determine whether a "reasonable person" of the same background would feel compelled to perform the labor at issue. One often-cited Second Circuit decision explains that this standard is a hybrid: it permits the jury to consider the particular vulnerabilities of a person in the victim's position but also requires that his acquiescence be objectively reasonable under the circumstances. *United States v. Rivera*, 799 F.3d 180, 186-187 (2d. Cir. 2015). In considering whether the employer intends the victims to believe they cannot leave, the Court must "consider the particular vulnerabilities of a person in the victim's position," though the victim's acquiescence must be *objectively reasonable* under the circumstances. *Id.*

---

[11] Section 1589 (a) provides four distinct types of conduct that satisfy the forced labor standard but Plaintiffs herein rely only on subsections (2) and (4).

[12] The District of Columbia Circuit has yet to weigh in on the scope of the "serious harm" provision under section 1589(c)(2) of the TVPRA. *See United States ex rel. Hawkins v. Mantech Int'l Corp.*, No. 15-cv-2105, 2020 U.S. Dist. LEXIS 13733, at *47 (D.D.C. Jan. 28, 2020).

This assessment that first looks at each Plaintiff's own subjective intent and then applies the facts to the "reasonable person" standard is an inherently factual issue that should not be resolved on a motion to dismiss. Plaintiffs' particularly challenging personal circumstances are alleged in the FAC and would certainly allow the inference to be drawn that they themselves felt coerced. Assessing the facts and applying them to an objective standard of reasonableness is a question for the jury. *See, e.g., Robinson v. Washington Metropolitan Area Transit Authority*, 774 F.3d 33, 39 (D.C. Cir. 2014) (suggesting that the applicable standard in negligence cases, to be ascertained by the jury, is the traditional reasonable person standard); *Godfrey v. Iverson*, 559 F.3d 569, 572 (D.C. Cir. 2009)*; see also Meyers v. Lamer*, 743 F.3d 908, 912 (4th Cir. 2014) ([I]t is [ordinarily] for the jury to determine whether a plaintiff knew of the danger, appreciated the risk, and acted voluntarily"); *Cousin v. Trans Union Corp.*, 246 F.3d 359 (5th Cir. 2001) ("In the majority of cases, reasonableness is a question for the jury"); *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991) (stating that reasonableness "will be a jury question in the overwhelming majority of cases"); *Levitt v. Merck & Company, Inc.*, 914 F.3d 1169, 1172 (8th Cir. 2019) (same).

In addition, the question of whether Plaintiffs or their decedents were ultimately "forced" or "coerced" to perform the labor that injured or killed them is a question of fact for the jury. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) (holding in the context of the Fourth and Fifth Amendment that "the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances"); *United States v. Hodge*, 19 F.3d 51, 52 (D.C. Cir. 1994) (same; quoting *Schneckloth*); *see also United States v. Cash*, 733 F.3d 1264, 1279 (10th Cir. 2013) ("whether police intimidated or threatened a suspect or whether the suspect was particularly susceptible to police coercion" are both factual questions).

22

Likewise, the assessment required by subsection 1589(a)(4) as to whether there was a "scheme, plan, or pattern intended to cause the person to believe that" serious harm would result if he failed to work is an assessment of a member of the venture's subjective intent, a question that is reserved for the finder of fact. "The jury must find that the employer intended to cause the victim to believe that she would suffer serious harm — from the vantage point of the victim — if she did not continue to work. The statute "requires that the plan be intended to cause the victim to believe that that harm will befall her." *United States v. Calimlim*, 538 F.3d 706, 711-12 (7th Cir. 2008). A statement is considered a threat if "a reasonable person would believe that the intended audience would receive it as a threat, regardless of whether the statement was intended to be carried out." *Id.* at 713 (citing *United States v. Hart*, 226 F.3d 602, 607 (7th Cir. 2000)); *see also United States v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) ("The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim[s] to believe that such harm would befall" them if they left employment); *Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017), quoting *Dann*, 652 F.3d at 1170.

These factual issues of intent are essential to a determination of whether Plaintiffs satisfy the "forced labor" standard. Accordingly, resolution of this issue must be reserved for the trier of fact and cannot be resolved on a motion to dismiss. Plaintiffs' allegations with all reasonable inferences drawn in their favor demonstrate that they will prevail on the forced labor issue before the jury.

The legislative history of 18 U.S.C.S. § 1589 makes clear that the statute was intended to look broadly at "forced labor" and that "the statute's purpose is to counter the 'increasingly subtle methods of [offenders] who place their victims in modern-day slavery . . . [and] combat severe forms of worker exploitation . . ..'" *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 115 (D.D.C. 2012) (Lamberth, J.) (citing H.R. Rep. No. 106-939, at 101 (2000)). Several courts have agreed with the breadth of the forced labor amendments. *See, e.g., Lagayan v. Odeh*, 199 F. Supp. 3d 21, 28 (D.D.C.

23

2016); *Calimlim*, 538 F.3d at 714 ("when Congress amended the [TVPRA] it expanded the definition of involuntary servitude to include nonphysical forms of coercion."); *Muchira*, 850 F.3d at 617 (citing *Calimlim* with approval).

A key fact in assessing Plaintiffs' vulnerability to coercion is that they were all children when they were put to work as cobalt miners. Citing *Bistline* [918 F.3d at 873], Defendants assert only "the TVPRA does not create automatic liability under § 1589 or § 1590 based on a victim's age." MTD at 25. Plaintiffs do not make that assertion, and Defendants do not in any way credit Plaintiffs' ages or circumstances in assessing whether they believed they were threatened with "serious harm" if they failed to show up every day to mine cobalt under extremely dangerous conditions. *See id.* at 24-25. In *Bistline*, the Tenth Circuit stated "each of these plaintiffs was a teenager at the time she was purportedly ordered into a sexual relationship . . . 'a victim's age or special vulnerability may be relevant in determining whether a particular type or a certain degree of physical or legal coercion is sufficient to hold that person to involuntary servitude.' *United States v. Kozminski*, 487 U.S. 931, 948 (1988). In the same way, these plaintiffs' youth and vulnerability, particularly with respect to the parties who were forcing them into this labor, contribute to the plausibility of their allegations under §1589." *Bistline*, 918 F.3d at 873.

