# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:19−cv−03737−CJN

DOE 1 et al v. APPLE INC. et al
Assigned to: Judge Carl J. Nichols
Demand: $100,000,000
Cause: 28:1331 Fed. Question: Tort Action

Date Filed: 12/15/2019
Date Terminated: 11/02/2021
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: Federal Question

**Plaintiff**

**JOHN DOE 1**
*Individually and on behalf of Proposed*
*Class Members*

represented by **Terrence P. Collingsworth**
INTERNATIONAL RIGHTS
ADVOCATES
621 Mayland Ave. NE
Washington, DC 20002
202−543−5811
Fax: 866−803−1125
Email: tc@iradvocates.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOHN DOE 2**
*Individually and on behalf of Proposed*
*Class Members*

represented by **Terrence P. Collingsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JANE DOE 1**
*Individually and on behalf of Proposed*
*Class Members*

represented by **Terrence P. Collingsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JENNA ROE 3**
*Individually and on behalf of Proposed*
*Class Members*

represented by **Terrence P. Collingsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JAMES DOE 4**
*Individually and on behalf of Proposed*
*Class Members*

represented by **Terrence P. Collingsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOHN DOE 5**
*Individually and on behalf of Proposed*
*Class Members*

represented by **Terrence P. Collingsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JENNA DOE 6**
*Individually and on behalf of Proposed
Class Members*

represented by **Terrence P. Collingsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JANE DOE 2**
*Individually and on behalf of Proposed
Class Members*

represented by **Terrence P. Collingsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JENNA DOE 7**
*Individually and on behalf of Proposed
Class Members*

represented by **Terrence P. Collingsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JENNA DOE 8**
*Individually and on behalf of Proposed
Class Members*

represented by **Terrence P. Collingsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOHN DOE 9**
*Individually and on behalf of Proposed
Class Members*

represented by **Terrence P. Collingsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JENNA DOE 10**
*Individually and on behalf of Proposed
Class Members*

represented by **Terrence P. Collingsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JENNA DOE 11**
*Individually and on behalf of Proposed
Class Members*

represented by **Terrence P. Collingsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JANE DOE 3**
*Individually and on behalf of Proposed
Class Members*

represented by **Terrence P. Collingsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOHN DOE 12**
*Individually and on behalf of Proposed
Class Members*

represented by **Terrence P. Collingsworth**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JOHN DOE 13**

represented by **Terrence P. Collingsworth**

*Individually and on behalf of Proposed*
*Class Members*

(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**APPLE INC.**                     represented by **Emily Johnson Henn**
COVINGTON & BURLING LLP
333 Twin Dolphin Drive
Suite 700
Redwood Shores, CA 94065
(650) 632−4715
Fax: (650) 632−4815
Email: ehenn@cov.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Henry Ben−Heng Liu**
COVINGTON & BURLING LLP
850 Tenth Street, NW
One City Center
Washington, DC 20001
(202) 662−5536
Fax: (202) 778−5536
Email: hliu@cov.com
*ATTORNEY TO BE NOTICED*

**John Edward Hall**
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
202−662−5104
Fax: 202−778−5104
Email: jhall@cov.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**ALPHABET INC.**                   represented by **Craig Alan Hoover**
HOGAN LOVELLS
555 13th Street, NW
Washington, DC 20004−1161
(202) 637−5694
Fax: 202−637−5910
Email: craig.hoover@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Martin Foster**
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW

Washington, DC 20004
(202) 637−5573
Fax: (202) 637−5910
Email: david.foster@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Neal Kumar Katyal**
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637−5528
Fax: (202) 637−5910
Email: neal.katyal@hoganlovells.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MICROSOFT INC.**                    represented by  **Carolyn Frantz**
ORRICK, HERRINGTON & SUTCLIFFE
LLP
701 Fifth Ave.,
Suite 5600
Seattle, WA 98104
206−839−4300
Email: cfrantz@orrick.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Darren Edward Pouliot**
ORRICK, HERRINGTON &
SUTCLIFFE, LLP
51 West 52nd Street
New York, NY 10019−6142
212−506−3674
Email: dpouliot@orrick.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Cruikshank**
INSTITUTE FOR CONSTITUTIONAL
ADVOCACY & PROTECTION
600 New Jersey Avenue NW
Room 944
Washington, DC 20001
202−662−9042
Email: erc56@georgetown.edu
*TERMINATED: 07/09/2021*

**James L. Stengel**
ORRICK, HERRINGTON &
SUTCLIFFE, LLP

51 West 52nd Street
New York, NY 10019−6142
212−506−5000
Email: jstengel@orrick.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark Parris**
ORRICK
701 5th Avenue
Suite 5600
Seattle, WA 98104
206−839−4300
Email: mparris@orrick.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Upnit K. Bhatti**
ORRICK, HERRINGTON & SUTCLIFFE
LLP
1152 15th Street NW
Washington, DC 20005
202−339−8400
Email: ubhatti@orrick.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**DELL TECHNOLOGIES INC.**     represented by     **Theodore J. Boutrous , Jr.**
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229−7804
Fax: (213) 229−6804
Email: tboutrous@gibsondunn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kristin Andrea Linsley**
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
Suite 3000
San Francisco, CA 94105−0921
415−393−8395
Fax: 415−374−8471
Email: KLinsley@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Perlette Michele Jura**
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
213−229−7121

Fax: 213−229−6121
Email: pjura@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**TESLA, INC.**                    represented by     **Sean P. Gates**
CHARIS LEX P.C.
301 N Lake Ave
Suite 1100
Pasadena, CA 91101
626−508−1715
Fax: 626−508−1730
Email: sgates@charislex.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 12/15/2019 | 1 | | COMPLAINT against ALL DEFENDANTS with Jury Demand ( Filing fee $ 400 receipt number BDCDC−6646450) filed by Jenna Roe, JOHN DOE 1, JANE DOE 1, JOHN DOE 2. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Summons Alphabet Inc., # 3 Summons Apple Inc., # 4 Summons Dell Technologies Inc., # 5 Summons Microsoft Inc., # 6 Summons Tesla Inc.,) (Collingsworth, Terrence) (Entered: 12/15/2019) |
| 12/23/2019 | 2 | | MOTION to Proceed Under Pseudonym by All Plaintiffs (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(adh, ) (Entered: 12/26/2019) |
| 12/23/2019 | 3 | | MEMORANDUM AND ORDER granting 2 Motion for Leave to Proceed Under Pseudonym (see order for details) Signed by Chief Judge Beryl A. Howell on 12/23/2019. (adh, ) (Entered: 12/26/2019) |
| 12/23/2019 | 4 | | UNREDACTED COMPLAINT filed by All Plaintiffs. re 1 Complaint, filed by All Plaintiffs. (This document is SEALED and only available to authorized persons.)(adh, ) (Entered: 12/26/2019) |
| 12/26/2019 | | | Case Assigned to Judge Carl J. Nichols. (adh, ) (Entered: 12/26/2019) |
| 12/26/2019 | 5 | | SUMMONS (5) Issued Electronically as to ALPHABET INC., APPLE INC., DELL TECHNOLOGIES INC., MICROSOFT INC., TESLA, INC.. (Attachment: # 1 Notice and Consent)(adh, ) (Entered: 12/26/2019) |
| 03/19/2020 | 6 | | NOTICE of Appearance by Elizabeth Cruikshank on behalf of MICROSOFT INC. (Cruikshank, Elizabeth) (Entered: 03/19/2020) |
| 03/19/2020 | 7 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Mark Parris, Filing fee $ 100, receipt number ADCDC−6937084. Fee Status: Fee Paid. by MICROSOFT INC. (Attachments: # 1 Declaration of Mark Parris, # 2 Text of Proposed Order)(Cruikshank, Elizabeth) (Entered: 03/19/2020) |
| 03/19/2020 | 8 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− James L. Stengel, Filing fee $ 100, receipt number ADCDC−6937102. Fee Status: Fee Paid. by MICROSOFT INC. (Attachments: # 1 Declaration of James Stengel, # |

| | | | |
|---|---|---|---|
| | | | 2 Text of Proposed Order)(Cruikshank, Elizabeth) (Entered: 03/19/2020) |
| 03/19/2020 | 9 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Carolyn Frantz, Filing fee $ 100, receipt number ADCDC−6937112. Fee Status: Fee Paid. by MICROSOFT INC. (Attachments: # 1 Declaration of Carolyn Frantz, # 2 Text of Proposed Order)(Cruikshank, Elizabeth) (Entered: 03/19/2020) |
| 03/19/2020 | 10 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Darren Pouliot, Filing fee $ 100, receipt number ADCDC−6937132. Fee Status: Fee Paid. by MICROSOFT INC. (Attachments: # 1 Declaration of Darren Pouliot, # 2 Text of Proposed Order)(Cruikshank, Elizabeth) (Entered: 03/19/2020) |
| 03/19/2020 | 11 | | NOTICE of Appearance by Craig Alan Hoover on behalf of ALPHABET INC. (Hoover, Craig) (Entered: 03/19/2020) |
| 03/19/2020 | 12 | | NOTICE of Appearance by Neal Kumar Katyal on behalf of ALPHABET INC. (Katyal, Neal) (Entered: 03/19/2020) |
| 03/19/2020 | 13 | | NOTICE of Appearance by David Martin Foster on behalf of ALPHABET INC. (Foster, David) (Entered: 03/19/2020) |
| 03/19/2020 | 14 | | STIPULATION *for Extension of Time (Joint)* by ALPHABET INC., APPLE INC., DELL TECHNOLOGIES INC., MICROSOFT INC., TESLA, INC.. (Attachments: # 1 Text of Proposed Order Proposed Order)(Hoover, Craig) (Entered: 03/19/2020) |
| 03/20/2020 | 15 | | NOTICE of Appearance by Sean P. Gates on behalf of TESLA, INC. (Gates, Sean) (Entered: 03/20/2020) |
| 03/23/2020 | | | MINUTE ORDER. Upon consideration of the Parties' 14 Joint Stipulation for Extension of Time, it is hereby ORDERED that: on or before May 29, 2020, Defendants shall file their Motion(s) to Dismiss; on or before August 4, 2020, Plaintiffs shall file their Response to Defendants' Motion(s) to Dismiss; and on or before September 18, 2020, Defendants shall file their Reply or Replies in Support of their Motion(s) to Dismiss. Signed by Judge Carl J. Nichols on March 23, 2020. (lccjn3) (Entered: 03/23/2020) |
| 03/23/2020 | | | MINUTE ORDER. The Court having considered Plaintiffs' 7 Motion for Admission *Pro Hac Vice* of Mark Parris, and it appearing to the Court that the attorney referenced therein meets the requirements for *pro hac vice* admission under Local Civil Rule 83.2(d), it is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that Mark Parris, 701 5th Ave., Ste 5600 Seattle, WA 98104 is ADMITTED to practice before the Court *pro hac vice*. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Carl J. Nichols on March 23, 2020. (lccjn3) (Entered: 03/23/2020) |
| 03/23/2020 | | | MINUTE ORDER. The Court having considered Plaintiffs' 8 Motion for Admission *Pro Hac Vice* of James Stengel, and it appearing to the Court that the attorney referenced therein meets the requirements for *pro hac vice* admission under Local Civil Rule 83.2(d), it is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that James Stengel, 51 West 52nd St. New York, NY 10019 is ADMITTED to practice before the Court *pro hac vice*. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by |