Plaintiffs' status as children is an overarching fact in considering whether they had a reasonable fear that they would suffer serious harm if they failed to risk their lives crawling into fragile tunnels to mine cobalt. *United States v. Djoumessi*, 538 F.3d 547, 552 (6th Cir. 2008) (finding a victim who was "just fourteen years old" when brought to work to be especially vulnerable to threats). In addition to their youth, objective conditions that made Plaintiffs especially vulnerable to coercion include their physical and mental condition. *See, e.g., United States v. Calimlim*, 538 F.3d 706, 716 (7th Cir. 2008). Other vulnerability factors applicable to Plaintiffs are "squalid or otherwise

intolerable living conditions" and "the victim's lack of education" *United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015).

Here, Plaintiffs allege that their extreme vulnerability as desperate children lacking education and any other options to avoid starvation subjected them to a "scheme" under section 1589(a)(4) that caused them to fear "serious harm" if they stopped working. Also, they were each individually subjected to threats of "serious harm" under section 1589(a)(2) if they failed to keep working under dangerous conditions in the cobalt mines.

To establish the section 1589(a)(4) violation, Plaintiffs allege that Glencore and Huayou, the major mining companies supplying cobalt to Defendants within the cobalt venture, created a system that relied upon a steady stream of child (and adult) artisanal miners. *See, e.g.*, FAC ¶¶ 2, 5-7, 16. A steady stream was necessary because the lifespan of a child cobalt miner is short; they work until they die or are maimed and can no longer work. *Id.* ¶¶ 2, 6, 10-14, 16. Huayou always admitted that they used child miners, *id.* ¶ 72, but then recently, following this lawsuit and demands from "customers," Huayou joined the "Fair Cobalt Alliance" to address the "problem" of child labor they had been openly profiting from.[13] Glencore initially lied about using child miners, declaring in a press statement when this lawsuit was filed that they don't use cobalt mined by artisanal miners.[14] Shortly after Tesla bought an interest in Glencore, the company changed course and it too joined the Fair Cobalt Alliance to address the child labor problem that was present after all in its artisanal mining operations.[15] The horrible conditions in the cobalt mines were widely known and obvious in light of frequent deaths and severe injuries to child miners from the communities surrounding the

[13] FAC ¶ 106; Cobalt Mining Pact, available at https://www.ft.com/content/9194c7ee-9726-4462-ae04-e7c72c0818d4

[14] https://www.swissinfo.ch/eng/glencore-congo-cobalt-mining-lawsuit/45446800

[15] See note 13, *supra*.

mines. The cobalt venture participants knew that most families living in the area were desperately poor, that most of the children–like all of the Plaintiffs–had to drop out of school because they could not pay school fees, and that they would do virtually anything if they were paid enough to eat each day. *See id.* ¶¶ 2, 6, 10-14, 16, 30-64.

The cobalt venture's scheme worked perfectly, for its members, including Defendants. A steady supply of children, including Plaintiffs, arrived to work as planned, and the cobalt venture did not have to incur costs for safety equipment, fair wages, or health and safety measures; the workforce would tolerate virtually any hazard. Defendants assert that the children were not "forced" to work in the mines, but they were certainly unable to consent to working because they were highly vulnerable children who under any system of law would not be permitted to consent to such hazardous work that literally put them at risk of life and limb. The conditions Plaintiffs and their decedents endured easily satisfy the International Labor Organization's ("ILO") standard of "Worst Forms of Child Labor" in Convention No. 182,[16] which is the first ILO Convention that has been universally ratified by all countries, including the United States and the DRC.[17] Recognizing the particular vulnerability of children, all of the countries of the world united to protect them from being drawn into abusive and dangerous work. Based on Articles 5-8 of Convention No. 182, the U.S. government assumed a specific obligation to implement and enforce its provisions.[18]

---

[16]Convention Concerning the Prohibition and Immediate Action for the Elimination of the Worst Forms of Child Labour (No. 182), June 17, 1999, 2133 U.N.T.S. 161, available at https://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:12100:0::NO::P12100_ILO_CODE: C182. The Worst Forms of Child Labor include "forced or compulsory labour" and "work which, by its nature or the circumstances in which it is carried out, is likely to harm the health, safety or morals of children." Article 3, subsections (a) and (d).

[17]https://www.ilo.org/dyn/normlex/en/f?p=NORMLEXPUB:12100:0::NO:12100:P12100_INSTR UMENT_ID:312528:NO

[18]See *supra* note 16.

26

One court looking at whether children harvesting latex on rubber plantations under conditions that constitute the "Worst Forms of Child Labor" in violation of Convention No. 182 found the child workers had alleged "forced labor" sufficient to withstand a motion to dismiss under the Alien Tort Statute, 28 U.S.C. § 1350: "It would not require great 'judicial creativity' to find that even paid labor of very young children in these heavy and hazardous jobs would violate international norms. Those international norms are not inconsistent with Liberian law. Those norms also are stated in an international convention [No. 182] that both the United States and Liberia have ratified." *Roe v. Bridgestone*, 492 F. Supp 2d 988, 1022 (S.D. Ind. 2007).

Allowing children to perform hazardous mining work not only violates Convention No. 182,  it also violates the domestic law of both the United States[19] and the DRC.[20] Across the board under U.S. law, children are given special protection under the law[21] and cannot legally consent to perform activities that risk their health and well-being.[22] Consequently, it is inconceivable that Plaintiffs could "consent" to perform the hazardous mining work that ultimately killed or maimed them. The cobalt

---

[19] Section 212(c) of the Fair Labor Standards Act of 1938 provides that "no employer shall employ any oppressive child labor in commerce… in the production of goods for commerce or in any enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 212(c) (1974). Precluded under statute is the employment of any child below the age of 18 in any "occupation declared by the Secretary of Labor to be particularly hazardous for the employment of minors of such age or detrimental to their health or well-being," including, but not limited to, "coal mining occupations… [and] occupations in connection with mining, other than coal." 29 C.F.R. § 570.53.

[20] Article 10 of Ministerial Order No. 12 (60) (Dem. Rep. Congo).