| | | | |
|---|---|---|---|
| | | | Judge Carl J. Nichols on March 23, 2020. (Entered: 03/23/2020) |
| 03/23/2020 | | | MINUTE ORDER. The Court having considered Plaintiffs' <u>9</u> Motion for Admission *Pro Hac Vice* of Carolyn Frantz, and it appearing to the Court that the attorney referenced therein meets the requirements for *pro hac vice* admission under Local Civil Rule 83.2(d), it is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that Carolyn Frantz, 701 5th Ave., Ste 5600 Seattle, WA 98104 is ADMITTED to practice before the Court *pro hac vice*. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Carl J. Nichols on March 23, 2020. (lccjn 3) (Entered: 03/23/2020) |
| 03/23/2020 | | | MINUTE ORDER. The Court having considered Plaintiffs' <u>10</u> Motion for Admission *Pro Hac Vice* of Darren Pouliot, and it appearing to the Court that the attorney referenced therein meets the requirements for *pro hac vice* admission under Local Civil Rule 83.2(d), it is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that Darren Pouliot, 51 West 52nd St. New York, NY 10019 is ADMITTED to practice before the Court *pro hac vice*. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Carl J. Nichols on March 23, 2020. (lccjn3) (Entered: 03/23/2020) |
| 03/23/2020 | | | Set/Reset Deadlines/Hearings: Motion(s) to Dismiss due by 5/29/2020. Responses due by 8/4/2020. Reply due by 9/18/2020. (zcdw) (Entered: 03/24/2020) |
| 03/24/2020 | <u>16</u> | | NOTICE of Appearance by Darren Edward Pouliot on behalf of MICROSOFT INC. (Pouliot, Darren) (Entered: 03/24/2020) |
| 03/24/2020 | <u>17</u> | | NOTICE of Appearance by James L. Stengel on behalf of MICROSOFT INC. (Stengel, James) (Entered: 03/24/2020) |
| 03/24/2020 | <u>18</u> | | NOTICE of Appearance by Mark Parris on behalf of MICROSOFT INC. (Parris, Mark) (Entered: 03/24/2020) |
| 03/24/2020 | <u>19</u> | | NOTICE of Appearance by Emily Johnson Henn on behalf of APPLE INC. (Henn, Emily) (Entered: 03/24/2020) |
| 03/24/2020 | <u>20</u> | | NOTICE of Appearance by John Edward Hall on behalf of APPLE INC. (Hall, John) (Entered: 03/24/2020) |
| 03/25/2020 | <u>21</u> | | NOTICE of Appearance by Henry Ben−Heng Liu on behalf of APPLE INC. (Liu, Henry) (Entered: 03/25/2020) |
| 03/25/2020 | <u>22</u> | | NOTICE of Appearance by Carolyn Frantz on behalf of MICROSOFT INC. (Frantz, Carolyn) (Entered: 03/25/2020) |
| 05/19/2020 | <u>23</u> | | Joint MOTION for Extension of Time to Amend *Complaint and Brief Dismissal Motions* by JANE DOE 1, JOHN DOE 1, JOHN DOE 2, JAMES DOE 4, JANE DOE 2, JANE DOE 3, JENNA DOE 10, JENNA DOE 11, JENNA DOE 6, JENNA DOE 7, JENNA DOE 8, JOHN DOE 12, JOHN DOE 13, JOHN DOE 5, JOHN DOE 9, JENNA ROE 3 (Attachments: # <u>1</u> Text of Proposed Order)(Collingsworth, Terrence) (Entered: 05/19/2020) |
| 05/27/2020 | | | |

| | | | MINUTE ORDER. Upon consideration of the Parties' 23 Joint Stipulation for Scheduling Filing of Amended Complaint and Motion to Dismiss Briefing, it is hereby ORDERED that the Stipulation is GRANTED and that: on or before June 26, 2020, Plaintiffs shall file their Amended Complaint; on or before August 25, 2020, Defendants shall file their Motion(s) to Dismiss; on or before October 26, 2020, Plaintiffs shall file their Response to Defendants' Motion(s) to Dismiss; and on or before December 18, 2020, Defendants shall file their Reply or Replies in Support of their Motion(s) to Dismiss. Signed by Judge Carl J. Nichols on May 27, 2020. (lccjn3) (Entered: 05/27/2020) |
|---|---|---|---|
| 06/26/2020 | 24 | | NOTICE *of Filing First Amended Complaint* by JANE DOE 1, JOHN DOE 1, JOHN DOE 2, JAMES DOE 4, JANE DOE 2, JANE DOE 3, JENNA DOE 10, JENNA DOE 11, JENNA DOE 6, JENNA DOE 7, JENNA DOE 8, JOHN DOE 12, JOHN DOE 13, JOHN DOE 5, JOHN DOE 9, JENNA ROE 3 re Order on Motion for Extension of Time to Amend,, (Collingsworth, Terrence) (Entered: 06/26/2020) |
| 06/26/2020 | 25 | | AMENDED COMPLAINT against All Defendants with Jury Demand filed by JOHN DOE 9, JENNA DOE 7, JANE DOE 2, JOHN DOE 2, JOHN DOE 1, JOHN DOE 5, JAMES DOE 4, JOHN DOE 12, JANE DOE 1, JENNA DOE 10, JOHN DOE 13, JANE DOE 3, JENNA ROE 3, JENNA DOE 8, JENNA DOE 11, JENNA DOE 6.(Collingsworth, Terrence) (Entered: 06/26/2020) |
| 07/29/2020 | 26 | | NOTICE of Appearance by Upnit K. Bhatti on behalf of MICROSOFT INC. (Bhatti, Upnit) (Entered: 07/29/2020) |
| 08/25/2020 | 27 | | NOTICE of Appearance by Theodore J. Boutrous, Jr on behalf of DELL TECHNOLOGIES INC. (Boutrous, Theodore) (Entered: 08/25/2020) |
| 08/25/2020 | 28 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Perlette M. Jura, Filing fee $ 100, receipt number ADCDC−7507222. Fee Status: Fee Paid. by DELL TECHNOLOGIES INC. (Attachments: # 1 Declaration Declaration of Perlette M. Jura, # 2 Text of Proposed Order Proposed Order)(Boutrous, Theodore) (Entered: 08/25/2020) |
| 08/25/2020 | 29 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Kristin A. Linsley, Filing fee $ 100, receipt number ADCDC−7507233. Fee Status: Fee Paid. by DELL TECHNOLOGIES INC. (Attachments: # 1 Declaration of Kristin A. Linsley, # 2 Text of Proposed Order)(Boutrous, Theodore) (Entered: 08/25/2020) |
| 08/25/2020 | 30 | | MOTION for Leave to Appear Pro Hac Vice :Attorney Name− Josh Krevitt, Filing fee $ 100, receipt number ADCDC−7507247. Fee Status: Fee Paid. by DELL TECHNOLOGIES INC. (Attachments: # 1 Declaration of Josh Krevitt, # 2 Text of Proposed Order)(Boutrous, Theodore) (Entered: 08/25/2020) |
| 08/25/2020 | 31 | | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by DELL TECHNOLOGIES INC. (Boutrous, Theodore) (Entered: 08/25/2020) |
| 08/25/2020 | 32 | | MOTION to Dismiss for Lack of Jurisdiction *with Incorporated Memorandum of Law* by DELL TECHNOLOGIES INC. (Attachments: # 1 Text of Proposed Order)(Boutrous, Theodore) (Entered: 08/25/2020) |
| 08/25/2020 | 33 | | |

| | | | |
|---|---|---|---|
| | | | MOTION to Dismiss by ALPHABET INC., APPLE INC., DELL TECHNOLOGIES INC., MICROSOFT INC., TESLA, INC. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Henn, Emily) (Entered: 08/25/2020) |
| 08/25/2020 | 34 | | MOTION to Dismiss *the First Amended Complaint* by ALPHABET INC. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Hoover, Craig) (Entered: 08/25/2020) |
| 08/25/2020 | 35 | | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by ALPHABET INC. (Hoover, Craig) (Entered: 08/25/2020) |
| 08/25/2020 | 36 | | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by MICROSOFT INC. (Bhatti, Upnit) (Entered: 08/25/2020) |
| 08/25/2020 | 37 | | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by TESLA, INC. (Gates, Sean) (Entered: 08/25/2020) |
| 09/28/2020 | | | MINUTE ORDER. The Court having considered Defendant's 28 Motion For Admission Pro Hac Vice of Perlette M. Jura, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under Local Civil Rule 83.2(d), it is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that Perlette M. Jura is ADMITTED to practice before the Court pro hac vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Carl J. Nichols on September 28, 2020. (lccjn3) (Entered: 09/28/2020) |
| 09/28/2020 | | | MINUTE ORDER. The Court having considered Defendant's 29 Motion For Admission Pro Hac Vice of Kristin A. Linsley, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under Local Civil Rule 83.2(d), it is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that Kristin A. Linsley is ADMITTED to practice before the Court pro hac vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Carl J. Nichols on September 28, 2020. (lccjn3) (Entered: 09/28/2020) |
| 09/28/2020 | | | MINUTE ORDER. The Court having considered Defendant's 30 Motion For Admission Pro Hac Vice of Josh Krevitt, and it appearing to the Court that the attorney referenced therein meets the requirements for pro hac vice admission under Local Civil Rule 83.2(d), it is hereby ORDERED that the Motion is GRANTED. It is further ORDERED that Josh Krevitt is ADMITTED to practice before the Court pro hac vice. **Counsel should register for e−filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a). Click for instructions**. Signed by Judge Carl J. Nichols on September 28, 2020. (lccjn3) (Entered: 09/28/2020) |
| 10/26/2020 | 38 | | Memorandum in opposition to re 33 MOTION to Dismiss *Plaintiffs' Response in Opposition to Defendants' Joint Motion to Dismiss* filed by JANE DOE 1, JOHN DOE 1, JOHN DOE 2, JAMES DOE 4, JANE DOE 2, JANE DOE 3, JENNA DOE 10, JENNA DOE 11, JENNA DOE 6, JENNA DOE 7, JENNA DOE 8, JOHN DOE 12, JOHN DOE 13, JOHN DOE 5, JOHN DOE 9, JENNA ROE 3. (Attachments: # 1 Exhibit A: Congressional TVPRA Amicus Brief in Nestle Case, # 2 Text of Proposed Order)(Collingsworth, Terrence) Modified |