[21] *Bellotti v. Baird*, 443 U.S. 622, 634-35 (1979) (Powell, J. ) ("Viewed together, our cases show that although children generally are protected by the same constitutional guarantees against governmental deprivations as are adults, the State is entitled to adjust its legal system to account for children's vulnerability and their needs for 'concern, ... sympathy, and ... paternal attention.'")

[22] *See, e.g., United States v. Rouse*, 936 F.3d 849, 850 (8th Cir. 2019) (holding a minor could not lawfully consent to distribution of her own child pornography); *United States v. Key*, 889 F.3d 910 (7th Cir. 2018) (finding victim's consent is not a defense to child sex trafficking laws).

venture, including Defendants, had a legal duty to prevent Plaintiffs from taking highly dangerous mining jobs rather than implicitly encouraging it with their scheme that depended on cheap, vulnerable child labor and then arguing that the cobalt venture is not liable because the children were working voluntarily. *See* MTD at 24-25.  A jury could  find that Plaintiffs, as minor children, could not legally consent to perform extremely hazardous mining work that was illegal for children to perform under international law, U.S. law and DRC law.

Even if the children could somehow be said to "consent" to taking highly dangerous mining jobs with the cobalt venture, it is not a requirement that they were "forced" to take the jobs in the first instance. The aspect of force or coercion does not need to extend to the entire period of labor. *See, e.g., Dann*, 652 F.3d at 1167 (A forced labor charge need not apply to the entire duration of a victim's service and can be applied to a portion of that time); *Djoumessi*, 538 F.3d at 552-553 (same). Once they began working as miners, these extremely vulnerable children, who were highly susceptible to any form of coercion, experienced some relief from starvation when they were paid their paltry wages, after they were cheated by their handlers or the buyers. *See, e.g,* FAC ¶¶ 30-64. The cobalt co-venturers knew that they could pay the child miners bare subsistence wages and expose them to life-threatening conditions, and they would continue working. *Id.* at ¶¶ 2,5-7,10-14,16. This is a much more extreme example of "coercion" than other cases finding forced labor when employers put workers in debt through fee and cost schemes knowing the workers would continue working to pay down their debts, particularly when they had no other options. *See, e.g., Dann*, 652 F3d 1160, 1173 (9th Cir. 2011) (affirming a forced labor conviction in a case involving a housekeeper made to believe she would suffer serious financial harm if she stopped working); *United States v. Farrell*, 563 F.3d 364, 367-69 (8th Cir. 2009) (finding employers created an atmosphere of coercion by reducing employees' wages upon arrival in the United States, charging them for various fees, and requiring them to work lengthy shifts to make debt payments); *United States ex rel. Hawkins*

*v. Mantech Int'l Corp.*, 2020 U.S. Dist. LEXIS 13733, at *48, *53 (finding coercion properly alleged when plaintiffs feared that if they had left their employment, they would have faced serious harm in the form of high financial penalties or arrest by local authorities).

Having no money or means of support could make individuals susceptible to threats by employers even if "such a threat made to an adult citizen of normal intelligence" might be "too implausible to produce involuntary servitude." *Djoumessi*, 538 F.3d at 552; *see also Nunag-Tanedo v. East Baton Rouge Parish School Bd*, 790 F. Supp. 2d 1134, 1146 (C.D. Ca. 2011) (finding defendants coerced plaintiffs by forcing them to take on crushing debt that plaintiffs could not repay absent continued employment by defendants); *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1274 (11th Cir. 2020) (finding the existence of a scheme when a detention center deprived detainees of basic necessities, made them join a "voluntary" work program to alleviate these conditions, and then threatened or harmed them if they refused to work, thus providing cheap labor to increase profits). Adding to the coercion, many of the Plaintiffs were also financially supporting their families, so any threat to lose their wages or their ability to work also threatened their families. *See, e.g, Calimlim*, 538 F.3d at 712, 714 (finding a threat of serious harm when defendants threatened to stop paying victim's poor family members).

Plaintiffs here were literally working for their lives. This is virtually a *per se* case of coercion; no one, especially a child, would perform dangerous work for starvation wages unless he had no other alternative. The various operatives of the cobalt venture made clear to Plaintiffs and other children working with them that if they did not accept the low pay and extremely dangerous conditions of work, they would be fired, would be blackballed from working at any mines in the area, and would starve. *See, e.g.*, FAC ¶¶ 36, 39, 42, 44, 50, 54, 56, 59, 62, 64. A reasonable inference could be made that these sorts of threats were systemic in that they were made to gangs of children, and that part of the cobalt venture's scheme was to terrorize the children into working under the

29

threat of termination and starvation. *See id.* A reasonable jury could certainly find that Plaintiffs were subjected to a scheme to keep them working in violation of section 1589(a)(4), that they–as extremely vulnerable children–subjectively believed the threats of serious harm, and that the threat of serious harm would cause "***a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm***." 18 U.S.C. § 1589(c)(2) (emphasis added).

Likewise, when the various agents of the cobalt venture made these threats to the vulnerable children, a jury could certainly find under section 1589(a)(4) that these agents possessed the subjective intent of coercing the children to keep working. *See Calimlim*, 538 F.3d at 711-12. This scheme directed at the Plaintiffs and other children was sufficient to coerce the starving and extremely vulnerable children to keep working under the horrific conditions that ultimately killed or maimed them.

The Plaintiffs also directly received "threats of serious harm" that, given their particular circumstances as uneducated, impoverished, and desperate children, coerced them to continue working in their dangerous DRC mining jobs for virtually no pay under extremely hazardous conditions in violation of section 1589(a)(2). For example, John Doe 7 was "recruited" to work in a Glencore mine by armed DRC Presidential Guards who supervised the work of a gang of boys including John Doe 7. FAC ¶¶ 45-46. The Guards kept most of the money the boys earned and gave them a small portion that barely covered subsistence costs. When John Doe 7 attempted to negotiate with the Guards to improve his terms and conditions of employment, one of the Guards shot and seriously injured him. *Id.* ¶ 46. It would be hard to imagine a more coercive way to keep the child miners working than to be ordered to work for specific terms by brutal Presidential Guards.