| | | | |
|---|---|---|---|
| | | | docket event/text on 10/27/2020 (eg). (Entered: 10/26/2020) |
| 10/26/2020 | 39 | | Memorandum in opposition to re 32 MOTION to Dismiss for Lack of Jurisdiction *with Incorporated Memorandum of Law Plaintiffs' Response in Opposition to Defendant Dell's Motion to Dismiss* filed by JANE DOE 1, JOHN DOE 1, JOHN DOE 2, JAMES DOE 4, JANE DOE 2, JANE DOE 3, JENNA DOE 10, JENNA DOE 11, JENNA DOE 6, JENNA DOE 7, JENNA DOE 8, JOHN DOE 12, JOHN DOE 13, JOHN DOE 5, JOHN DOE 9, JENNA ROE 3. (Attachments: # 1 Text of Proposed Order)(Collingsworth, Terrence) Modified docket event/text on 10/27/2020 (eg). (Entered: 10/26/2020) |
| 10/26/2020 | 40 | | Memorandum in opposition to re 34 MOTION to Dismiss *the First Amended Complaint Plaintiffs' Response in Opposition to Defendant Alphabet's Motion to Dismiss* filed by JANE DOE 1, JOHN DOE 1, JOHN DOE 2, JAMES DOE 4, JANE DOE 2, JANE DOE 3, JENNA DOE 10, JENNA DOE 11, JENNA DOE 6, JENNA DOE 7, JENNA DOE 8, JOHN DOE 12, JOHN DOE 5, JOHN DOE 9, JENNA ROE 3. (Attachments: # 1 Text of Proposed Order)(Collingsworth, Terrence) Modified docket event/text on 10/27/2020 (eg). (Entered: 10/26/2020) |
| 10/27/2020 | 41 | | NOTICE of Appearance by Kristin Andrea Linsley on behalf of DELL TECHNOLOGIES INC. (Linsley, Kristin) (Entered: 10/27/2020) |
| 12/08/2020 | 42 | | NOTICE of Appearance by Perlette Michele Jura on behalf of DELL TECHNOLOGIES INC. (Jura, Perlette) (Entered: 12/08/2020) |
| 12/18/2020 | 43 | | REPLY to opposition to motion re 32 MOTION to Dismiss for Lack of Jurisdiction *with Incorporated Memorandum of Law* filed by DELL TECHNOLOGIES INC.. (Boutrous, Theodore) (Entered: 12/18/2020) |
| 12/18/2020 | 44 | | REPLY to opposition to motion re 33 MOTION to Dismiss filed by ALPHABET INC., APPLE INC., DELL TECHNOLOGIES INC., MICROSOFT INC., TESLA, INC.. (Hoover, Craig) (Entered: 12/18/2020) |
| 12/18/2020 | 45 | | REPLY to opposition to motion re 34 MOTION to Dismiss *the First Amended Complaint* filed by ALPHABET INC.. (Hoover, Craig) (Entered: 12/18/2020) |
| 06/11/2021 | | | MINUTE ORDER. Upon review of Defendants' 33 Motion to Dismiss, is hereby ORDERED that a hearing on the Motion is scheduled for 2:00 p.m. on July 8, 2021, in Courtroom 19. Signed by Judge Carl J. Nichols on June 11, 2021. (lccjn2) (Entered: 06/11/2021) |
| 06/11/2021 | | | Set/Reset Hearings: Motion Hearing set for 7/8/2021 at 02:00 PM in Courtroom 19 before Judge Carl J. Nichols. (zcal) (Entered: 06/14/2021) |
| 07/08/2021 | | | Minute Order and Entry for Proceedings held before Judge Carl J. Nichols: Motion Hearing held on 7/8/2021 re Motions 32 , 33 , and 34 . Motions taken under advisement. Further Order and Opinion to be issued by the Court. Court Reporter: Lorraine Herman. (zcal) (Entered: 07/08/2021) |
| 07/09/2021 | 46 | | NOTICE OF WITHDRAWAL OF APPEARANCE as to MICROSOFT INC.. Attorney Elizabeth Cruikshank terminated. (Cruikshank, Elizabeth) (Entered: 07/09/2021) |
| 09/14/2021 | 47 | | NOTICE OF SUPPLEMENTAL AUTHORITY by JANE DOE 1, JOHN DOE 1, JOHN DOE 2, JAMES DOE 4, JANE DOE 2, JANE DOE 3, JENNA DOE |

| | | | |
|---|---|---|---|
| | | | 10, JENNA DOE 11, JENNA DOE 6, JENNA DOE 7, JENNA DOE 8, JOHN DOE 12, JOHN DOE 13, JOHN DOE 5, JOHN DOE 9, JENNA ROE 3 (Attachments: # 1 Exhibit 1: Doe v. Twitter, # 2 Exhibit 2: Jane Doe v. Mindgeek)(Collingsworth, Terrence) (Entered: 09/14/2021) |
| 09/17/2021 | 48 | | RESPONSE re 47 NOTICE OF SUPPLEMENTAL AUTHORITY, filed by ALPHABET INC., APPLE INC., DELL TECHNOLOGIES INC., MICROSOFT INC., TESLA, INC.. (Stengel, James) (Entered: 09/17/2021) |
| 09/20/2021 | 49 | | REPLY re 48 Response to Document *Response to Notice of Supplemental Authority* filed by JANE DOE 1, JOHN DOE 1, JOHN DOE 2, JAMES DOE 4, JANE DOE 2, JANE DOE 3, JENNA DOE 10, JENNA DOE 11, JENNA DOE 6, JENNA DOE 7, JENNA DOE 8, JOHN DOE 12, JOHN DOE 13, JOHN DOE 5, JOHN DOE 9, JENNA ROE 3. (Collingsworth, Terrence) (Entered: 09/20/2021) |
| 11/02/2021 | 50 | | MEMORANDUM OPINION. Signed by Judge Carl J. Nichols on November 2, 2021. (lccjn3) . (Entered: 11/02/2021) |
| 11/02/2021 | 51 | | ORDER. Signed by Judge Carl J. Nichols on November 2, 2021. (lccjn3) (Entered: 11/02/2021) |
| 11/30/2021 | 52 | | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 51 Order on Motion to Dismiss/Lack of Jurisdiction,, 50 Order by JANE DOE 1, JOHN DOE 1, JOHN DOE 2, JAMES DOE 4, JANE DOE 2, JANE DOE 3, JENNA DOE 10, JENNA DOE 11, JENNA DOE 6, JENNA DOE 7, JENNA DOE 8, JOHN DOE 12, JOHN DOE 13, JOHN DOE 5, JOHN DOE 9, JENNA ROE 3. Filing fee $ 505, receipt number ADCDC−8896924. Fee Status: Fee Paid. Parties have been notified. (Collingsworth, Terrence) (Entered: 11/30/2021) |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JANE DOE 1 et al. ,

       Plaintiffs,

     v.

APPLE INC. et al.,

       Defendants

**Case No. CV: 1:19-cv-03737 (CJN)**

## **NOTICE OF APPEAL**

Notice is hereby given that all Plaintiffs appeal to the United States Court of Appeals for the District of Columbia Circuit from the Order (ECF No. 51) and Memorandum Opinion (ECF No. 50) of this Court entered on November 2, 2021, dismissing the case with prejudice under Fed. R. Civ. P. 12 (b) and issuing a final appealable order.

DATED:  November 30, 2021

By: _____
Terrence P. Collingsworth

**INTERNATIONAL RIGHTS ADVOCATES**
Terrence P. Collingsworth (D.C. Bar No. 471830)
621 Maryland Avenue NE
Washington, D.C. 20002
Phone: 202-255-2198
Emails: tc@iradvocates.org
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on November 30, 2021, I electronically filed the foregoing Notice of Appeal with the United States District Court for the District of Columbia by using the CM/ECF system, which will send a notice of filing to all registered users, including counsel for all parties.

Date: November 30, 2010

/s/ Terrence P. Collingsworth
Terrence P. Collingsworth (D.C. Bar No. 471830)
INTERNATIONAL RIGHTS ADVOCATES
621 Maryland Avenue, NE
Washington, D.C. 20002
Telephone: (202) 543-5811
tc@iradvocates.org

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE I, et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:19-cv-03737 (CJN) |
| APPLE INC., et al., | |
| *Defendants*. | |

## ORDER

This matter is before the Court on Dell Technologies, Inc.'s Motion to Dismiss, ECF No. 32, Defendants' Joint Motion to Dismiss, ECF No. 33, and Alphabet, Inc.'s Motion to Dismiss, ECF No. 34.

Accordingly, for the reasons given in the accompanying Memorandum Opinion, it is **ORDERED** that:

Dell's Motion to Dismiss, ECF No. 32, is **GRANTED**;

Defendants' Joint Motion to Dismiss, ECF No. 33, is **GRANTED**; and

Alphabet's Motion to Dismiss, ECF No. 34, is **DENIED AS MOOT**.

The Clerk is directed to **CLOSE** this case.

This is a final, appealable order.

DATE:  November 2, 2021

CARL J. NICHOLS
United States District Judge

| | |
|---|---|
| JOHN DOE I, et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:19-cv-03737 (CJN) |
| APPLE INC., et al., | |
| *Defendants*. | |

## <u>MEMORANDUM OPINION</u>

Modern electronics, including the lithium-ion batteries in Defendants' products, require cobalt. But in some circumstances cobalt is mined using child labor, which can be dangerous and deadly. Each Plaintiff or a family member allegedly suffered a terrible injury or loss of life mining cobalt in the Democratic Republic of the Congo. Plaintiffs seek to represent a class of similar child laborers in this suit against the Defendants for alleged violations of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1581 *et seq.*, as well as various state-law causes of action.

While Plaintiffs' Amended Complaint describes tragic events, it suffers from several flaws. Plaintiffs must have standing to bring their claims, but here they do not: the harm they allege is not traceable to any Defendant. Plaintiffs have also failed to adequately plead a violation of the TVPRA or any of the common-law torts they pursue. And even then, it is not obvious that the civil-remedy portion of the TVPRA applies extraterritorially—a fatal fact, as the alleged violations took place far from this country's shores. The Court will thus grant Defendants' Joint Motion to Dismiss, ECF No. 33, grant Dell's Motion to Dismiss for Lack of Jurisdiction, ECF No. 32, and deny Defendant Alphabet, Inc.'s, Motion to Dismiss, ECF No. 34, as moot.

# I.     Background

On these motions to dismiss, the Court accepts all well-pleaded facts in the complaint as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## A.     Cobalt mining and the DRC

Two-thirds of the world's mined cobalt comes from the far southeastern reaches of the DRC. Amend. Compl. ("Compl."), ECF No. 25 ¶ 5. It is precious among nonprecious metals; lithium-ion batteries require it. *Id.* From iPhones to electric cars, Chromebooks to tablets, many everyday pieces of technology need cobalt from the DRC to run. *Id.* ¶¶ 72, 76, 82, 85. Each Defendant is a major consumer of the metal. *See id.*

Cobalt mining in the DRC is dominated by two factions: "artisanal" miners and large-scale producers. Artisanal miners are a large and informal group. *See id.* ¶ 6. They go to areas where cobalt is found and dig for it on their own—often with primitive tools, and often without safety equipment. *Id.* Major tunnel collapses are common on artisanal mines, killing and maiming the miners. *Id.* Young children are often among the victims. *Id.* But despite its informal nature, artisanal mining is a state-sanctioned profession. *See id.* ¶ 35. It is, however, allowed of only Congolese nationals. *Id.*

The large-scale producers of cobalt operate on a larger, mechanized scale. The major participants include the Kamoto Copper Company ("KCC"), Mutanda Mining ("MUMI"), and Katanga Mining, all subsidiaries of a company called Glencore. *Id.* ¶ 73. Compagnie Miniere de Musconi ("COMUS"), along with Congo Dongfang Mining ("CDM"), both subsidiaries of a company called Zhejiang Huayou Cobalt, are also part of this group. *Id.* ¶¶ 37, 73.

Cobalt from artisanal miners and large-scale producers often gets mixed throughout the supply chain. *Id.* ¶ 101. But from the large-scale producers, it follows a fixed path. Glencore, for example, is in a formal arrangement with a company called Umicore. *Id.* ¶ 103. As part of that

2

arrangement, Glencore takes the cobalt it acquires from its subsidiaries and sells it to Umicore. *Id.* ¶¶ 73, 77, 80, 82, 85, 103. Umicore then processes and refines that cobalt, in the process adding in cobalt mined by artisanal miners, including children. *Id.* ¶ 103. As for Huayou Cobalt, that company directly processes its cobalt into "battery materials," which it then sells. *Id.* ¶¶ 37, 73. The company supplements the cobalt its subsidiaries mine by purchasing from artisanal miners, including children. *Id.* ¶ 104.