John Doe 3 was recruited by a labor broker to work in a cobalt mine operated by Huayou. *Id.* ¶ 37. The mine he worked was also guarded by the Presidential Guard who had a "reputation for

brutality and operated in the DRC with complete impunity." *Id.* The labor broker who recruited John Doe 3 was "an influential person," and the Guards appeared to work at his direction. John Doe 3 understood from what was told to him that he had to work for the broker or he would not be able to earn any money to eat. *Id.* James Doe 1 was killed when a mine collapsed after the other child miners scattered at the arrival of soldiers who must have been overseeing the miners. *Id.* ¶ 31.

At least seven of the Plaintiffs or their decedents worked for "Ismail," a mine boss who had control over several Glencore operated cobalt mines. John Doe 4 (*id.* ¶ 39), John Doe 6 (*id.* ¶ 42), and John Doe 9 (*id.* ¶ 50) were severely injured following the orders of Ismail to work under dangerous conditions, and James Doe 2 ((*id.* ¶ 36), Joshua Doe 2 (*id.* ¶ 44), James Doe 3 (*id.* ¶ 59) were killed in mine collapses while performing extremely dangerous work under Ismail's direction. The boys were "terrified" of Ismail and did whatever he told them, however dangerous. *See, e.g., id.* ¶¶ 44, 50, 59. Ismail cheated the boys and also deducted money for food and miscellaneous costs from what little he did pay them so that sometimes they were paid nothing. *Id.* ¶ 42. Ismail threatened the boys that if they did not work properly for him, he would blackball them so they could never get another job in the mining sector and they would starve. *See, e.g., id.* ¶¶ 44,59. A jury could easily find that these vulnerable children reasonably believed they had to continue working for Ismail based on his threats to them, and a reasonable person experiencing their particular circumstances would have continued working. It would be difficult for a reasonable juror to conclude that these children continued working for Ismail until they were killed or seriously injured if they believed they could walk away.

The other child miners experienced various similar sources of coercion to keep them working in the extremely dangerous DRC cobalt mines. A man connected to Glencore, "John," recruited John Doe 11 and directed his work. *Id.* ¶ 56. John Doe 10 was recruited to work by "Jean-Pi," who directed him where to work and dictated the conditions of work. John Doe 10 feared that

if he did not follow Jean-Pi's directions, he would be fired and would not be able to work to help feed his family. *Id.* ¶ 54. John Doe 13 worked for Ahmed and Aza who purchased his cobalt for the venture. *Id.* ¶ 54. John Doe 1 worked as a human mule hauling cobalt at the direction of three adult miners. *Id.* ¶ 33. A reasonable jury could find that these boys likewise were coerced to keep working by the adults who directed their work, as well as by the daily difficult circumstances they endured.

An overall reasonable inference to draw is that all of the Plaintiffs and their decedents were working under adult male figures whom they feared and obeyed blindly while ultimately working under such dangerous conditions that they were killed or maimed. A jury must ultimately determine whether all of these child miners reasonably believed they had no choice but to work as directed and that a reasonable person in their circumstances would have reached that conclusion as well.

### B. <u>Plaintiffs or their Decedents Were Trafficked</u>.

While Defendants virtually ignore this claim, *see* MTD at 24-25, Plaintiffs also allege that they or their decedents were trafficked by the cobalt venture when they were recruited to work in the cobalt mines. FAC ¶¶ 120-123. Section 1590(a) of the TVPRA prohibits "knowingly recruit[ing]" any person for "forced labor." Based on the proceeding section, Plaintiffs and their decedents were subject to "forced labor" by the cobalt venture within the scope of section 1589. The additional claim for trafficking requires that the cobalt venture also "recruited" the child miners. Based on specific facts available at this time, the following 11 Plaintiffs or Plaintiffs' decedents have alleged that they were recruited by someone within the cobalt venture: James Doe 2 (¶ 36), John Doe 3 (¶ 37), John Doe 4 (¶ 39), John Doe 6 (¶ 42), Joshua Doe 2 (¶ 44), John Doe 7 (¶ 46), John Doe 9 (¶ 50), John Doe 10 (¶ 54), John Doe 11 (¶ 56), James Doe 3 (¶ 59), and James Doe 12 (¶ 62).

Based on these specific allegations, which Defendants do not discuss or dispute, these Plaintiffs have stated a claim for trafficking. These allegations could also allow a reasonable

inference that the cobalt venture had a recruitment scheme that made it a regular practice that also resulted in the other Plaintiffs being recruited for forced labor by the cobalt venture.

**C. Section 1596(a) Extends the TVPRA to Plaintiffs' Claims Even if They Are Considered Extraterritorial.**

Section 1596(a) expressly extends extraterritorial jurisdiction to any "offense" under sections 1589 (forced labor) and 1590 (trafficking), among others, if, as here, members of the venture are (1) U.S. nationals or (2) "present" in the U.S. 18 U.S.C.A. § 1596(a). A group of Members of Congress recently agreed "[t]he TVPRA] applies extraterritorially as long as a defendant is an American citizen or resident, or is present in the United States."[23] There is no dispute that the five Defendants are U.S. nationals and "present" in the U.S. FAC ¶¶ 26, 73-86.

Without citing any TVPRA case interpreting section 1596(a) as applying only to criminal violations, and burying in footnote 12 the cases holding that the provision *does* apply to civil cases (MTD at 32), Defendants rely on inapposite cases applying statutes with no extraterritorial provision to argue section 1596(a) extends the TVPRA extraterritorially only in criminal cases. MTD 31-34.