Plaintiffs allege that Umicore supplies cobalt to every Defendant. *Id.* ¶ 100. (But not always directly—Plaintiffs allege that Umicore sells refined cobalt to "LG Chem," for example, which in turn sells it to Tesla. *Id.* ¶ 85.) And they allege that Huayou Cobalt "certainly supplies to Defendants Apple, Dell and Microsoft, and probably other Defendants." *Id.* ¶ 100. Yet it is only these end purchasers of the refined cobalt (Apple, Alphabet, Microsoft, Dell, and Tesla), not the actual suppliers (Umicore and Huayou Cobalt) or the suppliers' suppliers (Glencore, KCC, MUMI, Kantaga Mining, COMUS, and CDM), that Plaintiffs name as Defendants.

## B. Plaintiffs' injuries

Plaintiffs are three Jane Does, one James Doe, five Jenna Does, one Jenna Roe, and six John Does. Their stories are tragic.

James Doe 1 was seventeen when he died. *Id.* ¶ 30. Forced out of school in the second grade because his family could not afford the fees, he turned to mining. *Id.* At fifteen, he joined a gang of boys digging tunnels at copper and cobalt mine. *Id.* He made about seventeen dollars a week, supporting his aunt, Jane Doe 1. *Id.* ¶ 31.

The mine in which James Doe 1 dug tunnels was first run by a state entity. *Id.* ¶ 30. But at the time of his death, it was operated by KCC, a Glencore subsidiary. *Id.* James Doe 1 died when a mining tunnel collapsed on him, an accident triggered by a rush of scared children running from some soldiers who had entered the mine. *Id.* ¶ 31.

John Doe 1 started mining at age nine; his family, too, could not afford his school fees. *Id.* ¶ 32. By fifteen, he was working at a mine operated by KCC, a Glencore subsidiary. *Id.* One day, while carrying a bag of cobalt down a mountain, he fell into a tunnel and broke his back. *Id.* ¶ 33. He is now paralyzed from the chest down. *Id.*

James Doe 2, the son of John Doe 2, also took to mining when school costs got too high. *Id.* ¶ 34. He worked as an artisanal miner, picking up loose rocks of cobalt to sell. *Id.* One day, he went to an industrial mining site called Tilwezembe. *Id.* While John Doe 2 "work[ed] as [an] artisanal miner[ ]," *id.*, and thus did not mine for any corporation, *see id.* ¶ 6, the mineral rights of Tilwezembe were owned by Glencore, *id.* ¶ 34. Yet despite owning these mineral rights, it does not appear that Glencore mined at Tilwezembe. Instead, Plaintiffs allege that Glencore set up a sham corporation, CMKK, to purchase the cobalt mined by artisanal miners (even though Glencore technically already owned that cobalt). *Id.* ¶¶ 34–36. CMKK would then sell that cobalt to Glencore. *Id.* at 36.

A Lebanese man named Ismail ran CMKK. *Id.* Ismail had a large gang of child miners working under him. *Id.* He paid them very little. *Id.* It was while working under Ismail's direction at Tilwezembe that John Doe 2 died in a tunnel collapse. *Id.*

John Doe 3 is Jenna Roe 3's only son. *Id.* ¶ 37. He dropped out of school at age eleven to support his mother, selling vegetables. *Id.* But at age fourteen, he went into cobalt mining. *Id.* A labor broker, "Mr. X," arranged for him to work at a mine owned by CDM, a subsidiary of Huayou Cobalt. *Id.* But it does not appear that John Doe 3 worked for CDM. Rather, the Amended Complaint alleges that he was one of nine boys who worked under Mr. X. *Id.* The group would go to the mine, fill up bags with cobalt, and then transport that cobalt to a nearby buying house run by Chinese men. *Id.* The boys would give the money paid by the Chinese men to Mr. X, who

would in turn pay them at the end of each week. *Id.* It was while transporting cobalt to the buying house that a truck hit John Doe 3, forcing doctors to amputate his left leg. *Id.*

John Doe 4 is the son of James Doe 4. *Id.* ¶ 38. Like many of the Plaintiffs, he started cobalt mining when his family could no longer afford school fees. *Id.* ¶ 39. The Amended Complaint alleges that he was severely injured when a pit wall collapsed on him at the Tilwezembe mining site. *Id.* In the particular area of the mine at which he worked, all the cobalt he gathered would get purchased by three Chinese men. *Id.* "On information and belief, the three Chinese men . . . worked for Ismail," and thus the "sham Congolese cooperative at the site, CMKK," which "Glencore directs and controls." *Id.*

John Doe 5 was an artisanal miner working at a mine controlled by CDM, a Huayou Cobalt subsidiary. *Id.* ¶ 40. He was a tunnel digger and would sell the cobalt he gathered to Chinese buying houses located on the mine site. *Id.* But one day, his tunnel collapsed, crushing his legs. *Id.* He will never walk again. *Id.*

John Doe 6 is the son of Jenna Doe 6. *Id.* ¶ 41. He worked at Tilwezembe. *Id.* But like most Plaintiffs, it does not appear that he worked for Glencore directly. Rather, he worked on a team of six boys who did all the tasks in the cobalt-mining process: digging the ore, washing it, and transporting it to a buying site. *Id.* ¶ 42. They would often sell to Ismail. *Id.* But one day, Ismail informed John Doe 6 and his friends that he would no longer buy cobalt from them unless they started working under a "sponsor," Chief Wali. *Id.* Chief Wali often paid the boys nothing, claiming that they were in his debt. *Id.* While working for Chief Wali, a tunnel at Tilwezembe collapsed on John Doe 6. *Id.* He can no longer walk on his left leg. *Id.*

Joshua Doe 2 was the sister of Jane Doe 2. *Id.* ¶ 43. He also worked at Tilwezembe. *Id.* He worked in the mines part-time before school started, and full-time once he dropped out. *Id.*

¶ 44. One day, while working under a man named Guylain, a tunnel collapsed and killed him. *Id.* Plaintiffs allege that Guylain worked under Ismail, who was in charge of CMKK, which Glencore had "created to comply with DRC mining regulations." *Id.*

John Doe 7 is the son of Jenna Doe 7. *Id.* ¶ 45. He worked at a KCC mine, owned by Glencore. *Id.* But apparently, Presidential Guards managed to take control of the mine. *Id.* ¶ 46. They then recruited children, including John Doe 7, to work there. *Id.* He worked with a team of ten children, giving cobalt to the Presidential Guards to sell to a buying house located at the mine. *Id.* One day, John Doe 7 decided that he would sell his cobalt on his own, paying the Presidential Guards a fee to do so. *Id.* One Guard did not like that, so he shot John Doe 7 in the back. *Id.* John Doe 7 can no longer lift his left arm. *Id.*

John Doe 8 is the son of Jenna Doe 8. *Id.* ¶ 47. He dropped out of school in the fifth grade, as his family could no longer afford his school fees. *Id.* John Doe 8 worked at a KCC mine, owned by Glencore. *Id.* He would sell the cobalt that he mined to buying houses, paying a motorcycle driver to transport it to them in a nearby city. *Id.* ¶ 48. But one day, while digging a tunnel, a pit wall collapsed. *Id.* It crushed his right leg, making it hard for him to walk. *Id.*

John Doe 9 dropped out of school when both his parents died. *Id.* ¶ 49. He started working at the Tilwezembe mining site. *Id.* At the start of his career, he worked for a man named Ilunga, who had control over a specific pit at the mine. *Id.* ¶ 50. He would dig for Ilunga and sell his cobalt to Ismail. *Id.* When that pit collapsed, John Doe 9 started working on an independent basis. *Id.* ¶ 51. But to continue working at Tilwezembe, Ismail required him to sell his cobalt to three other Lebanese brokers who worked with Ismail. *Id.* It was during this time that his leg was smashed by a pit-wall collapse. *Id.*¶ 52.

John Doe 10 is the son of Jenna Doe 10.  *Id.* ¶ 53.  After school, he would work at a mine operated by an Australian company, Taruga Minerals, but owned by KCC (and thus, Glencore).  *Id.*  Aged fifteen, he worked in a group of thirty men under "a boss at the mine, 'Jean-Pi.'"  *Id.* 54.  A tunnel collapsed on John Doe 10, crushing his left leg.  *Id.*

John Doe 11 is the son of Jenna Doe 11.  *Id.* ¶ 55.  He worked at a mine operated by KCC.  *Id.*  He would gather rocks in the mine, which he sold to a man named John.  *Id.* ¶ 56.  "'John' was related to the Glencore mining site in some way, but Plaintiffs do not yet have the details."  *Id.*  One day, the pit wall of the mine collapsed on John Doe 11.  *Id.* ¶ 57.  He can walk only with crutches now.  *Id.*

Jane Doe 3 was the mother of James Doe 3, who died at fourteen.  *Id.* ¶ 58.  He worked at Tilwezembe in an area controlled by Ismail.  *Id.* ¶¶ 58–59.  A tunnel collapse killed him.  *Id.* ¶ 60.  His parents have been unable to recover his body.  *Id.*

James Doe 12 was the brother of John Doe 12.  *Id.* ¶ 61.  The brothers worked at Tilwezembe in an area controlled by Ismail.  *Id.* at ¶¶ 61–62.  One day, the tunnel they were in collapsed, injuring John Doe 12 and killing James Doe 12.  *Id.* ¶ 63.  John Doe 12 is now severely injured and cannot work.  *Id.*

John Doe 13 is the last Plaintiff.  He dropped out of high school because he could not afford the fees.  *Id.* ¶ 64.  He started working at a mine owned by the Eurasian Resources Group, which sells cobalt to Tesla.  *Id.*  He would pick up rocks at the site and sell them to two men, Ahmed and Aza.  *Id.*  Like other Plaintiffs, he was in a tunnel collapse that severely injured him.  *Id.*

### C.     This Action

Plaintiffs filed their operative complaint in 2020.  *See id.* ¶ 139(j).  They seek relief under § 1589 and § 1590 of the TVPRA, titled "Forced labor" and "Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor," respectively, *id.* ¶¶ 87–123.  18 U.S.C. §§ 1589,

1590.  Plaintiffs also bring claims of unjust enrichment, negligent supervision, and intentional infliction of emotional distress, although they do not allege what law governs these claims.  Compl. ¶¶ 124–37.  Apple, Alphabet, Dell, Microsoft, and Tesla are the only defendants named in the Amended Complaint.  Plaintiffs bring no claims against Omicore, Glencore and its subsidiaries, Huayou Cobalt and its subsidiaries, Ismail, Chief Wali, or any other individual or company involved in the cobalt-mining process.

In addition to monetary relief, Plaintiffs seek an order requiring Defendants to create a fund to pay for medical care for the proposed class, conduct medical monitoring for all class members who were exposed to cobalt, and to "clean up the environmental impacts caused by Defendants' use of suppliers for cobalt that failed to take any steps to protect the environment where they were mining for cobalt."  *Id.* ¶ 139(i).

Once Plaintiffs filed their Amended Complaint, the pending Motions to Dismiss, ECF Nos. 32, 33, and 34, followed.