There is, however, absolutely no indication in the TVPRA that the term "offense" was intended to apply only to criminal actions. Quite the opposite, the cases considering the issue uniformly apply the TVPRA extraterritorially in civil claims based on section 1596(a). *See, e.g.*, *Aguilera v. Aegis Commc'ns Grp., LLC*, 72 F. Supp. 3d 975, 978-79 (W.D. Mo. 2014) (rejecting the argument that the TVPRA covers only victims trafficked "into" the United States). Much of the litigation over the scope of extraterritorial jurisdiction for civil claims brought undersection 1596(a) concerns whether the extension of extraterritorial jurisdiction to civil cases in 2008 is retroactive. For example, in *Adhikari v. Kellogg Brown & Root, Inc.,* the Court found that "§ 1596… explicitly rebuts the

---

[23] Congressional TVPRA Amicus Brief, *supra* note 1, at 6. *See also*, *id.* at 24, 32-33.

presumption against extraterritoriality" and that "Congress amended the TVPRA to provide a civil remedy for extraterritorial violations because it had concluded none previously existed." 845 F.3d 184, 200-01 (5th Cir. 2017). The Court ultimately ruled in that case that the provision was not retroactive. *Id*;[24] *see also Abafita v. Aldukhan*, No. 116-CV-06072 (RMB) (SDA), 2019 U.S. Dist. LEXIS 59316, at *12 (S.D.N.Y. Apr. 4, 2019)(following *Adhikari* and finding that section 1596(a) extends extraterritorial jurisdiction to civil violations of TVPRA), *report and recommendation adopted*, 2019 WL 4409472 (S.D.N.Y. Sept. 16, 2019); *Plaintiff A v. Schair*, No. 2:11-CV-00145-WCO, 2014 WL 12495639, at *6-7 (N.D. Ga. Sept. 9, 2014) (concluding that section 1596(a) provides prospective extraterritorial application for civil claims but does not apply retroactively). None of these cases expressed doubt that, from 2008 forward, the TVPRA applies extraterritorially to civil claims.

The text of section 1596(a) clearly indicates that the TVPRA extends extraterritorially to civil claims after the 2008 amendments, and the cases assessing the statute's extraterritorial application are in accord. Unlike the unrelated statutes Defendants cite, the TVPRA is not silent on extraterritoriality. In each reauthorization of the TVPRA, Congress has expressly expanded the Act's extraterritorial reach in order to combat the transnational crimes of forced labor and human trafficking, conduct Congress has described as the "dark side of globalization." H.R. Rep. No. 110-430 at 33 (2007).

Even if Defendants steer the Court away from the plain text and legislative history of the TVPRA to examine the "focus" of the statute based on cases unrelated to the TVPRA, *see* MTD at 36-37, the TVPRA authorizes suits against persons who *benefit in the United States* from human

---

[24] There is no issue of retroactivity in this case, as there is no dispute that all of Plaintiffs' injuries occurred well after the 2008 enactment of the enactment of section 1596(a).

trafficking and forced labor, regardless of the location of the forced labor. The focus of the TVPRA's statutory prohibition on "benefitting, financially or by receiving anything of value" is on the benefitting, not on the other conduct. *E.g., Morrison v. Nat'l Australia Bank*, 561 U.S. 247, 266 (2010) (stating the focus of §10(b) "is not upon the place where the deception originated, but upon purchases and sales of securities" in the U.S.). Plaintiffs do not seek to apply 18 U.S.C. §§ 1589 and 1590 "extraterritorially" when those provisions are applied to a benefit in the United States. Defendants cite *Nunag-Tanedo v. East Baton Rouge Par. Sch. Bd.*, 2012 WL 5378742, *6 (C.D. Cal. Aug. 27, 2012), to argue the TVPRA's focus is on foreign conduct, MTD at 36, but that case is off point as it concerned a different provision of the TVPRA with a focus distinguishable from the benefit prong (which had not yet been enacted).

### D. <u>The Doctrine of Lenity Does Not Apply to the TVPRA, a Remedial Statute Meant to Be Construed Broadly.</u>

Launching from a footnote in *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004), Defendants assert that the doctrine of "lenity" requires that "any ambiguity" in the TVPRA be resolved in favor of Defendants. MTD at 28-29. As an initial matter, Plaintiffs' positions on the TVPRA do not require any benefit from ambiguity. The TVPRA is a relatively specific statute, and Plaintiffs rely on the great weight of case law—which Defendants largely ignore—in interpreting each of the issues. In addition, Defendants' assertion of the lenity doctrine in this civil case based on recent amendments to the TVPRA runs up against two bedrock legal principles that trump the lenity doctrine.

First, on a motion to dismiss in a civil case, Plaintiffs' allegations are taken as true and all reasonable inferences must be drawn in their favor. *See, e.g, Twombly*, 550 U.S. at 554-56. Thus, there is no question that Plaintiffs get the full benefit of any *factual* ambiguities. Here, the elements of the TVPRA are not controversial, and the cases Plaintiffs cite largely agree upon the legal standard.

When Plaintiffs' allegations are taken as true and all reasonable inferences are drawn in their favor,

they have properly alleged the necessary elements to state their TVPRA claims.

Second, unlike 18 U.S.C.S. § 16(a), the statute at issue in *Leocal*, where the Court assessed

whether a conviction for drunk driving and causing bodily harm under Florida law subjected the

defendant to deportation for committing a sufficiently serious crime, 543 U.S. at 4-7,[25] the 2008 civil

amendments to the TVPRA were universally described as creating a broad remedial statute. *See, e.g.,*

*Noble v. Weinstein*, 335 F. Supp. 3d 504, 515 (S.D.N.Y 2018) (holding that § 1595 of the TVPRA

requires broad interpretation and that those amendments served the remedial purpose of

"enhancing...protections of trafficking victims"). In *Peyton v. Rowe*, 391 U.S. 54, 65 (1968), the

Supreme Court was clear that it is a "canon of construction that remedial statutes should be liberally

construed." *See also Abbott Laboratories v. Portland Retail Druggists Ass'n, Inc.*, 425 U.S. 1, 12 (1976)

(stating, "[b]ecause the [Act] is remedial, it is to be construed broadly to effectuate its purposes.").

Defendants do not cite any cases actually *applying* the lenity doctrine to the remedial amendments

to the TVPRA.[26] While Defendants fail to identify any TVPRA provision that is so ambiguous that it

---

[25] *Crandon v. United States*, 494 U.S. 152, 158 (1990), was also a purely criminal prosecution within a statutory framework that included civil provisions.