## II.     Legal Standard

### A.  Motion to dismiss under Rule 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges this Court's subject-matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  Federal courts have limited jurisdiction. *Gunn v. Minton*, 568 U.S. 251, 256 (2013).  And a court presumes it lacks jurisdiction "unless the contrary appears affirmatively from the record."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (quoting *Renne v. Geary*, 501 U.S. 312, 316 (1991)).  Thus, when a defendant contends that the Court lacks subject-matter jurisdiction, the plaintiff must demonstrate it does. When assessing such a motion, "the court assumes the truth of all material factual allegations in the complaint and construes the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged and upon such facts determines jurisdictional questions."

*Kangarloo v. Pompeo*, 480 F. Supp. 3d 134, 137 (D.D.C. 2020) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)) (quotation marks omitted) (alterations accepted).

All Defendants move to dismiss for lack of subject-matter jurisdiction. *See* Memorandum in Support of Defendants' Joint Motion to Dismiss ("Joint Mot."), ECF No. 33-1, at 8–14. It is thus up to Plaintiffs to establish subject-matter jurisdiction over every claim.

### B.    Motion to dismiss under Rule 12(b)(2)

A motion to dismiss under Rule 12(b)(2) challenges a lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). Once again, the plaintiff "bears the burden of establishing a factual basis for the court's exercise of personal jurisdiction over the defendant." *Capital Bank Int'l Ltd. v. Citigroup, Inc.*, 276 F. Supp. 2d 72, 74 (D.D.C. 2003); *see also Williams v. Romarm, SA*, 756 F.3d 777, 785 (D.C. Cir. 2014). To prove that personal jurisdiction exists, a plaintiff must allege specific facts connecting the defendant to the forum; bare allegations and conclusory statements are not enough. *Capital Bank*, 276 F. Supp. 2d at 74.

The jurisdictional reach of this Court is coextensive with that of the District of Columbia. *See* Fed. R. Civ. P. 4(k)(1)(A). And D.C.'s long-arm statute, D.C. Code § 13-423(a), "has been held 'to be coextensive . . . with the Constitution's due process limit.'" *Forras v. Rauf*, 812 F.3d 1102, 1106 (D.C. Cir. 2016) (quoting *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987) (Ruth Bader Ginsburg, J.)). Thus, the general constitutional limits of personal jurisdiction established by the Supreme Court govern the limits of personal jurisdiction in this Court.

Only Dell brings a motion to dismiss for lack of personal jurisdiction. *See generally* Motion of Dell to Dismiss for Lack of Personal Jurisdiction with Incorporated Memorandum of Law ("Dell Mot."), ECF No. 32.

### C.    Motion to dismiss under Rule 12(b)(6)

A Rule 12(b)(6) motion to dismiss alleges a failure to state a claim. Fed. R. Civ. P. 12(b)(6). When assessing this type of motion, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (quoting *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000)). "[A] formulaic recitation of the elements of a cause of action," however, "will not do"; a complaint must provide more than mere labels and conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Put differently, a claim to relief must be "plausible on its face," and the pleadings must "nudge[ the] claims across the line from conceivable to plausible." *Id.* at 570.

All Defendants move to dismiss for failure to state a claim. *See* Joint Mot. at 14–41; *see also generally* Memorandum in Support of Alphabet Inc.'s Motion to Dismiss ("Alphabet Mot."), ECF No. 34-1.

### III.    Plaintiffs Lack Standing

Defendants mount a threshold challenge to the Court's ability to hear this case, arguing that Plaintiffs lack Article III standing.[1] Defs.' Mot. at 8–13. Because standing is a jurisdictional requirement, the Court must assess it before considering any merits inquiries. *Steel Co. v. Citizens for a Better Envt.*, 523 U.S. 83, 102 (1998).

---

[1] Alphabet also brings a separate Motion to Dismiss, but under Federal Rule of Civil Procedure 12(b)(6). *See generally* Alphabet's Mot. It alleges that it is not a proper Defendant in this case, as it is merely the parent holding company of Google. *Id.* at 1–2. And it is Google, not Alphabet, that Plaintiffs seek to hold responsible. *See id.* Plaintiffs admit this mistake. *See generally* Plaintiffs' Opp. to Alphabet's Motion to Dismiss ("Pls.' Apple Resp."), ECF No. 40. They ask for leave to amend their complaint to substitute Google for Alphabet "following the Court's ruling on all the pending motions to dismiss." *Id.* at 1–2. Accordingly, the Court will address the outstanding Motions to Dismiss first—a course of action Alphabet agrees with. *See* Reply in Support of Alphabet's Motion to Dismiss, ECF No. 45, at 1 n.1.

## A. Standing generally

Standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "[T]he irreducible constitutional minimum of standing contains three elements," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992): First, the plaintiffs must have suffered an "injury in fact"— that is, an invasion of a legally protected interest that is both concrete and particularized and actual or imminent (as opposed to conjectural or hypothetical). *Id.* Second, there must be a causal connection between the injury and the conduct complained of. *Id.* at 560–61. Finally, it must be likely, not merely speculative, that the injury will be redressed by a favorable decision of the court. *Id.* at 561.

Defendants contend that Plaintiffs fail this second prong. *See* Defs.' Mot. at 8–13. It is thus up to Plaintiffs to show that they do not. *Lujan*, 504 U.S. at 561.

## B. Plaintiffs have not shown a causal connection between their injuries and the Defendants

To satisfy Article III's traceability requirements—that is, for there to be a causal connection between the injury and the conduct complained of— "the injury has to be 'fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)) (alterations accepted). But Plaintiffs do not allege that any Defendant employed any Plaintiff, or that Defendants owned or operated any of the mining sites at which Plaintiffs worked. Rather, Plaintiffs put their harm as both happening under the supervision of others—"Ahmed" and "Aza" (John Doe 13), "John" (John Doe 11), "Jean-Pi" (John Doe 10), three unnamed Lebanese men (John Doe 9), "Ismail" (John Does 6, 9, and 12 and James Doe 3), "Mr. X" (John Doe 3), three unnamed Chinese men (John Doe 4), "Chief Wali" (John Doe

6), "Guylain" (Joshua Doe 2), unnamed Presidential Guards (John Doe 7), and "Ilunga" (John Doe 9)—and as occurring on land owned by others, including Glencore (James Does 1, 2, 3, and 12, Joshua Doe 2, and John Does 1, 4, 6, 7, 8, 9, 10, and 11), Huayou Cobalt (John Does 3 and 5), and the Eurasian Resources Group (John Doe 13). None of those persons or companies is a defendant here.

Rather than alleging that Defendants are directly responsible for their harm, Plaintiffs instead argue that they "allege with specificity that Defendants are in a 'venture' with their mining companies, a venture that is jointly responsible for the injuries suffered by Plaintiffs." Pls.' Opp. to Def.'s Mot. ("Pls.' Opp."), ECF No. 38, at 42. But for the reasons discussed below, Plaintiffs do not adequately plead that Defendants were in a venture with those other companies. *See* Part V.A, *infra*. In any event, the "venture" Plaintiffs allege is really no "venture" at all: Defendants participate in what Plaintiffs themselves describe as the global "cobalt supply chain." Compl. ¶¶ 99–100. But Plaintiffs have pleaded no facts showing that every individual in the entire global supply chain—let alone one or more of the Defendants—controlled the mines or conditions that led to Plaintiffs' injuries. Instead, they fault Defendants for purchasing cobalt generally, propping up demand for the metal in the process. *See, e.g.*, Compl. ¶ 19 ("Defendants are knowingly participating in, supporting, and providing the essential market for cobalt that has caused the explosion of production by young children."); *id.* ¶ 66 (defining the class as certain children who worked "while under the age of 18 at an 'artisanal' cobalt mine in the Lualaba Province of DRC that supplied cobalt to any of the Defendants"); *id.* ¶ 100 ("Based on prior allegations, Defendants Apple, Alphabet, Dell, Microsoft, and Tesla certainly had knowledge that the cobalt they purchase from these companies is produced by global outlaws that think nothing

of selling DRC cobalt mined by seriously exploited children."); *id.* ¶ 111 ("Defendants Apple, Alphabet, Dell, Microsoft, and Tesla are all buying DRC cobalt . . . .").

The allegations here—which involve the actions of several independent third parties in the causal chain between Plaintiffs and Defendants—present an even more tenuous causal chain than in other recent cases that have been dismissed for lack of Article III standing. Take, for example, *Turaani v. Wray*, 988 F.3d 313 (6th Cir. 2021). In that case, the plaintiff, Turaani, wanted to buy a gun from a dealer. *Id.* at 315. The dealer ran his name through the federal background-check system but received a "delay" response. *Id.* That meant that the transaction could not be processed for three days. *Id.* During this time, an FBI agent visited the dealer. *Id.* He told him that he could sell the gun to Turaani, but expressed concern to the dealer about Turaani as a person. *Id.* The dealer declined to go through with the sale. *Id.*

Unhappy with the dealer's decision, Turaani filed suit against several members of the FBI. *Id.* at 315–16. But the Sixth Circuit concluded that the plaintiff's alleged injuries were not traceable to defendants' actions. *Id.* at 316–18. "Turaani's injury," the Court explained, "stems from the actions of the gun dealer, not the FBI." *Id.* at 316. That matters because "[c]ourts should not 'presume either to control or to predict' the 'unfettered choices made by independent actors not before the courts.' " *Id.* at 317 (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989)). And while it would be conceivable to make out a causal chain connecting the FBI visit to the decision not to sell the gun, it would be "the kind of attenuated causal chain that fails to meet Article III's requirements." *Id.*

Here, there is not even an allegedly direct connection between Defendants and the source of Plaintiffs' injuries. Rather, the only connection that Plaintiffs allege with specificity is that Defendants are end-purchasers of refined cobalt. *See* Compl. ¶ 19. It might be true that if Apple,

for example, stopped making products that use cobalt, it would have purchased less of the metal from Umicore, which might have purchased less from Glencore, which might have purchased less from CMKK, which might thus have instructed Ismail to stop purchasing cobalt from child artisanal miners, which might have led some of the Plaintiffs to not have been mining when their injuries occurred.  But this long "chain of contingencies, in all its rippling glory, creates mere speculation, not a traceable harm."  *Turaani*, 988 F.3d at 317 (internal quotations omitted).  That chain of contingencies is not sufficient to tie Defendants' conduct to Plaintiffs' injuries.

### C.  Plaintiffs' alternative theories of traceability fail

Plaintiffs retreat to a fallback argument.  They contend that, even if the people who oversaw them are unrelated third parties, "the traceability requirement can be satisfied even if the harm is directly caused by a third-party."  Pls.' Resp. at 43.  They point to cases from the Ninth Circuit and the Eleventh Circuit for support.  *See id.*  But those decisions do not bind this one.  And even if they did, they do little to help Plaintiffs' case.

Take the Ninth Circuit case on which Plaintiffs rely, *Doe v. Nestlé, S.A.*, 929 F.3d 623 (9th Cir. 2019).  It is not good law; the Supreme Court overturned it.  *See Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021).  And while the Supreme Court did not reverse on Article III grounds, the Ninth Circuit's traceability analysis consisted of a single sentence, stating that the plaintiffs in that case "also satisfy the traceability requirement as to [one defendant] because they raise sufficiently specific allegations regarding [that defendant's] involvement in farms that rely on child slavery." *Doe*, 929 F.3d at 625.  It provides no detailed analysis upon which this Court can draw parallels.