[26] In neither of the cases cited by Defendants, MTD at 29, did the court actually *apply* the lenity doctrine to interpret the TVPRA. In *Fei Guan v. Bing Ran*, No. 1:17CV332 (JCC), 2017 WL 2881363, at *4 (E.D. Va. July 6, 2017), the court noted the existence of the doctrine of lenity but did not apply it. Instead, the court first found that most of plaintiff's claim for peonage under § 1581 pre-dated the 2008 amendments to the TVPRA that created broader civil remedies and thus was not actionable. The court dismissed the remaining claim because, as a factual matter, plaintiff had failed to state a claim. There was no discussion of actually interpreting the TVPRA because of the lenity doctrine. The court did not address the fact that the TVPRA is a remedial statute. *Id.* *11-14. In *St. Louis v. Perlitz*, No. 3:13-CV-1132 (RNC), 2016 WL 1408076 (D. Conn. Apr. 8, 2016), the court referred to the lenity doctrine, *id.* * 3, n.3, but expressly held that it had no application because the TVPRA issue in the case was not ambiguous. *Id.* The Court found that Plaintiffs' sex trafficking claim under section 1591 was barred because all of the conduct occurred before the TVPRA amendments extending civil liability were enacted in 2008 and the amendments did not apply retroactively. *Id.* at 23-29.

would be susceptible to a favorable construction for Defendants, it is Plaintiffs, not Defendants, who are entitled to favorable application of all remedial provisions of the TVPRA. Nevertheless, Plaintiffs' positions on the remedial 2008 amendments of the TVPRA are supported by overwhelming case law and, as a result, do not require any benefit from ambiguity.

E. **Plaintiffs Have Properly Alleged Their Common Law Claims**.

Plaintiffs likewise state a claim for their common law claims for unjust enrichment, negligent supervision, and intentional infliction of emotional distress. FAC ¶¶ 124-37.[27]

1. **Plaintiffs have stated a claim for unjust enrichment**.

In the District of Columbia, unjust enrichment occurs when (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust. *News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005); *Mazor v. Farrell*, 186 A.3d 829, 833 (D.C. 2018). These elements are easily met in this case involving tech giants unjustly benefiting from the forced labor of Plaintiffs. *See, e.g.*, *Kiwanuka*, 844 F. Supp. 2d at 117 (after finding TVPRA claim properly alleged, allowed unjust enrichment claim to go forward because defendants "accepted [plaintiff's] services but failed to compensate her adequately.").

Laboring on behalf of another constitutes a benefit. In *Bregman v. Perles*, 747 F.3d 873 (D.C. Cir. 2014), an investigator who provided services to lawyers conferred a benefit, with the Court

---

[27] Plaintiffs agree with Defendants that District of Columbia choice of law rules apply to the state law claims. MTD at 37. *See, e.g., Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842, 387 U.S. App. D.C. 366 (D.C. Cir. 2009). Defendants properly identify the possible options as the forum, District of Columbia, or the home states of the Defendants, California, Texas and Washington. MTD at 37. All but Texas have similar laws governing Plaintiffs' common law tort claims. *See id.*, n.14. Although differing in the reason, assuming the Court agrees, Plaintiffs agree with Defendants that the claims can be evaluated based on general tort principles at this stage of the proceedings, and there will likely be a need to address choice of law issues at a later point. *See id.* at 37-38.

noting "benefit" denotes any form of benefit. *Id.* at 878; *Fed. Deposit Ins. Corp. v. Bank of Am., N.A.*, 308 F. Supp. 3d 197, 203 (D.D.C. 2018) (quoting *Bregman*). Here, as Plaintiffs established in discussing the "benefit" requirement of the TVPRA, Defendants, as members of the cobalt venture, "knowingly benefited" from Plaintiffs' forced labor, *see* section IV (A)(3), *supra.* Thus, there is no question Plaintiffs have also alleged they conferred a benefit to Defendants, a steady supply of cheap cobalt due to the forced labor system imposed by the venture.

As to the second element, Defendants retained the benefits conferred upon them by Plaintiffs because Defendants profited from the cheap, forced labor of Plaintiffs and certainly did not return to them the actual value of their labor or provide restitution. *See Kramer Assocs., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 254 (D.C. 2005); *Bregman,* 747 F.3d at 878; *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 50-51 (D.D.C. 2003).

The third element, that Defendants' retention of the benefit is unjust, is unquestionably alleged in this case. Plaintiffs described in detail the unlawful, horrific and deadly conditions they worked under, and that they sacrificed literally life and limb so that Defendants could increase their profits. FAC ¶¶ 6,8,9,11,12, 30-64. Indeed, this case is an extreme example of unjust retention of a benefit. In *Kramer*, the court held defendant's retention of a benefit was unjust because defendants had not performed any work in exchange for the $75,000 advanced by plaintiff and then refused to return the money. *Kramer*, 888 A.2d at 254. In *Bregman*, defendant's retention of the benefit of Bergman's labor became unjust when Bregman was refused payment for his services by his employers. *Bregman,* 747 F.3d at 878. In *In re Lorazepam*, 295 F. Supp. 2d at 50-51, defendant's enrichment by economic windfall on the backs of plaintiff's payments of rebates to drug subscribers was "unjust or inequitable." Unjust enrichment can also be supported when, as here, defendant paid too little. *Fed. Deposit Ins. Corp.*, 308 F. Supp. 3d at 204 (citing *Mitchell v. Riegel Textile, Inc.*, 259 F.2d 954, 956 (D.C. Cir. 1958)).

Defendants' sole defense to Plaintiffs' well-pleaded allegations establishing unjust enrichment is to argue over a factual issue that is not even an element of the claim. Defendants assert they did not have a sufficient "relationship" to the Plaintiffs for them to assert a claim. MTD at 38-39. As an initial matter, unjust enrichment does not require a "relationship" between the victim and the predator; in fact if there is a direct contract between them, the claim fails.[28] Unlike the cases Defendants cite, Plaintiffs allege that Defendants in this case were members of a venture that exploited them. *See* section IV.A.2, *supra*. Further distinguishing the cases Defendants cite, Defendants here had knowledge that their profits were boosted by the forced labor of Plaintiffs and others similarly situated. *See* section IV.A.1, *supra*. Here, Defendants took advantage of and were enriched by a known population of child victims, including Plaintiffs, who were forced to confer the benefit of their coerced labor on some of the richest companies that ever existed.