The Eleventh Circuit case, *Baloco ex rel. Tapia v. Drummond Company*, is closer to the mark.  640 F.3d 1338 (11th Cir. 2011).  But it, too, falls short.  In *Baloco*, a group of children plaintiffs alleged that Drummond had hired paramilitaries to assassinate their fathers in Colombia. *Id.* at 1341.  The Eleventh Circuit concluded that these allegations were sufficient to satisfy

Article III standing because "the Children allege that the defendants paid for and otherwise provided for their fathers' deaths, which more than adequately renders the Children's 'injury . . . fairly traceable to the challenged action of the defendant.'" *Id.* at 1343 (quoting *Lujan*, 504 U.S. at 560) (alterations in original). Plaintiffs here make no such allegations. Nothing in the Amended Complaint alleges (or reasonably implies) that Apple, Alphabet, Dell, Microsoft, or Tesla directly oversaw or controlled Plaintiffs, their supervisors, or employers in any way.

### D. Plaintiffs separately lack standing to seek injunctive relief

Plaintiffs also seek injunctive relief. *See* Compl. ¶ 139(h). For additional reasons, they lack standing to pursue such relief.

The D.C. Circuit "has denied standing where 'the plaintiff seeks to change the defendant[s'] behavior *only as a means* to alter the conduct of a third party, not before the court, who is the direct source of the plaintiff's injury.'" *Fulani v. Brady*, 935 F.2d 1324, 1330 (D.C. Cir. 1991) (quoting *Common Cause v. Dep't of Energy*, 702 F.2d 245, 251 (D.C. Cir. 1983)) (emphasis in original). But that is what Plaintiffs seek to do. As they readily admit, they "explicitly seek an injunction to require Defendants to stop the cobalt venture from using forced child labor."[2] Pls.' Resp. at 44. This is a request for Defendants to change the behavior of a third party not before the court.

\*   \*   \*

The injuries Plaintiffs suffered are horrifying. But it takes many analytical leaps to say that the end-purchasers of a fungible metal are responsible for the conditions in which that metal might

---

[2] Plaintiffs also seek an injunction forcing Defendants "to provide medical care and other treatment to the child miners and members of the class who have been injured mining cobalt." Pls.' Resp. at 44. But the injuries that this relief seeks to remedy are not fairly traceable to the conduct of the Defendants, as discussed above.

or might not have been mined, especially when that mining took place thousands of miles away and flowed through many independent companies before reaching Defendants. At the very least, Plaintiffs would need to allege specific facts laying out each Defendants' role in this protracted causal chain. *See Prosser v. Fed. Argic. Mortg. Corp.*, 593 F. Supp. 2d 150, 155 (D.D.C. 2009) ("There is no allegation that the defendants control or controlled [the alleged wrongdoers], and no claim or allegation that the defendants actually caused them direct injury at all."). They have not. Thus, this "protracted chain of causation fails both because of the uncertainty of several individual links and because of the number of speculative links that must hold for the chain to connect the challenged acts to the asserted particularized injury." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) (en banc). Based on the allegations in the Amended Complaint, Plaintiffs' harm is "the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.

## IV.    The Court Lacks Personal Jurisdiction over Dell

Personal jurisdiction comes in two types: general and specific. General jurisdiction allows a forum to hear any claim brought against a defendant. It exists only where a defendant's contacts are "so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). For a corporation, those contacts exist in two places: the company's state of incorporation and its principal place of business. *Id.* at 137. The Supreme Court, however, has also left open the door to finding general jurisdiction in other forums. *Id.* at 139 n.19. Yet that would be an "exceptional" case, one in which the corporation's contacts are "so substantial and of such a nature as to render the corporation at home" in that other, third jurisdiction. *Id.*

16

Specific jurisdiction, on the other hand, "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). "[T]he defendant's *suit-related* conduct must create a substantial connection with the forum State" to support specific jurisdiction. *Id.* (emphasis added). Mere assertions of a general connection with the forum are not enough. *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1781 (2017).

Dell argues that the Court lacks personal jurisdiction over it. *See generally* Dell's Mot. But despite it being "the centerpiece of modern jurisdiction theory," *Goodyear*, 564 U.S. at 925, Plaintiffs do not allege specific personal jurisdiction over Dell. *See* Plaintiffs' Opposition to Dell's Motion to Dismiss ("Pl.s' Dell Resp."), ECF No. 39, at 2. Instead, they contend that "Dell is subject to *general personal jurisdiction* in the District of Col[u]mbia." *Id.* (emphasis added; capitalization modified). The Court disagrees.

This position faces an immediate uphill battle. As discussed, a corporation is typically subject to general jurisdiction in just two places: its place of incorporation and the location of its principal place of business. *Daimler*, 571 U.S. 137. But as Plaintiffs allege, Dell is headquartered in Texas, Compl. ¶ 79, and Plaintiffs do not contest that Dell is incorporated in Delaware. *See* Pls.' Dell Resp. at 6. The traditional, non-"exceptional" bases of general personal jurisdiction thus do not apply.

That leaves Plaintiffs having to argue that this is an "exceptional" case in which Dell's contacts are "so substantial and of such a nature as to render the corporation at home" in the District of Columbia. *Daimler*, 571 U.S. at 139 n.19. But they neither allege nor claim any such "exceptional" circumstances. The Amended Complaint merely asserts that "Dell does substantial and continuous business in the District of Columbia," Compl. ¶ 79—nothing more. And Plaintiffs'

response to Dell's motion to dismiss is similarly sparse, claiming only that "the clear inference from Plaintiffs' allegation of Dell doing substantial business in the District of Columbia is that Dell sells and ships a tremendous number of computers and other equipment to the District of Columbia." Pls.' Dell Resp. at 3. But selling many devices in this nation's capital is not so exceptional. Big businesses undoubtedly sell many goods to many states and territories. Yet no one would suggest that, without more, those companies are subject to general personal jurisdiction in each location. "A corporation that operates in many places can scarcely be deemed at home in all of them." *Daimler AG*, 571 U.S. at 139 n.20.

Backing away from this argument, Plaintiffs argue that Dell has brought some lawsuits in the District of Columbia and is subject to a consent decree in a D.C. court. Pls.' Dell Resp. at 4–5. This might very well be true. But it does nothing to inform the Court whether Dell is subject to general personal jurisdiction in the District of Columbia. There are many other reasons why it might have had to litigate in this forum or chose to do so—perhaps because it was subject to *specific* jurisdiction, for example.

Finally, Plaintiffs cite to the Supreme Court case of *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985). They quote much from this opinion, emphasizing how Dell is "transacting substantial business" in D.C. Pls.' Dell Resp. at 2–3. But that case discusses *specific*—not *general*—personal jurisdiction. *See Burger King,* 471 U.S. at 472–73 & n.15; *see also Daimler AG*, 571 U.S. at 139 n.20 (describing *Burger King* as applying when "*specific* jurisdiction is at issue" (emphasis in original)). And again, Plaintiffs do not argue that specific jurisdiction applies here.

In a final effort to save their claims against Dell, Plaintiffs request jurisdictional discovery. *See* Pls.' Dell Resp. at 7. They seek discovery as to Dell's total sales in the District, its contracts

with distributors and retailers, and its contracts with other major purchasers, among other things. *Id.* With this, they claim, they can show that Dell is essentially "at home" in this forum. *Id.*

While the standard for permitting jurisdictional discovery "is quite liberal," *Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003), it is not unlimited. Here, the Court cannot "see what facts additional discovery could produce that would affect [its] jurisdictional analysis." *Mwani v. bin Laden*, 417 F.3d 1, 17 (D.C. Cir. 2005) (quoting *Goodman Holdings v. Rafidain Bank*, 26 F.3d 1143, 1147 (D.C. Cir. 1994)). "At best, the additional discovery sought by Plaintiff[s] would demonstrate that Defendants engage in a 'substantial, continuous, and systematic course of business' in the District of Columbia, which is explicitly insufficient under *Daimler* to establish general jurisdiction." *Freedman v. Suntrust Banks, Inc.*, 139 F. Supp. 3d 271, 281 (D.D.C. 2015) (quoting *Daimler*, 571 U.S. at 137–38). Indeed, *Daimler* found such a theory of general personal jurisdiction "unacceptably grasping." *Daimler*, 571 U.S. at 138.

## V.     Plaintiffs Have Not Adequately Alleged
## a Violation of the TVPRA

Even if the Court had jurisdiction over this dispute, and even if the Court had jurisdiction over Dell, Plaintiffs have failed to state a claim for relief.

Plaintiffs bring their primary claims for relief under 18 U.S.C. § 1595, which is part of the Trafficking Victims Protection Reauthorization Act, or TVPRA. 18 U.S.C. § 1581, et seq. The TVPRA is a group of criminal statutes, all focusing, as the name suggests, on human trafficking and similar heinous crimes. Section 1595 is the Act's civil analogue. It allows for victims of certain TVPRA crimes to maintain civil actions against certain violators in certain situations. Here, Plaintiffs use § 1595 to bring a civil suit for violations of two of those criminal TVPRA

violations: § 1589 (titled "Forced labor") and § 1590 (titled "Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor").

Plaintiffs thus seek to recover under § 1595 for violations of § 1589 and § 1590. Compl. ¶¶ 87–123. Under the text of § 1595 (and as relevant here), that requires them to allege: that Defendants (1) "knowingly benefit[ed]" (2) from "participation in a venture" (3) that violated § 1589 or § 1590, and (4) that they knew or should have known that the "venture" committed such a violation. 18 U.S.C. §§ 1589, 1590, 1595(a).

### A. Plaintiffs have not adequately alleged that Defendants "participated in a venture" under § 1595

Plaintiffs assert that "[t]he cobalt supply chain to Defendants Apple, Alphabet, Dell, Microsoft, and Tesla, is a 'venture' that exists for the purpose of maintaining a steady supply of cheap cobalt that is mined by children and poverty-stricken adults." Compl. ¶ 99. This claim runs into an immediate problem: a "global supply chain" is not a venture.[3]

Section 1595 does not define "venture." Accordingly, the Court must give that term its ordinary meaning, as suggested by the context of the surrounding statutory text. *See HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Assoc.*, 141 S. Ct. 2172, 2176 (2021). American dictionaries contemporary to the statute's enactment used "venture" in one of two ways: to refer to "an undertaking involving chance, risk or danger, . . . *esp*[*ecially*]: a business enterprise of speculative nature," or "something at hazard in a speculative venture." *Venture*, Webster's New

---

[3] Plaintiffs also contend that "Defendants had a tacit agreement that the cobalt supply chain would include cheap cobalt mined by forced child labor," and that the "Defendants then protected this tacit agreement by covering it up, enacting sham programs to mislead the public, and failing to implement known policies that would protect against abusing children." Pls.' Resp. at 17. But much like a bare assertion of a conspiracy existing is insufficient for pleading a violation of the Sherman Antitrust Act, *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007), claiming a tacit agreement, without more, will not suffice to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement," *id.* at 556.

Int'l Dictionary, Unabridged 2542 (3d ed. 2002). While the word could also refer to "fortune," "peril," "jeopardy," or the like, by this time those definitions were already considered "obs[olete]." *Id.* Of these definitions, only the first makes sense in the context of § 1595, which refers to "participation in a venture." 18 U.S.C. § 1595(a). That definition matches up with the accepted legal definition at the time, too. *See Venture*, Black's Law Dictionary 4826 (8th ed. 2004) ("An undertaking that involves risk; esp., a speculative commercial enterprise."). The string tying the two together is the idea of a commercial enterprise.