### 2. Plaintiffs have stated a claim for negligent supervision.

Plaintiffs properly allege the three elements of negligent supervision: (1) Defendants knew or should have known that their co-venturers had used or were using the forced labor of child miners; (2) Defendants failed to adequately supervise the cobalt venture, (3) resulting in harm to Plaintiffs. *See Phelan v. City of Mount Rainier,* 805 A.2d 930, 937–38 (D.C. 2002). As Plaintiffs have established, Defendants had knowledge of or recklessly disregarded the fact that their co-venturers Huayou and Glencore were using forced child labor to mine cobalt. *See* section IV.A.1, *supra*, satisfying the first element. As to the second element, Plaintiffs have also established that Defendants failed to properly supervise the venture and did nothing to prevent the use of forced child labor. *See* FAC ¶¶

---

[28] In the District of Columbia as most jurisdictions, "[u]njust enrichment presuppose[s] that an express, enforceable contract is absent, therefore courts generally prohibit litigants from asserting these claims when there is an express contract that governs the parties' conduct." *Cannon v. Wells Fargo Bank, N.A.*, 926 F.Supp.2d 152, 170 (D.D.C. 2013). This is not an issue in this case.

106-07, 110. Indeed, Defendants all claim to have strict policies against child labor "at any tier of the supply chain and require regular supplier audits to evaluate compliance." *See* MTD 6. Further, Defendants each made a specific commitment to comply with United Nations' Guiding Principles on Business and Human Rights, which often creates a higher standard than Defendants' policies to protect against serious human rights violations in their supply chains.[29] Defendants thus acknowledge that they had a duty to protect against a known risk that child miners were working in the cobalt mines that supplied them. However, Defendants failed to adequately implement their policies at cobalt mines controlled by Glencore and Huayou where Plaintiffs worked and were injured or killed. FAC ¶¶ 30-64. There is no question that the third element is satisfied here, as there was serious and undisputed resulting harm to the Plaintiffs. *Id.*

Plaintiffs' negligent supervision claim is further enhanced because Defendants have a higher duty of care to supervise the mining practices of Glencore and Huayou. As the deaths and maiming of Plaintiffs and their decedents attest, cobalt mining is an "inherently dangerous" activity. *Wilson v. Good Humor Corp.*, 757 F.2d 1293, 1296 (D.C. Cir. 1985). Applying *Wilson*, this Court denied summary judgment on a negligent supervision claim in *Doe I v. Exxon Mobil Corp.*, 573 F. Supp. 2d 16 (D.D.C. 2008), when Exxon hired Indonesian soldiers as a security force and then failed to adequately supervise this "inherently dangerous" activity. The security forces killed and tortured plaintiffs. *Id.* at 29-30.

Defendants' sole argument in defense is that they lacked the "day-to-day control required of a negligent supervision claim." MTD at 39-40. This, once again, ignores that Plaintiffs have shown Defendants were in a "venture" with the mining companies that established the close relationship

---

[29] *See, e.g.*, https://s2.q4cdn.com/470004039/files/doc_downloads/gov_docs/Apple-Human-Rights-Policy.pdf; https://about.google/human-rights/; https://www.microsoft.com/en-us/corporate-responsibility/human-rights-statement; http://i.dell.com/sites/doccontent/corporate/corp-comm/en/Documents/human-rights-labor.pdf; https://www.tesla.com/about/legal#human-rights-and-conflict-minerals-policy.

Defendants say is lacking for this claim. *See* section IV.A.2, *supra*. Further, as noted, Defendants claim they had prohibited child labor at the cobalt mines and had a duty to perform rigorous inspections to ensure compliance with their policies as well as international norms. *See* MTD at 6-7. Defendants are trying to have it both ways by claiming in one argument they had the very control they argue they lacked with respect to Plaintiffs' negligence claim. Plaintiffs were injured by Defendants' very failure to exercise the control they claim they had in falsely informing the public that they have effective policies in place to prevent child labor. If this is merely a factual dispute, the jury must resolve it.

     **3.  Plaintiffs have stated a claim for intentional infliction of emotional distress**.

There are three prongs to a claim for intentional infliction of emotional distress: "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Purcell v. Thomas*, 928 A.2d 699, 711 (D.C. 2007) (quoting *Howard University v. Best,* 484 A.2d 958, 985 (D.C. 1984)). Plaintiffs specifically allege these three elements: Defendants' cobalt venture engaged in extreme and outrageous conduct by forcing children to perform extremely dangerous work (FAC ¶¶ 134), Defendants knew or recklessly disregarded the horrible conditions faced by the child miners (*id.* ¶ 135) and Plaintiffs suffered physical injury and severe emotional distress (*id.* ¶¶136-37).

Defendants argue their conduct is not outrageous enough to meet this standard because they merely purchased cobalt from the mining companies. MTD at 40-41. Once again, Defendants fundamentally distort Plaintiffs' allegations and theory of the case. Defendants were not merely "purchasing goods", *id.* at 40, but rather they were participants in a cobalt "venture" that subjected Plaintiffs every day that they worked until they were killed or maimed to the trauma of being forced to work in extremely dangerous conditions. They feared every day they would be buried alive until the tunnels they feared would collapse inevitably did. *See* FAC ¶¶ 30-64. A jury should get to decide whether what Plaintiffs experienced from the conduct of the members of the cobalt venture was

outrageous enough to establish liability. *See, e.g., Kiwanuka*, 844 F. Supp. 2d at 119-120 (holding daily verbal abuse from employer was sufficient to state an emotional distress claim).