Plaintiffs fail to allege that Defendants are involved in a commercial enterprise encompassing the entirety of the cobalt industry. True, Plaintiffs allege that Glencore and Umicore are "partner[s] in supplying Defendants . . . with DRC cobalt." Compl. ¶ 103. They further allege that "Umicore and Glencore formally agreed to form a venture in which Glencoe would provide Umicore with DRC cobalt . . . and Umicore would whitewash this blood-stained cobalt and sell it to[,] among others, Defendants Apple, Alphabet, and Microsoft, as well as LG Chem (which supplies Defendants Dell and Tesla)." *Id.* But that merely implicates Glencore and Umicore in some cobalt-gathering venture. It does not tie in the Defendants in this litigation. The closest the Plaintiffs get to doing so is in asserting that "[a]ll of these companies were formally locked in a 'venture' that was established to mine cobalt under horrific conditions using young children to perform hazardous labor." *Id.*; *see also id.* ¶¶ 104–08. But whether Defendants are in a venture is a legal conclusion that the Court need not accept as true, even at the motion to dismiss stage. *Iqbal*, 556 U.S. at 678–79 ("Threadbare recitals of the elements of a cause of action, supported by

mere conclusory statements, do not suffice."). Rather, Plaintiffs must plead facts that plausibly

suggest such an arrangement existed. *See id.* Because they have not, this claim fails.[4]

### B.    Plaintiffs have not adequately alleged
### a violation of § 1589

The first violation of the TVPRA that Plaintiffs allege is of § 1589, titled "Forced labor."

It forbids what the title suggests:

> Whoever knowingly provides or obtains the labor or services of a person by
> any one of, or by any combination of, the following means—
> . . .
>> **(2)**  by means of serious harm or threats of serious harm to that person
>> or another person; or
> . . .
>> **(4)**  by means of any scheme, plan, or pattern intended to cause the
>> person to believe that, if that person did not perform such labor or
>> services, that person or another person would suffer serious harm or
>> physical restraint,
>
> shall be punished as provided under subsection (d).

18 U.S.C. § 1589. (Plaintiffs allege only violations of subsections (2) and (4). *See* Pls.' Resp. at

21 n.11.) "Serious harm" is in turn a defined term, covering "any harm, whether physical or

nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious,

under all the surrounding circumstances, to compel a reasonable person of the same background

---

[4] The closest Plaintiffs get to alleging a "venture" is with regards to Tesla. Tesla, they claim, "finalized an agreement with Glencore to obtain ownership of or exclusive rights to a major portion of its cobalt production in the DRC." Compl. ¶ 30. This is closer to the mark—it at least alleges some form of business relationship. But it still falls short. The Amended Complaint provides no details about this business arrangement besides that it exists. It does not allege that Tesla had any control over the mining practices of Glencore or its subsidiaries, or that it ran any of the mines at issue itself. Indeed, the pleadings make clear that Tesla joined this arrangement *after* this lawsuit was filed, and thus *after* Plaintiffs suffered their injuries. *See, e.g.*, Compl ¶ 58 (agreement finalized June 16, 2020). Without more, the Court cannot conclude that Plaintiffs adequately allege that Tesla was in a venture with Glencore, as opposed to being a mere large-scale purchaser of cobalt. (Indeed, Plaintiffs admit that they need "discovery of this arrangement to determine the details and how this likely effects Tesla's direct liability." *Id.*)

and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2).

Plaintiffs have failed to plead facts suggesting a violation of either § 1589(a)(2) or § 1589(a)(4).

### 1. Plaintiffs have not alleged that they were coerced into working "by means of serious harm or threats of serious harm"

No Plaintiff alleges that he (or his or her family member) was forced to work by means of serious harm or threats of serious harm. Rather, each alleges a decision to engage in cobalt mining because of economic necessity. In particular, the Amended Complaint alleges that Plaintiffs were "boys who [were] forced to drop out of school because they [could not] pay the school fees and who in turn [were] forced to work in cobalt mining or some other mining sector because there are no other ways to earn money in that area." Compl. ¶ 29. The Amended Complaint contains a similar allegation for nearly every Plaintiff. *See id.* ¶¶ 30 (Jane Doe 1 and James Doe 1), 32 (John Doe 1), 34 (John Doe 2 and James Doe 2), 37 (Jenna Roe 3 and John Doe 3), 38–39 (James Doe 4 and John Doe 4), 40 (John Doe 5), 41 (Jenna Doe 6 and John Doe 6), 44 (Jane Doe 2 and Joshua Doe 2), 45 (Jenna Doe 7 and John Doe 7), 47–48 (Jenna Doe 8 and John Doe 8), 49 (John Doe 9), 53 (Jenna Doe 10 and John Doe 10), 55–56 (Jenna Doe 11 and John Doe 11), 58 (Jane Doe 3 and James Doe 3), 61–62 (John Doe 12 and James Doe 12), 64 (John Doe 13).[5]

---

[5] To be sure, some Plaintiffs do allege some form of coercion at certain points in the mining process. *See, e.g.*, Compl. ¶¶ 36 (John Doe 2 and James Doe 2, from Ismail), 37 (Jenna Roe 3 and John Doe 3, from Mr. X), 42 (Jenna Doe 6 and John Doe 6, from Ismail and Chief Wali), 44 (Jane Doe 2 and Joshua Doe 2, from Guylain and Ismail), 46 (Jenna Doe 7 and John Doe 7, from a group of unnamed Presidential Guards), 50 (John Doe 9, from Ilunga and Ismail), 54 (Jenna Doe 10 and John Doe 10, from Jean-Pi), 59 (Jane Doe 3 and James Doe 3, from Ismail), 62 (John Doe 12 and James Doe 12, from Ismail). Even then, however, it is unlikely that these allegations are sufficient. Take, for example, the situation of John Doe 10. John Doe 10 worked at a mine after school each day. *Id.* ¶ 53. As the Amended Complaint alleges, "John Doe 10 feared that if he did not follow Jean-Pi's directions, he would lose his income and he and his family would starve." *Id.* at 54. While John Doe 10 evinced some fear of Jean-Pi, the allegations do not

To avoid this shortcoming, Plaintiffs turn to alternative theories on why they were forced to work in the cobalt mines. But these, too, are not enough.

First, the Amended Complaint advances the theory that, because all Plaintiffs were minors when they were injured, they could not legally consent to work, and thus were victims of forced labor. Compl. ¶ 90 ("In other words, the 'coercion' required of 'forced labor' is inherently present when young children are put to work under extremely hazardous conditions."). But that is not part of the definition of "forced labor" in § 1589. No doubt, child labor is abhorrent. Yet the mere fact that children performed the labor does not mean that the Defendants or their agents "knowingly . . . obtain[ed] the labor . . . by means of serious harm or threats of serious harm." 18 U.S.C. § 1589(a)(2).

Second, Plaintiffs contend that "no one, especially a child, would perform dangerous work for starvation wages unless he had no other alternative." Pls.' Resp. at 29. But again, this argument does not satisfy § 1589(a)(2). Section 1589(a)(2) does not criminalize the hiring of people desperate for money; it criminalizes physical coercion in the act of *soliciting* the work itself. Plaintiffs plead no facts suggesting that they were physically forced to seek to work in the mines. *See generally* Compl. ¶¶ 29–64

## 2. Plaintiffs have not alleged that they were coerced into working by a threat of serious harm or injury

Whereas subsection (a)(2) focuses on actual harm, (a)(4) covers threats of actual harm, criminalizing obtaining labor "by means of any scheme, plan, or pattern intended to cause the

---

suggest that Jean-Pi himself "obtained the labor" of John Doe 10 through use of or threat of force. Instead, John Doe 10 worked "so that he could help feed his family." *Id.* At least according to the Amended Complaint, Jean-Pi did not create that exigency or stoke it in any way. Thus, § 1589(a)(2) is inapplicable. And even if the pleadings were sufficient to show a violation of § 1589(a)(2) by any of these DRC-based parties, Plaintiffs fail to adequately plead that Defendants had any control over these overseeing individuals.

person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint." 18 U.S.C. § 1589(a)(4).

Plaintiffs rely on this subsection by drawing parallels to their economic situations and the definition of "serious harm." Specifically, they "allege that their extreme vulnerability as desperate children lacking education and any other options to avoid starvation subjected them to a 'scheme' under section 1589(a)(4) that caused them to fear 'serious harm' if they stopped working." Pls.' Resp. at 25. Starvation likely qualifies as a serious harm under the statutory definition, but that misses the thrust of § 1589(a)(4). Plaintiffs must allege that Defendants acted in a way that was intended to cause Plaintiffs to fear starvation, and subsequently used that fear to obtain Plaintiffs' labor. 18 U.S.C. § 1589(a)(4). But the Amended Complaint contains no such allegation.[6]

*     *     *

The Amended Complaint alleges that extreme poverty and the threat of starvation made Plaintiffs desperate for a job. But taking work out of that desperation is not the same as being coerced through actual harm or threats of harm. The statute punishes bad actors who enslave or force the labor of others through threats, harm, or intimidation, but the Amended Complaint does not allege such conduct here.

---

[6] Plaintiffs' failure to plead a violation of § 1589(a)(4) is perhaps best illustrated by looking at a successful § 1589(a)(4) claim. In *Arreguin v. Sanchez*, for example, "Plaintiffs allege[d] that [the defendant, who recruited alien workers from Mexico to bale pine straw in Georgia] charged them substantial recruitment fees knowing that they would have to keep working for him to try to pay off the loans, took them to the United States, threatened them with deportation and the inability to return to the United States . . . and subjected Plaintiffs to deplorable housing, little food, and cold temperatures." 398 F. Supp. 3d 1314, 1325 (S.D. Ga. 2019). "In these circumstances," the court explained, "Defendant's threats of deportation . . . were used to coerce Plaintiffs into continuing to work for him, despite their terrible working and living conditions." *Id.* In this case, Plaintiffs allege no such similar threats or coercion in this case, let alone from any Defendant.

## C. Plaintiffs have not adequately alleged a violation of § 1590

Plaintiffs' second basis for liability is § 1590.  As applied here, that provision extends § 1589's liability to any person who "knowingly recruits, harbors, transports, provides, or obtains by any means" any person in violation of § 1589.  18 U.S.C. § 1590.  But since Plaintiffs have failed to adequately allege a violation of § 1589, their § 1590 claim must fail, too.  And even looking past that threshold failure, the allegation that Defendants "knowingly recruit[ed], harbor[ed], transport[ed], provide[d], or obtain[ed] by any means" any Plaintiffs is conclusory.  The Amended Complaint alleges only that "[a]ll or virtually all of the Plaintiffs were recruited, provided, harbored or obtained to work at cobalt sites by an agent or employee of the cobalt supply chain venture."  Compl. ¶ 121.  That is precisely the type of "[t]hreadbare recital[ ] of [an] element[ ] of a cause of action, supported by mere conclusory statements," that the Supreme Court has found insufficient to defeat a motion to dismiss.  *Iqbal*, 556 U.S. at 678.

## VI. Section 1595 of the TVPRA Does Not Apply Extraterritorially

The foregoing assumes that § 1595 of the TVPRA even applies in this case, which involves allegations of conduct and harm in the DRC.  But not every statute applies extraterritorially.  Indeed, courts "presume that a statute applies only domestically."  *Nestlé USA*, 141 S. Ct. at 1936.  This presumption can be rebutted only if the statute "gives a clear, affirmative indication" that it covers foreign conduct.  *Id.* (quoting *RJR Nabisco, Inc. v. Eur. Cmty.*, 136 S. Ct. 2090, 2101 (2016)).  "When a statute gives no clear indication of an extraterritorial application, it has none."  *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010).