F. **Plaintiffs Have Article III Standing to Seek Redress for their Injuries Caused by Defendants**.

Defendants argue that Plaintiffs lack Article III standing to sue. MTD at 8-14. This Hail Mary argument, once again, begs one of the ultimate factual questions in the case, whether Defendants are in a "venture" with their cobalt suppliers. If they are, Defendants' unfounded argument about being too far removed from the cobalt mines to be responsible for Plaintiffs' injuries fails and Plaintiffs' claims against them are redressable. Constitutional standing requires only that (1) the plaintiff have suffered an injury in fact, (2) which is fairly traceable to the challenged action of the defendant, and (3) which may be redressed by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs easily satisfy the first and third requirements. Defendants do not dispute that Plaintiffs have suffered horrible concrete injuries by being killed or maimed in cobalt mining accidents. Further, Plaintiffs' injuries are redressable because when "one private party is injured by another, the injury can be redressed in at least two ways: by awarding compensatory damages or by imposing a sanction on the wrongdoer that will minimize the risk that the harm-causing conduct will be repeated." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 127 (1998). Plaintiffs here seek these entirely traditional remedies of monetary damages to compensate them for their undisputed injuries and injunctive relief to require these companies to take immediate preventive measures so that other children do not suffer the same fate of dying or getting maimed while mining cobalt.

Plaintiffs also satisfy the second element, the traceability requirement. It is with respect to this element that Defendants ignore the fundamental premise of this case, which is that Plaintiffs allege with specificity that Defendants are in a "venture" with their mining companies, a venture that is jointly responsible for the injuries suffered by Plaintiffs. *See* section IV.A.2, *supra*. This focus of

42

Plaintiffs' allegations and the very theory of their case eviscerates Defendants' argument that the mining companies, not the Defendants, injured the Plaintiffs. MTD at 10-13. Defendants' admission that the mining companies *did* injure the Plaintiffs extends to the entire venture. Venture liability under the TVPRA means that all members of the venture are liable for acts committed to benefit the venture. For example, in the hotel/sex trafficking cases, there was no allegation needed that the hotel chains were directly involved in sex trafficking; they were liable because they were in a venture with and profited from the actual traffickers and merely turned a blind eye to the unlawful conduct. *See, e.g.*, *A.B. v. Hilton Worldwide Holdings, Inc.*, 2020 WL 5371459, at *6; *B.M. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214, at *4; *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d at 968; *Lorain-Elyria Motel, Inc.*, 2020 U.S. Dist. LEXIS 44961, at *16-18. The sex traffickers in these cases were not distant third parties harming the victims; they were in a venture with the hotel chains. The only distinction with this case is that Defendants here actually had an explicit agreement with the mining companies to supply them with cobalt as part of their "venture."

Further, the traceability requirement can be satisfied even if the harm is directly caused by a third-party. In *Baloco ex rel. Tapia v. Drummond Co.*, 640 F.3d 1338 (11th Cir. 2011), children whose fathers were murdered by a paramilitary group in Colombia had Art. III standing to sue Drummond, a mining company that was alleged to have hired the paramilitaries to provide "security." *Id.* at 1343-45. Likewise, in *Doe v. Nestle, S.A.*, 929 F.3d 623, 625-626 (9th Cir. 2019), *cert. granted on other issues*, 2020 WL 3578678 (U.S. July 2, 2020) (Nos. 19-416 and 19-453), the Court of Appeals found Plaintiffs, child laborers harvesting cocoa on plantations that supplied Cargill, had standing to sue the company due to "Cargill's involvement in farms that rely on child slavery." Like these cases, Defendants' participation in a venture with the mining companies that are directly responsible for Plaintiffs' injuries gives them standing to sue Defendants for their injuries.

Defendants separately argue that Plaintiffs lack standing to seek injunctive relief. MTD at 13-14. In so arguing, Defendants completely mischaracterize the injunctive relief Plaintiffs seek. Plaintiffs are **not** seeking an injunction to prevent Defendants from purchasing DRC cobalt as Defendants claim. *See id.* Plaintiffs explicitly seek an injunction to require Defendants to stop the cobalt venture from using forced child labor and to provide medical care and other treatment to the child miners and members of the class who have been injured mining cobalt for Defendants. *See* FAC ¶ 139 (i). Defendants certainly could change the practices of the cobalt venture that are killing and maiming children because of the degree of control and influence they have over the venture. *See id.* ¶¶ 107, 110, 128, 131. Indeed, following the mere **filing** of this case, Huayou claimed to stop using child labor because of pressure from Defendants, *see id.* ¶ 106, and Huayou and Glencore joined the "Fair Cobalt Alliance," which claims to be working to stop child labor in cobalt mining.[30] This leaves little doubt that these companies have the ability to require their mining companies in the cobalt venture to stop allowing artisanal miners to be killed and maimed. Indeed, the companies have falsely promised through their policies that they do not tolerate the very practices Plaintiffs here want to enjoin. *See* MTD at 4, 6-7. Injunctive relief prohibiting the Defendants from engaging in the practices allowing forced child labor to mine their cobalt would prevent the sort of injuries Plaintiffs suffered from reoccurring.

**G. Plaintiffs Seek Leave to Amend if There Are Any Issues the Court Identifies As Requiring More Specificity.**

Plaintiffs have demonstrated that their complaint has sufficiently alleged facts to meet all legal elements of their claims. If the Court identifies issues that require further factual pleadings, Plaintiffs seek leave to file a motion to amend their complaint and submit a second amended

---

[30] *See* Cobalt Mining Pact, available at https://www.ft.com/content/9194c7ee-9726-4462-ae04-e7c72c0818d4.

complaint to address any rulings by the Court. It is axiomatic that Fed. R. Civ. P. 15(a) requires leave to amend "'shall be freely given when justice so requires.'" *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "It is an abuse of discretion to deny leave to amend unless there is sufficient reason, such as 'undue delay, bad faith or dilatory motive . . . [or] futility of amendment.'" *Id.*

## V.    CONCLUSION

For the reasons stated, Defendants' Motion to Dismiss should be denied in its entirety and the parties should be permitted to begin the discovery process.

Respectfully submitted this 26ᵗʰ day of October 2020,

/s/ Terrence P. Collingsworth
Terrence P. Collingsworth (D.C. Bar No. 471830)
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 543-5811
tc@iradvocates.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 26, 2020 I electronically filed the foregoing with the United States District Court for the District of Columbia by using the CM/ECF system, which will send a notice of filing to all registered users.


Date: October 26, 2020

/s/ Terrence P. Collingsworth
Terrence P. Collingsworth (D.C. Bar No. 471830)
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 543-5811
tc@iradvocates.org

*Counsel for Plaintiffs*

46