That appears to be the case here.  Begin with the text.  As relevant here, § 1595 provides:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that

> person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees."

18 U.S.C. § 1595(a).  On its face, the statute says nothing about extraterritorial application.  Thus, standing alone, it does nothing to rebut the presumption that it applies only domestically.  *Nestlé USA*, 141 S. Ct. at 1936.[7]

Plaintiffs respond by pointing to § 1596(a).  Sure enough, that section provides that "the courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591" under certain circumstances.  18 U.S.C. § 1596(a).  Because Plaintiffs seek civil relief through § 1595 for violations of § 1589 and § 1590, they argue, § 1596(a) allows for extraterritorial application.  *See* Pls.' Resp. at 33–35.

At first glance, this is a compelling argument.  But closer scrutiny reveals potential flaws.

First, while § 1596 explicitly grants extraterritorial application to many criminal statutes, it does not mention their civil analogue, § 1595.  Congress could have easily included § 1595 in § 1596, but it did not.  (Indeed, in that very same Act, Congress amended the text of § 1595 itself.  *Compare* Pub. L. 110–457, title II, §221(2), Dec. 23, 2008 *with* Pub. L. 110–457, title II, §223(a), Dec. 23, 2008.)  And "when a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms."  *Morrison*, 561 U.S. at 265.

---

[7] The text of the underlying statutes that the Plaintiffs allege the Defendants violated—and thus support the cause of action under § 1595—are likewise silent about extraterritorial application.  *See* 18 U.S.C. §§ 1589, 1590.

Moreover, the text and structure of § 1596 suggest that it was focused on criminal, not civil, applications. After all, the title of § 1596 is "Additional jurisdiction in certain trafficking *offenses*." 18 U.S.C. § 1596 (emphasis added). It extends "extra-territorial jurisdiction over any *offense* (or any attempt or conspiracy to commit *an offense*)" to the above-mentioned sections of the TVPRA, all criminal provisions. *Id.* § 1596(a) (emphases added). "The word 'offense' is most commonly used to refer to crimes." *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 658 (2015). True, the term "is sometimes used more broadly"—a 1948 dictionary, for example, suggested that all crimes are offenses, but that not all offenses are crimes. *Id.* at 659. "But while the term 'offense' is sometimes used in this way, that is not how the word is used in Title 18." *Id.*; *see also id.* ("Although the term appears hundreds of times in Title 18, neither respondent nor the Solicitor General, appearing as an *amicus* in support of respondent, has been able to find a single provision of that title in which 'offense' is employed to denote a civil violation."). Title 18 uses the word in its criminal capacity. This is in line with the legal definition at the time of § 1596's enactment. *See Offense*, Black's Law Dictionary 3425 (8th ed. 2004) ("A violation of the law; a crime, often a minor one. See CRIME.").

The rest of § 1596 confirms this criminal focus. Section 1596(b) is entitled "Limitations on *Prosecutions of Offenses Prosecuted* in Other Countries." 18 U.S.C. § 1596(b) (emphasis added). That subsection, which limits the jurisdiction granted in § 1596(a), provides that "[n]o *prosecution* may be commenced against a person under this section if a foreign government, in accordance with jurisdiction recognized by the United States, has *prosecuted* or *is prosecuting*

such person for the conduct constituting such *offense* . . . ." *Id.* (emphases added). It makes no mention of civil suits.[8]

It thus seems likely that when in § 1596(a) Congress granted extraterritorial jurisdiction over "any *offense* (or any *attempt or conspiracy to commit an offence*) under section 1581, 1583, 1584, 1589, 1590, or 1591," its omission of § 1595 was not mistaken, but was an intentional decision not to extend extraterritorially the reach of the statute's civil component. It is not for this Court to question that decision; especially as grants of extraterritorial jurisdiction are fraught with international-relations considerations, ones far outside the judicial role. *See RJR Nabisco*, 136 S. Ct. at 2100.

The question then becomes whether this is a case seeking to hold Defendants responsible for overseas conduct. "[I]f the conduct relevant to the focus [of the statute] occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory." *Id.* at 2101. Defendants argue that the "focus" of the TVPRA is where the TVPRA violations occurred. Defs.' Mot. at 36. Plaintiffs respond that the text of § 1595 is focused on where the benefits of the alleged violation accrued. Pls.' Resp. at 34–35.

Both parties get it right—to an extent. Defendants are right that the focus of the TVPRA will naturally fall where the violation occurred. It would be odd to say that the "focus" of a statute

---

[8] To support their contrary reading, Plaintiffs cite to the Fifth Circuit case of *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184 (5th Cir. 2017). Plaintiffs are right that this case states that "Congress amended the TVPRA to provide a civil remedy for extraterritorial violations because it had concluded that none previously existed." *Id.* at 202; *see* Pls.' Resp. at 33–34. (Although this quote is misleading; Plaintiffs omit the first part of the sentence, "It is equally plausible to infer based on timing alone that . . . .") But the parties there "d[id] not dispute that the [creation of § 1596] enable[d] federal courts to entertain a private party's civil suit that alleges extraterritorial violations of the TVPRA." *Adhikari*, 845 F.3d at 200. Accordingly, the issue was never before that court.

is unrelated to the violation it seeks to remedy. And Plaintiffs are correct that § 1595 focuses on benefits that accrue to the parties.

But Plaintiffs' focus is too narrow. Section 1595 provides a civil remedy to "a victim of a violation" of the TVPRA—it does not create a new violation merely for benefitting from other violations. 18 U.S.C. § 1595(a). Indeed, the language that Plaintiffs quote—that "[t]he focus of the TVPRA's statutory prohibition on 'benefitting [stet], financially or by receiving anything of value' is on benefitting, not on the other conduct," Pls.' Resp. at 35—is misleading. The quoted language merely identifies *who* can be sued: "the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in [certain] venture[s] . . . .)." 18 U.S.C. § 1595(a). It ignores *why* they can be sued: either for being a "perpetrator" or for "engag[ing] in an act in violation of this chapter." *Id.*

Plaintiffs do not (and cannot) contest that their injuries, along with the underlying TVPRA violations that they allege, occurred anywhere other than in the DRC. Thus, seeking to hold Defendants liable for the TVPRA violations would amount to an extraterritorial application of § 1595. Because Congress did not authorize that, their claims must fail.

\* \* \*

This question of extraterritoriality is a close call. But when Congress wanted the TVPRA to apply extraterritorially, it knew how to do so. It provided clear language in § 1596, allowing for extraterritorial applications of several criminal statutes: § 1581, § 1583, §1584, § 1589, § 1590, and § 1591. 18 U.S.C. § 1596(a). Absent from this list is any mention of § 1595, nor any language suggesting a civil—as opposed to criminal—application of that section. *See id.* "When a statute gives no clear indication of an extraterritorial application, it has none." *Morrison*, 561 U.S. at 255. Such is the case with § 1595.

## VII.  Plaintiffs Fail to Adequately Allege Any
## Common-Law Violations

Invoking this Court's supplemental jurisdiction, Compl. ¶ 24, as well as diversity jurisdiction, *id.* ¶ 25, Plaintiffs also bring a host of common-law claims against Defendants: unjust enrichment, *id.* ¶¶ 124–26, negligent supervision, *id.* ¶¶ 127–32, and intentional infliction of emotional distress, *id.* ¶¶ 133–37.  Yet Plaintiffs fail to allege what law governs these generic claims.  *See id.* ¶¶ 124–37.  Even then, each fails for various reasons.

As mentioned, Plaintiffs failed to identify what state law governs their claims.  But they have agreed with Defendants that, at this stage in the proceedings, the claims can be evaluated based on general tort principles.  Pls.' Resp. at 37 n.27.  Since all the possible states whose law could apply approach these torts in similar ways, *see id.*, the Court will accept the parties' invitation.

To state a claim for unjust enrichment, Plaintiffs must allege that they conferred a benefit on Defendants, that Defendants retained that benefit, and that allowing Defendants to retain that benefit would be unjust.  *Aston v. Johnson & Johnson*, 248 F. Supp. 3d 43, 56 (D.D.C. 2017); *New World Comm'cns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005).  But as discussed above, the Amended Complaint fails to adequately allege that the Defendants had *any* relationship with Plaintiffs.  By mining the cobalt that Defendants might (or might not) have later used, Plaintiffs have as much conferred a benefit upon the Defendants as they have anyone with an iPhone in their pocket.  An unjust enrichment claim cannot survive such a tangential chain.  *See, e.g.*, *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 685 (9th Cir. 2009) (applying California law) ("[A] party generally may not seek to disgorge another's profits unless a prior relationship between the parties subject to and benefitting from disgorgement originally resulted in unjust enrichment.").

The negligent-supervision claim fails for similar reasons. To show a claim for negligent supervision, "a plaintiff must show: that the employer 'knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with actual or constructive knowledge, failed to adequately supervise the employee.' " *Phelan v. City of Mt. Rainier*, 805 A.2d 930, 937–38 (D.C. 2002) (quoting *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985)).[9] But again, no Defendant employed any Plaintiff, nor any of the people who oversaw them. A defendant cannot negligently fail to supervise someone it has no legal obligation to supervise. *See Doe I*, 572 F.3d at 684 (rejecting plaintiffs' claim of "negligent retention of control and supervision" under California law because "Wal-Mart is not Plaintiffs' employer because Wal-Mart exercised minimal or no control over the day-to-day work of Plaintiffs in the suppliers' foreign factories").

The claim for intentional infliction of emotional distress fails for identical reasons. That tort has three prongs: "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Purcell v. Thomas*, 928 A.2d 699, 711 (D.C. 2007) (quoting *Howard Univ. v. Best*, 484 A.2d 958, 985 (D.C. 1984)). But there is nothing "extreme and outrageous" about Defendants' conduct: purchasing a commodity from a supplier. As much as Plaintiffs claim that "Defendants were not merely 'purchasing goods,' but rather they were participants in a cobalt 'venture' " that engaged in tortious conduct, Pls.' Resp. at 41, the Court notes again that Plaintiffs have failed to plead any

---

[9] Citing to *Phelan*, Plaintiffs state that the first element of a negligent supervision claim is that "Defendants knew or should have known that their co-venturers had used or were using the forced labor of child miners." Pls.' Resp. at 39. That is not what *Phelan* says. Rather, *Phelan* focuses on an *employer* overseeing the actions of its *employee*. *See Phelan*, 805 A.2d at 937–38. The Plaintiffs do not allege facts showing that they (or their overseers) were employees of the Defendants.

nonconclusory facts showing that this was the case. The extreme and outrageous conduct must be keyed to Defendants. It is not here.

## VIII. Conclusion

Plaintiffs suffered terrible injuries in the DRC. But they fail to plead sufficient facts for their case to go forward against these Defendants in this forum. For the reasons stated above, the Court thus grants Dell's Motion to Dismiss for Lack of Jurisdiction, ECF No. 32, grants the Defendants' Joint Motion to Dismiss, ECF No. 33, and denies Defendant Alphabet, Inc.'s, Motion to Dismiss, ECF No. 34, as moot.

An Order will be entered contemporaneously with this opinion.

DATE: November 2, 2021

CARL J. NICHOLS
United States District Judge